UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 FEB 24 A 11: 36

| | | |
|---|---|---|
| TODD BENNETT | : | CIVIL ACTION NO. |
| | : | 3:03CV0080 (AVC) |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| ACCENTURE, LLP | : | |
| | : | |
| Defendant. | : | February 23, 2004 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendant, Accenture LLP ("Accenture" or the "Company"), hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment on all of Plaintiff Todd Bennett's ("Plaintiff" or "Mr. Bennett") claims.

The crux of Mr. Bennett's frivolous Complaint is that Accenture violated Section 46a-60(a)(1) of the Connecticut General Statutes because it did not reassign him to a limited part-time position within the Company when he returned after a four year disability leave. In fact, the record reflects that, upon his return, Accenture conducted an extensive search to find a position for which Mr. Bennett was qualified. Due to the Company's economic situation in 2001, and Mr. Bennett's outdated skills, Accenture could not find a position suitable for him, despite its good faith attempts to do so. In short, Mr. Bennett's proposed accommodation --reinstatement-- was unreasonable because in 2001, Accenture did not have a vacant position available for which he was qualified. Further, he cannot prove that any accommodation existed which would have allowed him to perform the essential functions of the consultant or analyst job. In sum, Accenture satisfied its duty when it made good faith efforts to accommodate Mr. Bennett's

BO1 15624509.1                                **ORAL ARGUMENT REQUESTED**

unreasonable requests for accommodation and, therefore, the Court must grant its Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   PLAINTIFF'S EMPLOYMENT WITH ACCENTURE

Accenture is a global management and technology consulting firm. *See* Affidavit of Toni L. Corban, hereinafter "Corban Aff.," filed simultaneously herewith at ¶ 5. Its primary mission is to help clients become more successful in their own businesses and operations. Corban Aff. at ¶ 6. The Company serves the major global industries through its five Market Units (Resources, Communications and High Technologies, Financial Services, Products and Government) and a number of Global Service Lines. Corban Aff. at ¶ 7.

Mr. Bennett began his employment as an analyst in Accenture's Connecticut office, located in Hartford, on August 17, 1992. See Deposition of Todd Bennett dated August 29, 2003, hereinafter "Bennett Dep.," attached as Exhibit A to Affidavit of Lynn A. Kappelman filed simultaneously herewith, at pages 48-49.[1] He was 22 years old at the time. Bennett Dep. at 21. Soon thereafter he became a staff consultant. Bennett Dep. at 45-50. As a staff consultant, Mr. Bennett primarily was responsible for solving the business problems of his Accenture clients by directing them to the most effective technologies to meet their business needs. Bennett Dep. at 49-50; Corban Aff. at ¶ 11. Specifically, Mr. Bennett worked with clients at their own facilities to maintain and solve problems with their computer systems. Bennett Dep. at 45-46; Corban Aff. at ¶ 12. On average, he would work seventy to eighty hours a week in this position. Bennett Dep. at 50-52. It was fairly common to put in long hours as an analyst or a consultant at Accenture. Bennett Dep. at 61-63; Corban Aff. at ¶ 13. Mr. Bennett performed reasonably well,

---

[1] Prior to August 2002, Accenture's Hartford office was the Company's only location in Connecticut. Corban Aff. at ¶ 9.

2

and the Company promoted him once and granted him annual salary increases. Bennett Dep. at 58-62; Corban Aff. at ¶ 14.

## II.  PLAINTIFF BEGINS HIS DISABILITY LEAVES.

In or about December 1996, Mr. Bennett took several intermittent sick leaves claiming fatigue and weakness. Bennett Dep. at 64-68; Corban Aff. at ¶ 15. Mr. Bennett applied for a short-term disability leave on February 14, 1997, and began that leave on April 7, 1997. *See* Application For Family and/or Personal Medical Leave of Absence attached to the Corban Aff. as Exhibit A; Bennett Dep. at 74, 79-81. According to correspondence from Mr. Bennett's physician, Dr. Robban Sica, Mr. Bennett suffered from hypothyroidism and candida enteritis, which caused him fatigue, weakness, chronic sinusitis and multiple allergies. *See* letter from Dr. Robban Sica, dated May 23, 1997, attached to the Corban Aff. as Exhibit B; *see also* Bennett Dep. at 74-76. By letter, Dr. Sica stated that he expected Mr. Bennett to recover within two to three months. *See* Exhibit B attached to Corban Aff. Thereafter, Mr. Bennett submitted a long-term disability leave application to Accenture's insurance carrier on June 17, 1997. Corban Aff. at ¶ 19. Accenture's long-term disability insurance carrier approved Mr. Bennett's application and he began long-term disability leave on July 7, 1997. Bennett Dep. at 86; *see* letter from Daniel Dolyak, dated August 30, 1997, attached to the Corban Aff. as Exhibit C.

