UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 FEB 24  A 11: 36

TODD BENNETT                    :    CIVIL ACTION NO.
                                :    3:03CV0080 (AVC)
            Plaintiff,          :
v.                              :
                                :
ACCENTURE, LLP                  :
                                :
            Defendant.          :    February 23, 2004

**LOCAL RULE 9(C)1 STATEMENT IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 9(c)1, the Defendant, Accenture LLP ("Accenture" or the "Company"), states that the following sets forth each material fact as to which there is no genuine issue to be tried in the above-captioned action:

1.  Accenture is a global management and technology consulting firm. *See* Affidavit of Toni L. Corban, hereinafter "Corban Aff.," filed simultaneously herewith at ¶ 5.

2.  The Company's primary mission is to help clients become more successful in their own businesses and operations. Corban Aff. at ¶ 6.

3.  The Company serves the major global industries through its five Market Units (Resources, Communications and High Technologies, Financial Services, Products and Government) and a number of Global Service Lines. Corban Aff. at ¶ 7.

4.  Todd Bennett began his employment as an analyst in Accenture's Connecticut office, located in Hartford, on August 17, 1992. Deposition of Todd Bennett dated August 29, 2003, hereinafter "Bennett Dep.," attached as Exhibit A to Affidavit of Lynn A. Kappelman filed simultaneously herewith, at pages 48-49; Corban Aff. at ¶ 8.

5.  Mr. Bennett was 22 years old at the time of his hire. Bennett Dep. at 21.

6. Prior to August 2002, Accenture's Hartford office was the Company's only location in Connecticut. Corban Aff. at ¶ 9.

7. Soon thereafter Accenture promoted Mr. Bennett to staff consultant. Corban Aff. at ¶ 10; Bennett Dep. at 45-50.

8. As a staff consultant, Mr. Bennett was primarily responsible for solving the business problems of his Accenture's clients by directing them to the most effective technologies to meet their business needs. Corban Aff. at ¶ 11; Bennett Dep. at 49-50.

9. Specifically, Mr. Bennett worked with clients at their own facilities to maintain and solve problems with their computer systems. Corban Aff. at ¶ 12; Bennett Dep. at 45-46.

10. On average, he would work seventy to eighty hours a week in this position. Bennett Dep. at 50-52.

11. It was fairly common to work long hours as an analyst or a consultant at Accenture. Bennett Dep. at 61-63; Corban Aff. at ¶ 13.

12. Mr. Bennett performed reasonably well, and the Company promoted him once and granted him annual salary increases. Bennett Dep. at 58-62; Corban Aff. at ¶ 14.

13. In or about December 1996, Mr. Bennett took several intermittent sick leaves claiming fatigue and weakness. Bennett Dep. at 64-68; Corban Aff. at ¶ 15.

14. Mr. Bennett applied for a short-term disability leave on February 14, 1997, and began that leave on April 7, 1997. Bennett Dep. at 74, 79-81; Corban Aff. at ¶ 16; *see also* Application For Family and/or Medical Leave of Absence attached to Corban Aff. as Exhibit A.

15. According to correspondence from Mr. Bennett's physician, Dr. Robban Sica, Mr. Bennett suffered from hypothyroidism and candida enteritis, which caused him fatigue,

weakness, chronic sinusitis and multiple allergies. Corban Aff. at ¶ 17; *see also* letter from Dr. Robban Sica, dated May 23, 1997, attached to Corban Aff. as Exhibit B; Bennett Dep. at 74-76.

16.     By letter, Dr. Sica stated that he expected Mr. Bennett to recover within two to three months. Corban Aff. at ¶ 18; *see also* Exhibit B attached to Corban Aff.

17.     Thereafter, Mr. Bennett submitted a long-term disability leave application to Accenture's insurance carrier on June 17, 1997. Corban Aff. at ¶ 19.

18.     Accenture's long-term disability insurance carrier approved Mr. Bennett's application and he began long-term disability leave on July 7, 1997. Bennett Dep. at 86; Corban Aff. at ¶ 20; *see also* letter from Daniel Dolyak, dated August 30, 1997, attached to Corban Aff. as Exhibit C.

19.     In 1997, Dr. Zampierson diagnosed Mr. Bennett with "copper toxicity." Bennett Dep. at 81-83.

20.     Mr. Bennett surmises that he developed this condition from the well water in East Granby, Connecticut where he grew up. Bennett Dep. at 84-85.

21.     No other members of his family, and none of his neighbors, have had any similar problems with copper toxicity. Bennett Dep. at 84-86.

22.     Mr. Bennett received Long-Term Disability benefits from July 6, 1997 until April 7, 2002. Bennett Dep. at 89; Corban Aff. at ¶ 21.

