UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

TODD BENNETT                           :

VS.                                    :        NO.  3:03CV80(AVC)

ACCENTURE, LLP                         :        MARCH 29, 2004

## PLAINTIFF'S RULE 56(a)(2) STATEMENT OF MATERIAL FACTS IN DISPUTE

**A.    Plaintiff's Response to Defendant's Rule 56(a)(1) Statement**

1.      Accenture is a global management and technology consulting firm. *See* Affidavit of Toni L. Corban, hereinafter "Corban Aff.," filed simultaneously herewith at ¶ 5.      **AGREE.**

2.      The Company's primary mission is to help clients become more successful in their own businesses and operations. Corban Aff. at ¶ 6. **AGREE.**

3.      The Company serves the major global industries through its five Market Units (Resources, Communications and High Technologies, Financial Services, Products and Government) and a number of Global Service Lines. Corban Aff. at ¶ 7.  **AGREE.**

4.      Todd Bennett began his employment as an analyst in Accenture's Connecticut office, located in Hartford, on August  17, 1992. See Deposition of Todd  Bennett dated August 29, 2003, hereinafter "Bennett Dep.," attached as

Exhibit A to Affidavit of Lynn A. Kappelman filed simultaneously herewith, at pages 48-49.[1]  **AGREE.**

5.      Mr. Bennett was 22 years old at the time. Bennett Dep. at 21.  **AGREE.**

6.      Prior to August 2002, Accenture's Hartford office was the Company's only location in Connecticut.  **AGREE.**

7.      Soon thereafter he became a staff consultant. Bennett Dep. at 45-50. **AGREE.**

8.      As a staff consultant, Mr. Bennett primarily was responsible for solving the business problems of his Accenture clients by directing them to the most effective technologies to meet their business needs. Bennett Dep. at 49-50; Corban Aff. at ¶ 11. **AGREE.**

9.      Specifically, Mr. Bennett worked with clients at their own facilities to maintain and solve problems with their computer systems. Bennett Dep. at 45-46; Corban Aff. at ¶ 12. **AGREE.**

10.     On average, he would work seventy to eighty hours a week in this position. Bennett Dep. at 50-52. **AGREE IN PART.  Employees at Accenture are compensated for their overtime.  For the first 80 hours each year, employees received compensatory time.  After 80 hours, the plaintiff**

---

[1]     Prior to August 2002, Accenture's Hartford office was the Company's only location in Connecticut. Corban Aff. at ¶ 9.

2

**received extra compensation at an hourly rate based upon his annual salary.  Ex. 7, Plaintiff's Affidavit, §§ 3-4.**

11.      It was fairly common to work long hours as an analyst or a consultant at Accenture. Bennett Dep. at 61-63; Corban Aff. at ¶ 13.  **AGREE IN PART. The plaintiff was paid extra compensation for overtime after the first 80 hours annually.  For the first 80 hours, employees received compensatory time. Ex. 7, Plaintiff's Affidavit, ¶3.**

12.      Mr. Bennett performed reasonably well, and the Company promoted him once and granted him annual salary increases. Bennett Dep. at 58-62; Corban Aff. at ¶ 14. **DISAGREE.  Plaintiff's work was described as "consistently outstanding" by his supervisor since his employment commenced at Accenture.  Plaintiff's Exhibit 1.**

13.    In or about December 1996,  Mr. Bennett took several intermittent sick leaves claiming fatigue and weakness. Bennett Dep. at 64-68; Corban Aff. at ¶ 15. **DISAGREE.  Sick leave was not intermittent, but consistent as of the pay period ending 12/15/96, continuing  through the pay period ending April 15, 1997; averaging 30 hours per pay period. Ex. 2**

14.    Mr. Bennett applied for a short-term disability leave on February 14,  1997, and began that leave on April 7, 1997. *See* Application For Family and/or

Personal Medical Leave of Absence attached to the Corban Aff. as Exhibit A; Bennett Dep. at 74,79-81. **AGREE.**

15.    According to correspondence from Mr. Bennett's physician, Dr. Robban Sica, Mr. Bennett suffered from hypothyroidism and candida enteritis, which caused him fatigue, weakness, chronic sinusitis and multiple allergies. *See* letter from Dr . Robban Sica, dated May 23, 1997, attached to the Corban Aff. as Exhibit B; *see also* Bennett Dep. at 74-76.