In 1997, Dr. Zampierson diagnosed Mr. Bennett with "copper toxicity." Bennett Dep. at 81-83. Mr. Bennett surmises that he developed this condition from the well water in East Granby, Connecticut where he grew up. Bennett Dep. at 84-85. No other members of his family, and none of his neighbors, have had any similar problems with copper toxicity. Bennett Dep. at 84-86.

Mr. Bennett received Long-Term Disability benefits from July 6, 1997 until April 7, 2002. Bennett Dep. at 89; Corban Aff. at ¶ 21. During this four and a half year period, Mr.

3

Bennett would spend his time during the day at two gyms in Unionville, Connecticut and Windsor, Connecticut, where he used the sauna, shower and whirlpool to "ramp up his excretions of copper." Bennett Dep. at 91-93.

### III. ACCENTURE UNDERWENT SUBSTANTIAL STRUCTURAL CHANGES DURING PLAINTIFF'S LEAVES OF ABSENCE.

During Mr. Bennett's medical leave from 1997 to 2001, Accenture made several organizational changes. Bennett Dep. at 95-98; Corban Aff. at ¶ 22. The largest change occurred in the Spring of 2000 when Accenture deployed its practice personnel, including consultants, into various Market Units based on industry. Corban Aff. at ¶ 23. Because Mr. Bennett did not focus on a particular industry at the time he began his disability leave, Accenture could not yet assign him to a Market Unit. Corban Aff. at ¶ 24. Mr. Bennett, however, remained assigned to the Hartford office. Corban Aff. at ¶ 25.

### IV. PLAINTIFF'S PHYSICIAN RELEASED HIM TO RETURN TO WORK WITH CERTAIN RESTRICTIONS.

On January 31, 2001, Mr. Bennett, now 27 years old, called Michele Holt, an EEO Officer in the Hartford office, and informed her that his physician had released him to return to work on a modified schedule. Bennett Dep. at 89-90, 112-113; *see also* Affidavit of Michele Holt, hereinafter "Holt Aff.," filed simultaneously herewith at ¶ 7. In response, Ms. Holt explained to Mr. Bennett that she would initiate the appropriate reinstatement procedures and call him back. Bennett Dep. at 113; Holt Aff. at ¶ 8. Shortly thereafter, Ms. Holt called Mr. Bennett and asked him to provide documentation to Accenture from his physician concerning Mr. Bennett's ability to return to work. Bennett Dep. at 113; Holt Aff. at ¶ 9. Mr. Bennett requested that Accenture ask his physician directly for the documentation. Holt Aff. at ¶ 10.

On February 28, 2001, Paula Miller, Hartford Benefits Contact, sent a request to Mr. Bennett's physician, Dr. Jerrold Kaplan, asking for Mr. Bennett's return to work date,

restrictions on his work, and the duration of his restrictions. Holt Aff. at ¶ 11; *see also* fax from Paula Miller, dated February 28, 2001, attached to the Holt Aff. as Exhibit A. Dr. Kaplan sent a letter on March 5, 2001 to Ms. Miller, stating that Mr. Bennett could begin working on March 12, 2001 on a limited basis. *See* letter from Dr. Jerrod Kaplan, dated March 5, 2001, attached to the Holt Aff. as Exhibit B. Specifically, Dr. Kaplan outlined Mr. Bennett's restrictions, stating in relevant part:

> [Mr. Bennett] can work three hours per day, three days per week for the first two weeks and then increase to four hours per day, three days per week for the next two weeks. He should continue at that level until he is re-evaluated at Gaylord Hospital. In order to make his transition the most successful, I would suggest that his three hours per day be done for a 9 a.m. to 12 noon shift, Monday, Wednesday, and Friday. When the extra hour is added in two weeks, I would suggest that it be done also on a Monday, Wednesday, Friday schedule. . . . He should be assigned just to his home office and not be sent to other locations until he is reassessed at Gaylord Hospital. I would recommend that he be set up in an office that minimizes possible distractions. It would be helpful for Mr. Bennett to have parking available at his office location so that his fatigue can be minimized.