23.     During this four and a half year period, Mr. Bennett would spend his time during the day at two gyms in Unionville, Connecticut and Windsor, Connecticut, where he used the sauna, shower and whirlpool to "ramp up his excretions of copper." Bennett Dep. at 91-93.

24.     During Mr. Bennett's medical leave from 1997 to 2001, Accenture made several organizational changes. Bennett Dep. at 95-98; Corban Aff. at ¶ 22.

25. The largest change occurred in the Spring of 2000 when Accenture deployed its practice personnel, including consultants, into various Market Units based on industry. Corban Aff. at ¶ 23.

26. Because Mr. Bennett did not focus on a particular industry at the time he began his disability leave, Accenture could not yet assign him to a Market Unit. Corban Aff. at ¶ 24.

27. Mr. Bennett, however, remained assigned to the Hartford office. Corban Aff. at ¶ 25.

28. On January 31, 2001, Mr. Bennett, now 27 years old, called Michele Holt, an EEO Officer in the Hartford office, and informed her that his physician had released him to return to work on a modified schedule. Bennett Dep. at 89-90, 112-113; *see also* Affidavit of Michele Holt, hereinafter "Holt Aff.," filed simultaneously herewith at ¶ 7.

29. In response, Ms. Holt explained to Mr. Bennett that she would initiate the appropriate reinstatement procedures and call him back. Bennett Dep. at 113; Holt Aff. at ¶ 8.

30. Shortly thereafter, Ms. Holt called Mr. Bennett and asked him to provide documentation to Accenture from his physician concerning Mr. Bennett's ability to return to work. Bennett Dep. at 113; Holt Aff. at ¶ 9.

31. Mr. Bennett requested that Accenture ask his physician directly for the documentation. Holt Aff. at ¶ 10.

32. On February 28, 2001, Paula Miller, Hartford Benefits Contact, sent a request to Mr. Bennett's physician, Dr. Jerrold Kaplan, asking for Mr. Bennett's return to work date, restrictions on his work, and the duration of his restrictions. Holt Aff. at ¶ 11; *see also* fax from Paula Miller, dated February 28, 2001, attached to the Holt Aff. as Exhibit A.

33. Dr. Kaplan sent a letter on March 5, 2001 to Ms. Miller, stating that Mr. Bennett could begin working on March 12, 2001 on a limited basis. *See* letter from Dr. Jerrod Kaplan, dated March 5, 2001, attached to the Holt Aff. as Exhibit B.

34. Specifically, Dr. Kaplan outlined Mr. Bennett's restrictions, stating in relevant part:

> [Mr. Bennett] can work three hours per day, three days per week for the first two weeks and then increase to four hours per day, three days per week for the next two weeks. He should continue at that level until he is re-evaluated at Gaylord Hospital. In order to make his transition the most successful, I would suggest that his three hours per day be done for a 9 a.m. to 12 noon shift, Monday, Wednesday, and Friday. When the extra hour is added in two weeks, I would suggest that it be done also on a Monday, Wednesday, Friday schedule. . . . He should be assigned just to his home office and not be sent to other locations until he is reassessed at Gaylord Hospital. I would recommend that he be set up in an office that minimizes possible distractions. It would be helpful for Mr. Bennett to have parking available at his office location so that his fatigue can be minimized.

Exhibit B attached to Holt Aff.

35. Ms. Holt immediately began looking for a position within the Company to accommodate Mr. Bennett's medical restrictions and his skill set. Bennett Dep. 115-121; Holt Aff. at ¶ 14.

36. In 2001, the essential job functions of analyst or consultant included, but were not limited to, ability to lift light materials; proficiency in applicable technologies; understanding in systems integration and interactive design; ability to work overtime, as required; ability to travel to different client locations; ability to work during business hours; proficiency in written and verbal communication skills; ability to work creatively and analytically in a problem-solving environment; ability to work independently in work and/or client settings; and ability to speak and write English proficiently. Hotle Aff. at ¶ 6.

37. By this time, Mr. Bennett had been out of work for approximately four years and had no experience or training on Accenture's current systems. Bennett Dep. 103-108; Holt Aff. at ¶ 15.

38. Indeed, the technology Mr. Bennett used prior to his disability leave was significantly outdated. Bennett Dep. 103-108; Holt Aff. at ¶ 16.

39. During 2001, Accenture suffered an economic downturn, during which it implemented several workforce reductions in its Consulting and Business Practices. Bennett Dep. at 96-99; Holt Aff. at ¶ 17.

40. In response to its economic situation, Accenture also issued a hiring freeze in its Business Practices group and deferred the start dates for its new hires. Bennett Dep. at 97-99; Holt Aff. at ¶ 18.