16.    By letter, Dr. Sica stated that he expected Mr. Bennett to recover within two to three months. *See* Exhibit B attached to Corban Aff. **AGREE IN PART. Dr. Sica revised her diagnosis and her opinion subsequently. Ex. 4**

17.    Thereafter, Mr. Bennett submitted a long- term disability leave application to Accenture's insurance carrier on June 17, 1997. Corban Aff. at ¶ 19. **AGREE.**

1.    Accenture's long-term disability insurance carrier approved Mr. Bennett's application and he began long-term disability leave on July 7, 1997. Bennett Dep. at 86; *see* letter from Daniel Dolyak, dated August 30, 1997 attached to the Corban Aff. as Exhibit C. **AGREE.**

19.    In 1997, Dr. Zampierson diagnosed Mr. Bennett with "copper toxicity." Bennett Dep. at 81-83. **AGREE.**

20.    Mr. Bennett surmises that he developed this condition from the well water

in East Granby, Connecticut where he grew up. Bennett Dep. at 84-85. **AGREE.**

21.    No other members of his family, and none of his  neighbors, have had any similar problems with copper toxicity. Bennett Dep. at 84-86**. AGREE.**

22.    Mr. Bennett received Long-Term Disability benefits from July 6, 1997 until April  7, 2002. Bennett Dep. at 89; Corban Aff. at ¶ 21.  **AGREE.**

23.     During this four and a half year  period, Mr. Bennett would spend his time during the day at two gyms in Unionville, Connecticut and Windsor, Connecticut, where he used the sauna, shower and whirlpool to "ramp up his excretions of copper." Bennett Dep. at 91-93.  **DISAGREE. Plaintiff was involved in many other activities, such as receiving chelation therapy at the University of Michigan Metal Toxicology Clinic,  to leach the copper out of his body. Ex. 3, Ex. 4.**

24.    During Mr. Bennett's medical leave  from 1997 to 2001, Accenture made several organizational changes. Bennett Dep. at 95-98; Corban Aff. at ¶ 22. **AGREE**.

25.    The largest change occurred in the Spring of 2000 when Accenture deployed its practice personnel, including consultants, into various Market Units based on industry. Corban Aff. at ¶ 23. **AGREE.**

26.    Because Mr. Bennett did not focus on a particular industry at the time he began his disability leave, Accenture could not yet assign him to a Market Unit.

Corban Aff. at ¶ 24.  **AGREE.**

27.     Mr. Bennett, however, remained assigned to the Hartford office. Corban Aff. at ¶ 25.  **AGREE.**

28.     On January 31, 2001, Mr. Bennett, now 27 years old, called Michele Holt, an EEO Officer in the Hartford office, and informed her that his physician had released him to return to work on a modified schedule. Bennett Dep. at 89-90, 112-113; *see also* Affidavit of Michele Holt, hereinafter "Holt Aff.," filed simultaneously herewith at ¶ 7.  **AGREE.**

29.     In response, Ms. Holt explained to Mr. Bennett that she would initiate the appropriate reinstatement procedures and call him back. Bennett Dep. at 113; Holt Aff. at ¶ 8.  **AGREE.**

30.     Shortly thereafter, Ms. Holt called Mr. Bennett and asked him to provide documentation to Accenture from his physician concerning Mr. Bennett's ability to return to work. Bennett Dep. at 113; Holt Aff. at ¶ 9.  **AGREE.**

31.     Mr. Bennett requested that Accenture ask his physician directly for the documentation. Holt Aff. at ¶ 10. **AGREE.**

32.     On February 28,2001, Paula Miller, Hartford Benefits Contact, sent a request to Mr. Bennett's physician, Dr. Jerrold Kaplan, asking for Mr. Bennett's return to work date, restrictions on his work, and the duration of his restrictions. Holt Aff. at ¶ 11; *see also* fax from Paula Miller, dated February 28, 2001,

attached to the Holt Aff. as Exhibit A.

**AGREE.**

33.    Dr. Kaplan sent a letter on March  5, 2001 to Ms. Miller, stating that Mr.

Bennett could begin working on March 12, 2001 on a limited basis. *See* letter from

Dr. Jerrod Kaplan, dated March  5,2001, attached to the Holt Aff. as Exhibit B**.**

**AGREE.**

34.    Specifically, Dr. Kaplan outlined Mr. Bennett's restrictions, stating in

relevant part:

> [Mr. Bennett] can work three hours per day, three days
> per week for the first two weeks and then increase to
> four hours per day, three days per week for the next
> two weeks. He should continue at that level until he is
> re-evaluated at Gaylord Hospital. In order to make his
> transition the most successful, I would suggest that his
> three hours per day be done for a 9 a.m. to 12 noon
> shift, Monday, Wednesday, and Friday. When the
> extra hour is added in two weeks, I would suggest that
> it be done also on a Monday, Wednesday , Friday
> schedule. . . . He should be assigned just to his home
> office and not be sent to other locations until he is
> reassessed at Gaylord Hospital. I would recommend
> that he be set up in an office that minimizes possible
> distractions. It would be helpful for Mr. Bennett to have
> parking available at his office location so that his
> fatigue can be minimized.