Exhibit B attached to Holt Aff.

## V. DUE TO THE COMPANY'S ECONOMIC SITUATION AND PLAINTIFF'S OUTDATED SKILL SETS, ACCENTURE, DESPITE ITS GOOD FAITH ATTEMPTS, COULD NOT FIND A POSITION SUITABLE FOR HIM.

Ms. Holt immediately began looking for a position within the Company to accommodate Mr. Bennett's medical restrictions and his skill set. Bennett Dep. 115-121; Holt Aff. at ¶ 14. By this time, Mr. Bennett had been out of work for approximately four years and had no experience or training on Accenture's current systems. Bennett Dep. 103-108; Holt Aff. at ¶ 15. Indeed, the technology Mr. Bennett used prior to his disability leave was significantly outdated. Bennett Dep. 103-108; Holt Aff. at ¶ 16.

During 2001, Accenture suffered an economic downturn, during which it implemented several workforce reductions in its Consulting and Business Practices. Bennett Dep. at 96-99;

5

Holt Aff. at ¶ 17. In response to its economic situation, Accenture also issued a hiring freeze in its Business Practices group and deferred the start dates for its new hires. Bennett Dep. at 97-99; Holt Aff. at ¶ 18.

Despite these economic restrictions, between March 2001 and November 2001, Ms. Holt contacted each of Accenture's five Consulting Market Units ("MUs") in the Hartford office in an effort to find Mr. Bennett a position in Connecticut. Holt Aff. at ¶ 19. For example, she spoke with Andrew Burns, the People Matters ("PM") Representative for the Resources MU in Hartford. Holt Aff. at ¶ 20. Mr. Burns had no Resources positions available in the Connecticut office. Holt Aff. at ¶ 20. Ms. Holt contacted Amy Salvatore, the PM Representative for the Communications and High Technologies MU. Holt Aff. at ¶ 21. Likewise, Ms. Salvatore did not have any Communications positions available in the Connecticut office. Holt Aff. at ¶ 21. Within the Financial Services MU, Ms. Holt spoke with Olga Conway, the PM Representative for the Banking and Insurance Group in Hartford, and Hilary McCracken, the PM Representative for the Health Services Group in Hartford, and learned that there were no opportunities for employment available at all in either department. Holt Aff. at ¶ 22. Similarly, there were no employment opportunities available in the Products MU in Connecticut. Holt Aff. at ¶ 23.

Ms. Holt also contacted Tara Parisi, the PM Representative for the Government MU in Hartford. Holt Aff. at ¶ 24. The Government MU in Hartford had a possible employment opportunity for Mr. Bennett and, therefore, Mark Raymond, an Associate Partner in the Government MU, contacted Mr. Bennett to come in for a meeting. Bennett Dep. 127-133; Holt Aff. at ¶ 24. Mr. Raymond met with Mr. Bennett on June 1, 2001. Bennett Dep. 127-133; Holt Aff. at ¶ 25. However, Mr. Raymond could not assign Mr. Bennett to his MU because Mr. Bennett did not have any knowledge of the Peoplesoft program, the software that the

Government MU currently uses on its Connecticut projects. Holt Aff. at ¶ 25. In June 2001, knowledge of the Peoplesoft program was an essential function of the position. Holt Aff. at ¶ 25.

Ms. Holt even searched beyond the Consulting MUs and contacted Martha Strong regarding opportunities on the Quality Client Survey Team in the Business Practices group in Connecticut. Holt Aff. at ¶ 26. Ms. Strong informed Ms. Holt that the Business Practices group was under a hiring freeze order and she could not hire or transfer any person into the group. Holt Aff. at ¶ 26. Ms. Holt also contacted Marty Cole, the Location Lead Partner for the Company, but he also could not find Mr. Bennett a position because many of the MUs were undergoing workforce reductions. Holt Aff. at ¶ 27.

Due to the state of its business and the Company's inability to locate a position for Mr. Bennett that would accommodate his work restrictions and skill sets, Accenture terminated Mr. Bennett's employment. Holt Aff. at ¶ 28. On November 7, 2001, Ms. Holt called Mr. Bennett's home, but he was unavailable. Bennett Dep. at 136-138. Ms. Holt spoke with Mr. Bennett's wife, who stated that Mr. Bennett and she had come to the conclusion that Accenture did not have a position for him. Bennett Dep. at 136-138; Holt Aff. at ¶ 29. Ms. Holt did not discuss Mr. Bennett's termination in detail with Mrs. Bennett at that time, but scheduled a telephone conference with Mr. and Mrs. Bennett for the following day. Holt Aff. at ¶ 29. On November 8, 2001, Ms. Holt called Mr. and Mrs. Bennett and informed them that Accenture was unable to find a position for Mr. Bennett and, thus, had to terminate his employment. Holt Aff. at ¶ 30.