41. Despite these economic restrictions, between March 2001 and November 2001, Ms. Holt contacted each of Accenture's five Consulting Market Units ("MUs") in the Hartford office in an effort to find Mr. Bennett a position in Connecticut. Holt Aff. at ¶ 19.

42. For example, Ms. Holt spoke with Andrew Burns, the People Matters ("PM") Representative for the Resources MU in Hartford. Holt Aff. at ¶ 20. Mr. Burns had no Resources positions available in the Connecticut office. Holt Aff. at ¶ 20.

43. Ms. Holt contacted Amy Salvatore, the PM Representative for the Communications and High Technologies MU. Holt Aff. at ¶ 21. Likewise, Ms. Salvatore did not have any Communications positions available in the Connecticut office. Holt Aff. at ¶ 21.

44. Within the Financial Services MU, Ms. Holt spoke with Olga Conway, the PM Representative for the Banking and Insurance Group in Hartford, and Hilary McCracken, the PM

Representative for the Health Services Group in Hartford, and learned that there were no opportunities for employment available at all in either department. Holt Aff. at ¶ 22.

45. Similarly, there were no employment opportunities available in the Products MU in Connecticut. Holt Aff. at ¶ 23.

46. Ms. Holt also contacted Tara Parisi, the PM Representative for the Government MU in Hartford. Holt Aff. at ¶ 24. The Government MU in Hartford had a possible employment opportunity for Mr. Bennett and, therefore, Mark Raymond, an Associate Partner in the Government MU, contacted Mr. Bennett to come in for a meeting. Bennett Dep. 127-133; Holt Aff. at ¶ 24.

47. Mr. Raymond met with Mr. Bennett on June 1, 2001. Bennett Dep. 127-133; Holt Aff. at ¶ 25. However, Mr. Raymond could not assign Mr. Bennett to his MU because Mr. Bennett did not have any knowledge of the Peoplesoft program, the software that the Government MU currently uses on its Connecticut projects. Holt Aff. at ¶ 25.

48. In June 2001, knowledge of the Peoplesoft program was an essential function of the position. Holt Aff. at ¶ 25.

49. Ms. Holt even searched beyond the Consulting MUs and contacted Martha Strong regarding opportunities on the Quality Client Survey Team in the Business Practices group in Connecticut. Holt Aff. at ¶ 26. Ms. Strong informed Ms. Holt that the Business Practices group was under a hiring freeze order and she could not hire or transfer any person into the group. Holt Aff. at ¶ 26.

50. Ms. Holt also contacted Marty Cole, the Location Lead Partner for the Company, but he also could not find Mr. Bennett a position because many of the MUs were undergoing workforce reductions. Holt Aff. at ¶ 27.

51. Due to the state of its business and the Company's inability to locate a position for Mr. Bennett that would accommodate his work restrictions and skill sets, Accenture terminated Mr. Bennett's employment. Holt Aff. at ¶ 28.

52. On November 7, 2001, Ms. Holt called Mr. Bennett's home, but he was unavailable. Bennett Dep. at 136-138. Ms. Holt spoke with Mr. Bennett's wife, who stated that Mr. Bennett and she had come to the conclusion that Accenture did not have a position for him. Bennett Dep. at 136-138; Holt Aff. at ¶ 29. Ms. Holt did not discuss Mr. Bennett's termination in detail with Mrs. Bennett at that time, but scheduled a telephone conference with Mr. and Mrs. Bennett for the following day. Holt Aff. at ¶ 29.

53. On November 8, 2001, Ms. Holt called Mr. and Mrs. Bennett and informed them that Accenture was unable to find a position for Mr. Bennett and, thus, had to terminate his employment. Holt Aff. at ¶ 30.

        Respectfully Submitted,

        by Defendant,
        ACCENTURE, LLP

        _____
        Lynn A. Kappelman
        Damian W. Wilmot
        SEYFARTH SHAW
        World Trade Center East
        2 Seaport Lane, Suite
        Boston, MA 02210
        (617) 946-4800
        lkappelman@seyfarth.com
        dwilmot@seyfarth.com

DEFENDANT'S LOCAL COUNSEL
Douglas Varga, Esq.
**ZELDES, NEEDLE & COOPER**
1000 Lafayette Blvd.
Bridgeport, CT 06604
(203) 333-9441
fax (203) 333-1489

## CERTIFICATE OF SERVICE

I, Damian W. Wilmot, hereby certify that, I have, on this February 23, 2004, sent a copy of the foregoing LOCAL RULE 9(C)1 STATEMENT IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT to the following counsel of record, via first class mail:

John R. Williams, Esq.
Katrena Engstrom, Esq.
Williams & Pattis LLC
51 Elm Street, Suite 409
New Haven, CT 06510

_____
Damian W. Wilmot, Esq.

9