Exhibit B attached to Holt Aff.

**AGREE.**

7

35.    Ms. Holt immediately began looking for a position within the Company to accommodate Mr. Bennett's medical restrictions and his skill set. Bennett Dep. 115-121; Holt Aff. at ¶ 14.  **DISAGREE.  In their response to plaintiff's interrogatories to defendant, the defendant produced paltry evidence of any effort to locate a temporary part-time assignment for the plaintiff. Ex. 5**

36.    In 2001, the essential job functions of analyst or consultant included, but were not limited to, ability to lift light materials, proficiency in applicable technologies; understanding in systems integration and interactive design; ability to work overtime, as required; ability to travel to different client locations; ability to work during business hours; proficiency in written and verbal communication skills; ability to work creatively and analytically in a problem-solving environment; ability to work independently in work and/or client settings; and ability to speak and write English proficiently. Holt Aff. At ¶6. **AGREE.**

37.    By this time, Mr. Bennett had been out of work for approximately four years and had no experience or training on Accenture's current systems. Bennett Dep. 103-108; Holt Aff. at ¶ 15.    **DISAGREE.  The defendant was using Oracle and File Net in 2001 and the plaintiff had experience with both systems.  Ex. 12, Plaintiff's deposition, pps. 102-106.**

38.    Indeed, the technology Mr. Bennett used prior to his disability leave was significantly outdated. Bennett Dep. 103-108; Holt Aff. at ¶ 16.

8

**AGREE.**

39.. During 2001, Accenture suffered an economic downturn, during which it implemented several workforce reductions in its Consulting and Business Practices. Bennett Dep. at 96-99; Holt Aff. at ¶ 17. **AGREE.**

40. In response to its economic situation, Accenture also issued a hiring freeze in its Business Practices group and deferred the start dates for its new hires. Bennett Dep. at 97-99; Holt Aff. at ¶ 18. **AGREE.**

41. Despite these economic restrictions, between March 2001 and November 2001, Ms. Holt contacted each of Accenture's five Consulting Market Units ("MUs") in the Hartford office in an effort to find Mr. Bennett a position in Connecticut. Holt Aff. at ¶ 19. **AGREE.**

42. For example, she spoke with Andrew Burns, the People Matters ("PM") Representative for the Resources MU in Hartford. Holt Aff. at ¶ 20. Mr. Burns had no Resources positions available in the Connecticut office. Holt Aff. at ¶ 20. **AGREE.**

43. Ms. Holt contacted Amy Salvatore, the PM Representative for the Communications and High Technologies MU . Holt Aff. at ¶ 21. Likewise, Ms. Salvatore did not have any Communications positions available in the Connecticut office. Holt Aff. at ¶ 21. **AGREE.**

9

44.     Within the Financial Services MU, Ms. Holt spoke with Olga Conway, the PM Representative for the Banking and Insurance Group in Hartford, and Hilary McCracken, the PM Representative for the Health Services Group in Hartford, and learned that there were no opportunities for employment available at all in either department. Holt Aff. at ¶ 22. **AGREE.**

45.     Similarly, there were no employment opportunities available in the Products MU in Connecticut. Holt Aff. at ¶ 23.  **AGREE.**

46.     Ms. Holt also contacted Tara Parisi, the PM Representative for the Government MU in Hartford. Holt Aff. at ¶ 24. The Government MU in Hartford had a possible employment opportunity for Mr. Bennett and, therefore, Mark Raymond, an Associate Partner in the Government MU, contacted Mr. Bennett to come in  for a meeting. Bennett Dep. 127-133; Holt Aff. at ¶ 24.     **AGREE.**

47.     Mr. Raymond met with Mr. Bennett on June 1, 2001. Bennett Dep. 127-133; Holt Aff. at ¶  25.  However,  Mr. Raymond could not assign  Mr. Bennett to his MU because Mr. Bennett did not have any knowledge of the  Peoplesoft program, the software that the Government MU currently uses on its Connecticut projects. Holt Aff. ¶25. **DISAGREE.  Peoplesoft was not the only program used by the Government Unit in Connecticut.  It may have been used in one contract with the state.  Ex. 12, Plaintiff's deposition, pps. 134-136.  In any case, since the plaintiff was a computer expert and he would have had no**

**difficulty in digesting the Peoplesoft program, in the same manner that other similarly trained Accenture employees learn to adapt to new software programs.   (See 1996 annual review, Ex. 1)**

48.      In June 2001, knowledge of the  Peoplesoft program was an essential function of the position. Holt Aff. at ¶ 25. **DISAGREE. See Response to No. 47, above.**

49.    Ms. Holt even searched beyond the Consulting MUs and contacted Martha Strong regarding opportunities on the Quality Client Survey Team in the Business Practices group in Connecticut. Holt Aff. at ¶ 26.