## PROCEDURAL POSTURE

On or about May 6, 2002, Plaintiff filed an Affidavit of Illegal Discriminatory Practice with the CHRO alleging that Accenture failed to reasonably accommodate his disability upon his return from a four year leave. On September 30, 2002, the CHRO dismissed Mr. Bennett's charge on the grounds that "there was no reasonable possibility that further investigation would

result in a finding of reasonable cause." On October 24, 2002, Mr. Bennett requested, and the CHRO issued, a right to sue letter. On or about December 20, 2002, Mr. Bennett filed the instant Complaint in Connecticut Superior Court. Accenture removed the case to federal court on January 10, 2003, and filed its Answer to the Complaint on February 13, 2003. Both Parties have served and responded to Interrogatories and Document Requests. Accenture deposed Mr. Bennett on August 29, 2003, but Plaintiff has taken no depositions. Pursuant to a Court order dated December 3, 2003, the discovery period ended on January 5, 2004. The parties have no outstanding discovery requests.

## ARGUMENT

### I. THE SUMMARY JUDGMENT STANDARD

Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Bickerstaff v. Vassar College,* 196 F.3d 435, 445 (2nd Cir. 1999). Summary judgment provides the Court a procedure to eliminate unsubstantiated claims—such as those in this case—without recourse to a costly, lengthy and unnecessary trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986); *Frost v. Chromalloy Aerospace Technology Corp.,* 697 F. Supp. 82, 83 (D. Conn. 1988). "Properly employed, summary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial." *Frost,* 697 F. Supp. at 83.

Although the Court must accept the nonmoving party's evidence as true for the purposes of the summary judgment motion, the nonmoving party must substantiate his adverse claim by showing that there is a genuine issue of material fact together with evidence disclosing the existence of such an issue. *See Hogan v. State of Conn. Judicial Branch,* 220 F. Supp. 2d 111,

116 (D. Conn. 2002). Mere assertions of fact are insufficient to refute a properly supported motion for summary judgment—the non moving party must come forward with extrinsic evidence. *See id.* at 116-117; *Page v. Conn. Dept. of Public Safety,* 185 F. Supp. 2d 149, 153, 156 (D. Conn. 2002). Here, the plaintiff "must do more than present evidence that is merely colorable, conclusory, or speculative and must present concrete evidence from which a reasonable juror could return a verdict in [his] favor . . ." (Citations omitted; internal quotation marks omitted.) *Page,* 185 F. Supp. 2d at 153. "[T]he mere existence of a scintilla of evidence in support of [the nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Id.* at 156.

## II.   PLAINTIFF'S CLAIMS ARE UNTIMELY AND, THEREFORE, MUST BE DISMISSED AS A MATTER OF LAW.

The Court should dismiss the Complaint as untimely. Prior to filing with the Superior Court, a plaintiff must file a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities (CCHRO) within 180 days of the occurrence of an allegedly discriminatory practice under section 46a-60. Conn. Genn. Stat. § 46a-82(e). Here, it is undisputed that Mr. Bennett knew by November 7, 2001 that Accenture was terminating his employment because it did not have an available position for him. Indeed, Mr. Bennett testified that he understood this as early as August 2001. Bennett Dep. at 136-138. Thereafter, he filed his charge of discrimination with the CCHRO on May 6, 2002—well more than 180 days after he concluded Accenture could not reinstate him. As a result, his claims are time-barred and the Court should dismiss his Complaint. *Ericson v. City of Meriden,* 113 F. Supp. 2d 276, 286 (D. Conn. 2000); *Williams v. Comm'n on Human Rights and Opportunities,* 257 Conn. 258, 284 (2001).

### III. THE COURT SHOULD DISMISS PLAINTIFF'S CLAIM FOR FAILURE TO ACCOMMODATE.

#### A. Plaintiff Cannot Establish a Prima Facie Case For His Claim.

In order to establish a prima facie case that Accenture failed to accommodate him under Connecticut's discrimination statute, Mr. Bennett must demonstrate that (1) he was disabled within the meaning of the statute; (2) he was qualified to perform the essential functions his job with reasonable accommodation; and (3) Accenture refused to make such accommodations. *Jackan v. New York State DOL*, 205 F.3d 562, 566 (2d Cir. 2000); *Rochford v. Town of Cheshire*, 979 F. Supp. 116, 119 (D. Conn. 1997).[2] Even assuming, *arguendo*, that Mr. Bennett's Complaint is timely, his claim fails because he cannot establish any of these requisites.