Ms. Strong informed Ms. Holt that the Business Practices group was under a hiring freeze order and she could not hire or transfer any person into the group. Holt Aff. at ¶ 26.      **AGREE.**

50.     Ms. Holt also contacted Marty Cole, the Location Lead Partner for the Company, but he also could not find Mr. Bennett a position because many of the MUs were undergoing workforce reductions. Holt Aff. at ¶  27.

**DISAGREE.   The defendant refused to provide the plaintiff with the number of employees who were eliminated from the Connecticut workforce as part of their RIF program during this period. (Ex. 6, Response to Interrogatory No. 6)**

51.     Due to the state of its business and the  Company's inability to locate a position for Mr. Bennett that would accommodate his work restrictions and skill

11

sets, Accenture terminated Mr. Bennett's employment. Holt Aff. at ¶ 28.

**DISAGREE.  Ex. 7, Plaintiff's Affidavit, §§3-13.**

52.     On November 7, 2001, Ms. Holt called Mr. Bennett's home, but he was

unavailable. Bennett Dep. at 136-138.  Ms. Holt spoke with Mr. Bennett's wife, who

stated that Mr. Bennett and she had come to the conclusion that Accenture did not

have a position for him. Bennett Dep. at 136-138; Holt Aff. at ¶ 29.

Ms. Holt did not discuss  Mr.  Bennett's termination in detail with Mrs. Bennett at

that time, but scheduled a telephone conference with Mr. and Mrs. Bennett for the

following day.  Holt Aff. at ¶ 29.  **DISAGREE.  Plaintiff did not say that Ms. Holt**

**called him at home and also did not say that he was unavailable. He does**

**state that his wife told him that she had spoken with Ms. Holt.   Ex. 12, p. 138.**

56.     On November 8, 2001, Ms. Holt called Mr. and Mrs. Bennett and informed

them that Accenture was unable to find a position for Mr. Bennett and, thus, had to

terminate his employment. Holt Aff. at ¶ 30. **AGREE.**


**B.     Rule 56(a)(2) Statement of Material Facts in Dispute**

        1.     The plaintiff was qualified to return to work part-time as of the spring

of 2001; among other alternatives, he was available to assist other consultants and

reduce overtime hours, .  **Ex. 7, Plaintiff's affidavit, §3-13, Defendant's**

**Statement of undisputed facts, ¶¶s 9, 10.**

2.    The defendant made no real attempt to re-instate the plaintiff's employment; it's miscellaneous inquiries to various departments in the Hartford office did not constitute a real effort to return the plaintiff to work on a part-time basis. **Ex. 8.**

3.    The plaintiff's skills could easily have been put to use in a part-time position as of the spring of 2001, whether the defendant was in a cost-cutting mode or not. **Ex. 7, Plaintiff's Affidavit, §§3-13.**

4.    Since the employees were frequently asked to work over-time hours, the defendant could have saved expense by utilizing the plaintiff in a part-time capacity.  **Ex. 7, §§3-4.**

5.    There is evidence that the defendant sought to terminate the plaintiff as early as August, 2001, and wondered aloud whether his receipt of LTD benefits posed a stumbling block to such a plan. **Ex. 8**

6.    Defendant's refusal to disclose the number of professional level employees who were actually terminated from the Hartford offices of Accenture during the relevant time period permits an adverse inference to be drawn against the defendant on the issue of attempts to accommodate the plaintiff; the defendant's rationalization concerning reduction in force during 2001 was pretext to avoid re-instating a person with a disability.  **Ex. 6**

7.     The defendant claims that the plaintiff was terminated due to a reduction in force; he was never offered any severance pay, although if other employees were terminated during the same time period, they were presumably offered the plan. **Ex. 13, Defendant's Separation Plan as of 9/01, Ex. 7, §14.**

THE PLAINTIFF


BY:_____
KATRENA ENGSTROM
Federal Bar No. ct09444
51 Elm Street
New Haven, CT 06510
(203)562-9931
FAX: (203)776-9494
E-Mail: kengstrom@johnrwilliams.com
His Attorney

14

**CERTIFICATION**

A copy of the foregoing was mailed, first class, on the date set forth above, to the  following counsel of record:


Damian W. Wilmot, Esq.
Seyfarth Shaw
Two Seaport Lane, Suite 300
Boston, MA 02110

Douglas Varga, Esq.
Zeldes, Needle & Cooper
1000 Lafayette Blvd.
Bridgeport, CT 06604

_____
KATRENA ENGSTROM