##### 1. Mr. Bennett was not "qualified" to perform the essential functions of Accenture's consultant or analyst positions.

Mr. Bennett cannot submit any evidence from which a fact finder could reasonably find that he could perform the essential duties of the analyst or consultant positions with a reasonable accommodation.[3] It is undisputed that in 2001 the essential functions of the positions, included, but were not limited to, ability to lift light materials; proficiency in applicable technologies; understanding in systems integration and interactive design; ability to work overtime, as required; ability to travel to different client locations; ability to work during business hours;

---

[2] Connecticut state courts look to federal cases analyzing the ADA for guidance in enforcing the state anti-discrimination statutes. *See, e.g., Hill v. Pinkerton Sec. & Investigation Serv., Inc.*, 977 F. Supp. 148, 153 (D. Conn. 1997); *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103 (1996).

[3] For the purposes of this motion only, Defendant does not dispute whether Mr. Bennett's purported condition (i.e., "copper toxicity") is a disability as that term is defined under Conn. Gen. Stat. § 46a-51(15). Query, however, whether Mr. Bennett's alleged lack of "extra energy" to visit family and friends and purported inability to read his mail or concentrate for long periods of time (Bennett Dep. at p. 71-72) constitutes a qualified disability. *See Munck v. New Haven Sav. Bank*, 251 F. Supp. 2d 1078, 1082-1085 (D. Conn. 2003) (finding that plaintiff's inability to play sports for long hours, perform repetitive motions, or lift more than 20 or 30 pounds without discomfort was not a qualified disability); *see also Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 642 (2d Cir. 1998) (focus is whether impairment substantially affects a major life activity, and not merely an activity that is important to a particular plaintiff).

10

proficiency in written and verbal communication skills; ability to work creatively and analytically in a problem-solving environment; ability to work independently in work and/or client settings; and ability to speak and write English proficiently. *See* Holt Aff. at ¶ 6.

There is no question that when Mr. Bennett sought reinstatement after a four-year leave of absence, his skills were outdated, leaving him unable to perform many of the essential duties of an analyst or a consultant position. Mr. Bennett admits this fact. Bennett Dep. at 106. Mr. Bennett does not dispute that he had absolutely no training or experience on Accenture's current systems as of 2001. Bennett Dep. at. 103-108. During his four year leave of absence, Mr. Bennett did not take any training courses or classes to update his skills. Bennett Dep. at 107. Instead, Mr. Bennett merely surfed the internet for a few hours a week to learn "what was happening in the industry." Bennett Dep. at 107-108.

Mr. Bennett's requested accommodations would have prevented him from performing many of the essential functions of an analyst or a consultant position. Mr. Bennett requested that Accenture accommodate him by significantly reducing the work schedule for an analyst (i.e., "three hours per day, three days per week for the first two weeks and then increase to four hours per day, three days per week for the next two weeks"). He requested this schedule for an indefinite period of time. Among other things, he specifically requested that Accenture assign him to a position in the Hartford office, and required that he "not be sent to other locations."

Assuming, *arguendo,* that an analyst or a consultant position was available in Accenture's Hartford office, Mr. Bennett's requested accommodations would have prevented him from performing the essential functions of the positions because he admitted that he regularly worked well in excess of forty hours per week to complete his tasks as a consultant and analyst. Moreover, he admitted he had no training or experience on Accenture's current systems.

11

Indeed, Accenture could not hire Mr. Bennett for the one vacant consultant position available in Hartford in 2001 because he had no knowledge of the Peoplesoft program, which was a essential function of the position. Holt Aff. at ¶ 25. Accordingly, Mr. Bennett was not "qualified" to perform the essential functions of a consultant or an analyst at Accenture.

### 2. Accenture did not refuse to provide Mr. Bennett with the accommodations he requested.

Contrary to Mr. Bennett's assertions in his Complaint, Accenture did not refuse to provide Mr. Bennett with his requested accommodations nor did it terminate his employment due to his disability. Rather, Accenture terminated his employment because, although he was available to work on a limited basis, Accenture had no vacant position for him in Connecticut. Indeed, Mr. Bennett admits that Michele Holt conducted an extensive search to find a position for which Mr. Bennett was qualified and which met his significant work limitations but she was not successful. Bennett Dep. 115-121. Since Mr. Bennett does not dispute these facts, this Court should grant summary judgment for Accenture.

### B. Accenture Satisfied Its Duty to Provide Plaintiff With Reasonable Accommodations.

Courts follow a two-step process in evaluating whether an employer failed to provide a proposed accommodation in violation of the Connecticut statute. *Borkowski v. Valley Central School District*, 63 F.3d 131, 137-38 (2d Cir. 1995). First, Mr. Bennett bears the burden of proving that an accommodation existed that permitted him to perform the essential functions of his job, thus, rendering him "otherwise qualified." *Id.* at 138-39. Accordingly, Mr. Bennett must prove that <u>a vacant position within his restrictions existed</u>. *See Jackan*, 205 F.3d at 566, 567.[4]

---

[4] According to the express terms of the ADA, "the term 'reasonable accommodation' may include . . . reassignment to a <u>vacant</u> position." 42 U.S.C. § 12111(9) (emphasis added).

12

Even if Mr. Bennett satisfies that burden, he must demonstrate that the proposed accommodation was reasonable. *Borkowski*, 63 F.3d at 138.

> 1. Mr. Bennett cannot prove that an accommodation existed that would permit him to perform the essential functions of his job.

Mr. Bennett cannot meet his initial burden. Indeed, Mr. Bennett does not dispute that Accenture did not have any vacant positions in Connecticut for him when he returned from leave. Although it was not required to create a new light duty position for him; *see Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035-36 (2d Cir. 1993); Accenture used its best efforts to find a position for Mr. Bennett. Nevertheless, because of the reorganization and work force reductions which Accenture had endured, and Mr. Bennett's outdated skill set, the Company simply could not find a vacant position for him. It is clear that even if Mr. Bennett had not had any work restrictions when he returned from disability leave, Accenture would not have been able to reinstate him.

> 2. Mr. Bennett's proposed accommodation was unreasonable.

An employer need not provide an accommodation that would "impose an undue hardship." *Jackan*, 205 F.3d at 566. Mr. Bennett's proposed accommodation – that Accenture reinstatement him with his doctor's significant limitations – is unreasonable because Accenture had no vacant positions in Connecticut for which he was qualified. Accenture was not required to "bump" another employee to make a position available for Complainant.[5] Furthermore, a "reasonable accommodation does not mean elimination of any of the job's essential functions." *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir. 1996) (internal quotations omitted) (quoting *Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991)). Mr. Bennett has testified that as both an analyst and a consultant with Accenture, he traveled to client sites for prolonged

---

[5] *See White v. York Int'l.*, 45 F.3d 357, 362 (10th Cir. 1995).

13

periods of time and regularly worked in excess of eighty hours a week to complete his tasks during "crunch times." Again, because Mr. Bennett demanded that he return to work only in Hartford, three days a week from eight to twelve in the morning, it is clear that he could not perform all of the essential functions of a consultant or analyst position. Accordingly, Mr. Bennett's requests were unreasonable because Accenture had no position available which would satisfy his alleged limitations, and he no longer had the skills to perform the job of an analyst or a consultant at Accenture.

## CONCLUSION

For the foregoing reasons, This Court should enter summary judgment for the Defendant Accenture, LLP on the Plaintiff's Complaint.

Respectfully Submitted,
by Defendant,
ACCENTURE, LLP

_____
Lynn A. Kappelman
Damian W. Wilmot
SEYFARTH SHAW
World Trade Center East
2 Seaport Lane, Suite
Boston, MA 02210
(617) 946-4800
lkappelman@seyfarth.com
dwilmot@seyfarth.com

DEFENDANT'S LOCAL COUNSEL
Douglas Varga, Esq.
**ZELDES, NEEDLE & COOPER**
1000 Lafayette Blvd.
Bridgeport, CT 06604
(203) 333-9441
fax (203) 333-1489

## CERTIFICATE OF SERVICE

I, Damian W. Wilmot, hereby certify that, I have, on this February 23, 2004, sent a copy of the foregoing MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT to the following counsel of record, via first class mail:

John R. Williams, Esq.
Katrena Engstrom, Esq.
Williams & Pattis LLC
51 Elm Street, Suite 409
New Haven, CT 06510

_____
Damian W. Wilmot, Esq.