Exhibit 12

1                    U.S. DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3    TODD BENNETT                CIVIL ACTION NO.
                Plaintiff        3:03CV0080AVC
4          VS.

5    ACCENTURE, LLP              AUGUST 29, 2003
                Defendants

6

7                                         COPY
           DEPOSITION OF TODD BENNETT
8

9    APPEARANCES:

10        FOR THE PLAINTIFF:
              WILLIAMS And PATTIS, LLC
11                51 Elm Street, Suite 409
                  New Haven, Connecticut 06510
12        BY:  TIMOTHY J. MAHONEY, ESQ. (203-562-9931)

13

          FOR THE DEFENDANT (LOCAL COUNSEL):
14            ZELDES, NEEDLE & COOPER
                  1000 Lafayette Boulevard
15                Bridgeport, Connecticut 06604
              BY:  DOUGLAS VARGAS, ESQ. (203-333-1489)
16                (Not Present)

17        FOR THE DEFENDANTS, ACCENTURE, LLP:
              LAW OFFICES OF SEYFARTH SHAW, LLP
18                Two Seaport Lane, Suite 300
                  Boston, Massachusetts 02210
19            BY:  LYNN A. KAPPELMAN, ESQ. (Ct.)13480
                  (617-946-4800)
20

          ALSO PRESENT:
21            Geomatrix Productions, Matt DeGennaro.

22                        ALEEN M. STANTON, CLSR, #00196

23

     NIZIANKIEWICZ & MILLER REPORTING SERVICES
24            972 Tolland Street
        East Hartford, Connecticut 06108-1533
25            (860) 291-9191

**1**

```
 1        U.S. DISTRICT COURT
 2        DISTRICT OF CONNECTICUT
 3   TODD BENNETT          CIVIL ACTION NO.
           Plaintiff        3:03CV0080AVC
 4   VS.
 5   ACCENTURE, LLP        AUGUST 29, 2003
           Defendants
 6
 7        DEPOSITION OF TODD BENNETT
 8
 9   APPEARANCES:
10     FOR THE PLAINTIFF:
          WILLIAMS And PATTIS, LLC
11            51 Elm Street, Suite 409
              New Haven, Connecticut 06510
12     BY:  TIMOTHY J. MAHONEY, ESQ. (203-562-9931)
13
14     FOR THE DEFENDANT (LOCAL COUNSEL):
          ZELDES, NEEDLE & COOPER
15            1000 Lafayette Boulevard
              Bridgeport, Connecticut 06604
16     BY:  DOUGLAS VARGAS, ESQ. (203-333-1489)
              (Not Present)
17
       FOR THE DEFENDANTS, ACCENTURE, LLP:
18        LAW OFFICES OF SEYFARTH SHAW, LLP
              Two Seaport Lane, Suite 300
19            Boston, Massachusetts 02210
       BY:  LYNN A. KAPPELMAN, ESQ. (Ct.)13480
20            (617-946-4800)
21     ALSO PRESENT:
          Geomatrix Productions, Matt DeGennaro.
22
               ALEEN M. STANTON, CLSR, #00196
23
     NIZIANKIEWICZ & MILLER REPORTING SERVICES
24            972 Tolland Street
       East Hartford, Connecticut 06108-1533
25            (860) 291-9191
```

**2**

```
 1        . . . Deposition of TODD BENNETT,
 2   Plaintiff, taken on behalf of the Defendants,
 3   Accenture, LLP, in the hereinbefore entitled action
 4   pursuant to Rules 26 and 30 of the Federal Rules of
 5   Civil Procedure of the Connecticut Practice Book and
 6   the videotape deposition videotaped pursuant to Rule
 7   30(b)(2) of the Federal Rules of Civil Procedure of the
 8   Connecticut Practice Book, before Aleen M. Stanton,
 9   CLSR and Notary Public, at the Law Offices of Zeldes,
10   Needle & Cooper, 1000 Lafayette Boulevard, Bridgeport,
11   Connecticut 06604, commencing at approximately
12   9:30 p.m., on Friday, August 29, 2003.
13
14             STIPULATIONS
15
16        It is hereby stipulated and agreed by and
     among counsel for the respective parties that all
17   formalities in connection with the taking of this
     deposition, including time, place, sufficiency of
18   notice and the authority of the officer before
     whom it is being taken may be and are hereby
19   waived.
20        It is further stipulated and agreed that
     objections, other than as to form, are reserved to
21   the time of trial and that the reading and signing
     of the deposition is not waived and that the
22   deposition may be signed before any Notary public.
23        It is further stipulated and agreed that the
     proof of the qualifications of the notary public
24   before whom the deposition is being taken is
     hereby waived.
25
```

**3**

```
 1   INDEX OF WITNESS                    PAGE
 2   TODD BENNETT                         5
 3   DIRECT EXAMINATION BY MS. KAPPELMAN  5
 4   INDEX OF DEFENDANT BENNETT'S EXHIBITS
 5   DESCRIPTION                    NO.  PAGE
 6   Notice of Deposition             1    5
     Responses to Accenture's First Request  2   12
 7   Responses to Accenture's Interrogatories  3   15
     Affidavit of Illegal Discriminatory Practice  4   16
 8   Document from Ct. Commission on Human Rights
     Rights And Opportunities         5   18
 9   10-24-02 Document from Ct. Commission on
     Human Rights And Opportunities   6   19
10   Complaint date 12-20-02          7   20
     Complaint with Aetna             8   28
11   Tax Returns                    A-9G   37
     Application To Anderson Consulting  10   42
12   Analyst job description          11   49
     7-1-93 letter from Mr. Gelfenbien  12   57
13   8-8-94 letter from Mr. Greene     13   59
     8-'95 Letter from Mr. Gelfenbien  14   60
14   Letter dated 8-9-96              15   62
     5-23-97 letter from Dr. Sica     16   70
15   Application form                 17   79
     Response from Aetna to Disability Claim  18   86
16   Notes                          19   94
     Clearance letter to work         20  117
17
```

**4**

```
 1        T O D D   B E N N E T T
 2
 3        MS. KAPPELMAN:  This is the
 4   deposition of Todd Bennett recorded on August
 5   29, 2003 in Bridgeport, Connecticut.  The
 6   deposition is being taken in the case of Todd
 7   Bennett Versus Accenture and was noticed on
 8   behalf of the defendant, Accenture, LLP.  The
 9   videotape operator is Matt DeGennaro of
10   Geomatrix Productions, 270 Amity Road, New
11   Haven, Connecticut.  We are using the usual
12   stipulations.  Counsel would like to read and
13   sign.  My name is Lynn Kappelman of Seyfarth &
14   Shaw and I am the attorney for Accenture, LLP.
15        MR. MAHONEY:  My name is Tim Mahoney.
16   I am the attorney representing Mr. Bennett.
17        MS. KAPPELMAN:  And now the witness
18   will be sworn on camera.
```

**TODD BENNETT**

1      T O D D   B E N N E T T
2  of 77 Harmony Hill Road, Granby, Connecticut 06035 was
3  duly sworn, was deposed and testified on his oath as
   follows:

4           DIRECT EXAMINATION
5  BY MS. KAPPELMAN:
6      Q   Good morning, Mr. Bennett. Have you ever
7  had your deposition taken before?
8      A   I have not.
9          MS. KAPPELMAN: I'd like to ask the
10    court reporter to mark this as the first
11    exhibit, please?
12        (Whereupon, the referred to
13    document was Marked For Identification as
14    Defendant's Exhibit No. 1).
15 BY MS. KAPPELMAN:
16     Q   Mr. Bennett, I am directing your attention to
17 what we have marked as Defendant's Exhibit 1 for your
18 deposition. It is a Notice of Deposition. That actual
19 notice says that we're going to come here on August
20 12th, but you and your counsel have graciously agreed
21 to come today instead; do you understand that?
22     A   I do.
23     Q   Okay. And you understand that you are here
24 today to give testimony and evidence in support of your
25 claims against Accenture, LLP?

---

1      A   Correct.
2      Q   And have you ever had your deposition taken
3  before?
4      A   No, I have not. Do I need to review that
5  document or?
6      Q   I don't think so. Unless you feel you need
7  to you are welcome to?
8      A   Does that just say I'm here for a deposition?
9          MR. MAHONEY: Well, it actually
10    references your previous notice.
11         THE WITNESS: Okay, fine.
12 BY MS. KAPPELMAN:
13     Q   Have you reviewed with your counsel the
14 purpose and the effect of your deposition today?
15     A   I have.
16     Q   And you understand that although we are
17 sitting in an informal conference room, your obligation
18 to testify truthfully and honestly is the same as if
19 you were in a court of law?
20     A   I understand.
21     Q   And that you have taken an oath of honesty?
22     A   Yes.
23     Q   There are a few rules of the road for taking
24 depositions and participating in depositions that are
25 different, so let me see if I can outline them for you.

---

1  Because we have got a court reporter sitting to my left
2  and your right and a videographer, it's very important
3  that you answer out loud and with words.
4      A   Uh-hum.
5      Q   So a mere shake of the head or uh-hum or
6  uh-huh while I would understand what you would mean in
7  normal conversation, it's important that the transcript
8  accurately reflect what your answer is. So try to
9  answer with a word and out loud, okay?
10     A   Okay, I understand.
11     Q   In addition, and I think you are going to be
12 okay with this I can tell already, you need to let me
13 completely finish my question before you answer. That
14 allows your attorney to interpose an objection if he
15 has one and it makes the record clear as to what
16 question you were actually answering.
17     A   Okay.
18     Q   In the same vein I will try to let you finish
19 your answer before I ask the next question. So if you
20 could do something to indicate that you are done, if
21 for some reason I am not catching your normal verbal
22 cues, okay?
23     A   Okay.
24     Q   All right. Do you feel well today, sir?
25     A   I'm still suffering from lingering affects of

---

1  copper poisoning.
2      Q   And how does that still effect you today?
3      A   I have all the symptoms I've had from the
4  beginning. They're just of a lower magnitude than they
5  used to be. I have difficulty concentrating, weakness
6  in my muscles, tingliness in my muscles, muscle
7  twitches; and as I was just referring to my counsel, I
8  will do my very best to answer your questions, but
9  since concentration is one of my weaknesses at this
10 point, I may need to take a break at some point.
11     Q   Okay.
12     A   But those are the symptoms I am exhibiting at
13 this point that I can remember.
14     Q   And that brings me to my next point which is
15 at any time if you feel like you need to take a break,
16 just let me know and we'll do that. We'll go off the
17 record. I would prefer if you would answer whatever
18 the pending question is so that we can take a break
19 without a question pending.
20     A   Sure, fair enough.
21     Q   But this isn't any kind of a race or I am not
22 trying to see what your stamina is, so let me know if
23 you need a comfort break or any kind of a break, okay?
24     A   Okay.
25     Q   Having described to me your symptoms, are you

1    under the influence of any alcohol or medication today?

2        A    No, I'm not.

3        Q    So thinking about the symptoms you just

4    described to me is there anything about those symptoms

5    that would either prohibit you from telling the truth

6    today?

7        A    No.

8        Q    Would it inhibit your ability to remember

9    things that happened recently or a long time ago?

10       A    Potentially depending on how tired I get.

11       Q    If at some point you get so tired that you

12   think your memory is starting to fade or you are not

13   remembering things correctly, will you let me know and

14   we will take a break?

15       A    I will.

16       Q    And if you don't let me know I'm going to

17   assume that you feel as though you are able to remember

18   what I'm asking you?

19       A    Fair enough.

20       Q    Okay.  In addition, if you don't understand a

21   question or you don't hear it, I'm going to ask you to

22   let me know that so that I can either repeat it or

23   rephrase it?

24       A    Okay.

25       Q    If you don't ask me to repeat or rephrase a

---

1    question, we're going to assume that you understand it

2    and you feel capable of answering it?

3        A    Okay.

4        Q    Okay.  What did you do to prepare for your

5    deposition today, sir?

6        A    I reviewed my Complaint and the various

7    responses that my attorneys and I have filed throughout

8    this process as well as the notes that I took in my

9    efforts to regain employment with Accenture.  By the

10   way, one thing that I was thinking I should say is that

11   I will make every effort to refer to your client as

12   Accenture as they're now known, but if I slip and call

13   them Anderson or Anderson Consulting, that's because

14   that's how I tend to think of them.  That's what they

15   were called when I was actively employed, but I will

16   make every effort to call them--

17       Q    Sure.

18       A    --Accenture.

19       Q    Actually, it's no problem and what we will

20   say is between us we will define that for the purposes

21   of this deposition when you refer to them as Anderson

22   or Accenture of any of the previous names, we'll

23   understand that you mean the entity that you have sued

24   here today?

25       A    Okay, fair enough.

---

11

1        Q    And your employer, okay?

2        A    Correct.  They're interchangeable in our

3    minds.

4        Q    Right.  So don't worry so much about that now

5    that we have defined that for ourselves.

6        A    Okay.

7        Q    Did you meet with anyone to prepare for your

8    deposition?

9        A    I have met with counsel and also talked via

10   telephone.

11       Q    And how many times did you meet with counsel

12   to prepare for your deposition?

13       A    I think there was one meeting.

14       Q    And how long did that take?

15       A    I would say about half an hour.

16       Q    And who was that?

17       A    That was with John Williams.

18       Q    And who did you speak with on the phone?

19       A    I spoke with Liz Brooks who I understand is

20   unable to join us today as well as Mr. Mahoney.

21       Q    And how long did you speak with Ms. Brooks?

22       A    I had I think two conversations with her.  I

23   probably spoke twenty minutes initially and five or ten

24   minutes the second time.

25       Q    And did Ms. Brooks show you any documents, or

---

12

1    did Mr. Williams show you any documents?

2        A    I'm not sure what you mean by documents,

3    pertaining to the case or in terms of the deposition

4    preparation?

5        Q    Right.  And to prepare for your deposition

6    today did Mr. Williams show you any documents to

7    prepare for today?

8        A    I already had all the documents, the legal

9    documents, that have been filed.  He did present me

10   with a couple of photocopied articles on how to prepare

11   for a deposition.

12       Q    So you already had the Complaint, your

13   Response to Discovery, and your own handwritten notes?

14       A    Correct.

15       Q    And that's what you have reviewed?

16       A    Correct.

17            MS. KAPPELMAN:  I would like to ask

18       the court reporter to mark this as the next

19       exhibit, please?

20            (Whereupon, the referred to

21       document was Marked For Identification as

22       Defendant's Exhibit Bennett No. 2).

23   BY MS. KAPPELMAN:

24       Q    Directing your attention, sir, to what we

25   have marked as Bennett 2 for your deposition, it is

14

1    your Responses to Accenture's First Request for the
2    Production of Documents; do you see that?
3        A    I do.
4        Q    Have you ever had an opportunity to review
5    this document, sir before now?
6        A    Yes, I have.
7        Q    And did you gather all the documents that you
8    had in your possession and control that would be
9    responsive to Accenture's requests?
10       A    Yes, to the best of my ability and the
11   documents that I had I complied with this request
12   through Williams And Pattis's office.
13       Q    Do you have anything in writing which in any
14   way pertains to this case but which you didn't produce
15   to your counsel?
16       A    I don't believe I have anything that wasn't
17   requested.  Everything that was requested was provided.
18   Let me phrase it that way.
19       Q    Do you have anything that wasn't requested
20   which you believe supports your claims in this case?
21       A    Not that I can think of at this time.
22       Q    If at any time during the deposition you
23   think of any documents which support your claims but
24   which you haven't already produced to us, will you
25   identify them for me?

1        A    I will.
2        Q    Did you request documents from third parties
3    such as physicians in order to respond to the Document
4    Request that we have marked as Exhibit 2?
5        A    Let me review the Document Request, if I may?
6        Q    Sure.
7             (Witness looking at document).
8        A    No, to the best of my recollection I was
9    already in possession of all documents that have been
10   requested.
11       Q    Okay.  Were there any electronic materials
12   that you printed out in order to respond to this
13   Disclosure?
14       A    Yes; there were records from my electronic
15   organizer that I forwarded in spread sheet form to the
16   Williams And Pattis office and I believe they were
17   included as part of -- as part of the documents.
18       Q    Okay.  And what information was contained on
19   the spread sheets?
20       A    They were it was a to do list and a calender.
21       Q    And whose to do list was it?
22       A    It was my to do list.
23       Q    And what items were reflected on the
24   calender?
25       A    They were my meetings and other engagements

15

1    work related.
2        Q    And what was the time period that the to do
3    list and the calender covered?
4        A    I would have to check that document.  It was
5    a little bit older.  I would say it was in the probably
6    1994 to 1996 timeframe.
7        Q    So it was a period during which you were
8    still employed with Accenture or Anderson?
9        A    Absolutely, but it did not cover the entire
10   period of my employment.
11            MS. KAPPELMAN:  I'd like to ask the
12       court reporter to mark this as the next
13       exhibit, please?
14            (Whereupon, the referred to
15            document was Marked For Identification as
16            Defendant's Exhibit No. 3).
17   BY MS. KAPPELMAN:
18       Q    Mr. Bennett, I am handing you what we have
19   marked as Exhibit 3 for your deposition.  It is your
20   responses to Accenture's first set of Interrogatories.
21   Have you ever had an opportunity to review this
22   document, sir?
23       A    I have.
24       Q    Okay.  And when did you review the document?
25       A    Most recently last night.

16

1        Q    Okay.  And did you assist your counsel in
2    preparing the responses to this document?
3        A    I did.
4        Q    And is the information contained in these
5    Interrogatory Responses true and correct to the best of
6    your knowledge?
7        A    Yes, it is.
8        Q    Are you familiar with the claims that have
9    been brought on your behalf against Accenture?
10       A    I am familiar with the claims.  I will defer
11   any detailed legal questions to counsel, but I am
12   familiar with the claims.
13       Q    And is it fair to say that you've filed an
14   action with the Connecticut Commission on Human Rights
15   and Opportunities prior to filing this lawsuit in
16   Federal District Court?
17       A    Yes, that is correct.  That was the proper
18   procedure as I was informed.
19            MS. KAPPELMAN:  I'd like to ask the
20       court reporter to mark this as the next
21       exhibit, please?
22            (Whereupon, the referred to
23            document was Marked For Identification as
24            Defendant's Exhibit No. 4).
25            MS. KAPPELMAN:  Off and record.

1  (Short comments made by Ms.
2  Kappelman.)
3  MS. KAPPELMAN:  Back on the record.
4  BY MS. KAPPELMAN:
5  Q  Directing your attention, Mr. Bennett, to
6  what's been marked as Exhibit 4 for your deposition it
7  is the Affidavit of Illegal Discriminatory Practice
8  which you filed with the Connecticut Commission on
9  Human Rights And Opportunities on May 6, 2002; do you
10  recognize that?
11  A  I do.
12  Q  Is that your signature on the last page?
13  A  Yes, it is.
14  Q  And did you have counsel at the time you
15  filed this CHRO charge?
16  A  Yes, I did.
17  Q  And when did you first engage counsel in
18  connection with your claims against Accenture?
19  A  It was in late winter or early spring before
20  this, but I do not know the exact date.
21  Q  So sometime winter or spring of 2002?
22  A  Correct.
23  Q  And have you read the allegations contained
24  in your CHRO charge?
25  A  I have.

1  Q  And do you believe them to be true and
2  correct to the best of your knowledge?
3  A  Yes, I do.
4  Q  And do you recall what the resolution was or
5  the result was of your CHRO charge?
6  A  I'm not sure what the proper terminology for
7  that is, but it was moved on to the next stage of the
8  process.
9  MS. KAPPELMAN:  I'd like to ask the
10  court reporter to mark this as Exhibit 5?
11  (Whereupon, the referred to
12  document was Marked For Identification as
13  Defendant's Exhibit No. 5).
14  BY MS. KAPPELMAN:
15  Q  Directing your attention to what's been
16  marked as Exhibit 5 for your deposition, it is a
17  document dated September 30, 2002 and addressed to you
18  from the Connecticut Commission of Human Rights and
19  Opportunities.  Could you take a moment to review this
20  document and let me know if you have ever seen it
21  before?
22  (Witness looking at document).
23  A  I do not recall if I have seen this before or
24  not.
25  Q  Okay.  Do you understand that on or about

19

1  September 30 of 2002 you received notice that the
2  commission had dismissed your Complaint for the reason
3  that "there was no reasonable possibility that further
4  investigation would result in a finding of reasonable
5  cause"?
6  A  I knew that it was dismissed.  I don't know
7  that I knew that was the exact reason and I believe
8  that we did appeal their finding.
9  Q  And what was the result of your appeal, if
10  you can recall?
11  A  To the best of my recollection the appeal was
12  also declined and we were given clearance therefore to
13  initiate a lawsuit.
14  MS. KAPPELMAN:  I'd like to ask the
15  court reporter to mark that as an Exhibit,
16  please?
17  (Whereupon, the referred to
18  document was Marked For Identification as
19  Defendant's Exhibit No. 6).
20  BY MS. KAPPELMAN:
21  Q  Directing your attention, sir, to what's been
22  marked as Exhibit 6 for your deposition, it is a
23  document dated October 24, 2002 from the Commission on
24  Human Rights And Opportunities addressed to you.  Could
25  you take a moment to review that and let me know if you

20

1  have ever seen it before?
2  A  I do not recall if I have seen this exact
3  document, but conceptionally I was aware that we were
4  then authorized to begin a civil action.
5  Q  Does it comport with your recollection that
6  was in or about the end of October of 2002 that you
7  received a right to sue letter from the Connecticut
8  Commission?
9  A  I do know the date and as I said, I don't
10  recall seeing this exact document.
11  Q  How did you learn of it?
12  A  Either verbally or in writing from my
13  attorney John Williams.
14  Q  Okay.  But you understood at least in sum and
15  substance that the Connecticut Commission had dismissed
16  your Action for lack of probable cause?
17  A  I knew it had been dismissed.  I'm not sure
18  if I knew that that was the reason.
19  Q  And had declined your appeal?
20  A  That's correct.
21  MS. KAPPELMAN:  I'd like to ask the
22  court reporter to mark this as the next
23  exhibit, please?
24  (Whereupon, the referred to
25  document was Marked For Identification as

22

1    Defendant's Exhibit No. 7).

2    BY MS. KAPPELMAN:

3        Q    Directing your attention, sir, to what's been

4    marked as Exhibit 7 for your deposition, it is your

5    Complaint in this matter dated December 20, 2002

6    against Accenture, LLP; do you see that?

7        A    I do.

8        Q    Have you had an opportunity to review the

9    allegations in your Complaint recently?

10       A    Yes, I have.

11       Q    In preparation for this deposition0?

12       A    Yes.

13       Q    And is there anything in the Complaint that

14   is not accurate as you sit here today?

15       A    Not that I'm aware of, no.  I believe it is

16   all accurate.

17       Q    And are there any facts in the Complaint that

18   you wish to add at this time that support your claims?

19       A    Nothing that I wish to add as I sit here.

20       Q    How old are you, sir?

21       A    I am 33-years-old.

22       Q    And how old were you when you first came to

23   work at Accenture?

24       A    I was 22-years-old.

25       Q    And what's your social security number?

---

1        A    My social security number is 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.

2        Q    Are you married, sir?

3        A    Yes, I am.

4        Q    To whom are you married?

5        A    My wife's name is Amy Bennett, A-m-y,

6    B-e-n-n-e-t-t.

7        Q    And how old is she?

8        A    She is 36.

9        Q    And have you ever been married before?

10       A    No, I have not.

11       Q    And how long have you two been married?

12       A    We've been married seven years.

13       Q    Do you have any kids?

14       A    I do.  We have one child.

15       Q    How old?

16       A    Just over eleven months.

17       Q    Boy or girl?

18       A    A little boy, his name is Spencer,

19   S-p-e-n-c-e-r.

20       Q    And where did you grow up, sir?

21       A    I grew up in East Granby, Connecticut.

22       Q    And did you go to high school?

23       A    I did.

24       Q    Did you graduate from high school?

25       A    I did.

---

23

1        Q    When?

2        A    In 1988.

3        Q    And where did you graduate from?

4        A    Which high school?

5        Q    Yes, sir.

6        A    East Granby High School in East Granby,

7    Connecticut.

8        Q    Did you matriculate further to college?

9        A    I did.

10       Q    Where did you go?

11       A    I attended Clarkson University.

12       Q    How many years?

13       A    Four years.

14       Q    Did you graduate from Clarkson?

15       A    I did.

16       Q    What year?

17       A    1992.

18       Q    So you went directly from high school to

19   college?

20       A    Correct, with the summer off in between,

21   obviously.

22       Q    And what did you major in?

23       A    I had two majors.  One was Management

24   Information Systems and the second major was

25   Interdisciplinary Engineering And Management.

---

24

1        Q    Have you ever been arrested, sir?

2        A    No, I have not.

3        Q    Did you go on to any further education after

4    you graduated from Clarkson in 1992?

5        A    I have done job related training, but no

6    formal education, no.

7        Q    And when you say "job related training," what

8    sort of courses have you taken?

9        A    Courses that were offered by Accenture, the

10   initial course was called CAPS.

11       Q    Do you know what stands for?

12       A    I used to.  Let me think about that.

13       Q    What was the curriculum?

14       A    It was an introduction to the

15   Accenture/Anderson at the time culture out at the

16   training center in St. Charles, Illinois.  It was also

17   a Cobol programming.

18       Q    C-o-b-o-l?

19       A    Correct.

20       Q    Okay.  Have you ever been in the military,

21   sir?

22       A    No, I have not.

23       Q    So other than the Accenture courses, have you

24   taken any other courses, continuing education courses,

25   et cetera?

26

1    A    No, I have not.

2    Q    Did you have any other computer or
3  information technology training other than the courses
4  that you took at Accenture?

5    A    First of all, let me say that the course that
6  I mentioned is not the full extent of the courses that
7  I took with Accenture.  There were certainly others.
8  Beyond that I had done some other self training in
9  terms of computer programs and applications and
10  application design, but I don't believe I have taken
11  any other formal courses.

12    Q    And can you remember the other Accenture
13  courses that you took or the curriculum of those
14  courses?

15    A    First of all, there is something that at
16  least at the time was called Green Books which is a
17  course of self study and everything from the history of
18  the firm to data base design.  I also took another
19  class out of St. Charles which I believe was called
20  Systems Integration, although I'm not certain of that.

21    Q    Anything else that you can remember as you
22  sit here today?

23    A    Not at this time, no.

24    Q    Other than the current lawsuit are you a
25  party to any other lawsuits?

1    A    I am a party to a concurrent lawsuit against
2  Aetna in relation to my long-term disability benefits.

3    Q    And what are your claims against Aetna in
4  that lawsuit?

5    A    I have not referred to that recently, so I
6  will defer detailed legal questions, but it's they did
7  not stand up to their contractual obligations.

8    Q    And when you say that what do you mean?  What
9  were their contractual obligations that they didn't
10  fulfill?

11    A    They are not recognizing the possibility of
12  partial disability.

13    Q    So to summarize, you are claiming that Aetna
14  should pay you for your partial disability?

15    A    Correct.

16    Q    And when did you bring that lawsuit?

17    A    Well, not the same day, but at about the same
18  time as this lawsuit against Accenture.

19         MS. KAPPELMAN:  I'd like to ask the
20         court reporter to mark this as the next
21         exhibit, please?

22         (Whereupon, the referred to
23         document was Marked For Identification as
24         Defendant's Exhibit No. 8).

25  BY MS. KAPPELMAN:

27

1    Q    Directing your attention, sir, to what's been
2  marked as Exhibit 8 for your deposition.  Can you take
3  a moment to review this document and let me know if you
4  could identify it for the record?

5         (Witness looking at document).

6    A    This appears to be a copy of the lawsuit that
7  we were just referring to against between me and Aetna.

8    Q    And what is the status of that lawsuit, if
9  you know?

10    A    I do not know the exact status of that
11  lawsuit at this time.

12    Q    But you haven't settled it?

13    A    Correct.

14    Q    And you haven't gone to trial?

15    A    Correct.

16    Q    Have you had your deposition taken in that
17  Action?

18    A    No, I have not.

19    Q    Paragraph 20 of your Complaint in that Action
20  against Aetna says:  "On March 22, 2002 Aetna informed
21  the plaintiff by telephone that they did not consider
22  him partially disabled under the policy and would
23  forward the matter to its appeal unit.  The plaintiff
24  repeated to the defendant Aetna at that time that he
25  was not claiming to be totally disabled and was not

28

1  challenging any determination that he was not totally
2  disabled, but that he was contending that he was
3  partially disabled."

4         Does that comport with your recollection of
5  the basis for your claims against Aetna?

6    A    Well, I don't recall the exact day.  The day
7  sounds reasonable and that is the basis of the claim,
8  yes.

9    Q    So has your condition changed since March of
10  2002?  Would you still consider yourself partially
11  disabled?

12    A    I do.

13    Q    And what are the symptoms of your partial
14  disability?

15    A    They are the symptoms that I outlined when we
16  first began this process, difficulty concentrating,
17  weakness in my muscles, tingliness in my muscles,
18  muscle twitches and fatigue.

19    Q    Okay.  Are you able to perform the functions
20  of your job with these symptoms?

21    A    Are you referring to the job I tried to get
22  back with Accenture?

23    Q    Well, that job.  Let's start with that.

24    A    I did get medical clearance to go back to
25  work on a part-time basis.  Initially it was three days

29
30

1    a week.  Then it became five days a week.

2        Q    As you sit here today does your partial

3    disability limit you from working fulltime in the

4    capacity that you were in when you left Accenture?

5        A    Yes, it does.

6        Q    So even as you sit here today, you would not

7    be able to work fulltime in the same capacity as you

8    were working when you left?

9        A    I don't believe so, no.  One of the

10   challenges is that my ability is not the same on every

11   day and my stamina is not the same on every day.  So I

12   wouldn't know if I could work fulltime unless I tried

13   it, but based on recent experiences I don't think I

14   would be, no.

15       Q    And in terms of your partial disability

16   payments that you are seeking from Aetna how much would

17   that be if you were to prevail and convince Aetna that

18   you were indeed partially disabled?  What portion of

19   your salary would you receive?

20       A    They have a formula and I'm not aware of

21   exactly how it's calculated.  It's not a one for one --

22   let's take a step back.  If Accenture had been willing

23   to take me back for every dollar that I would have

24   earned with Accenture there would have been a reduction

25   from my long-term disability payments, but it was not a

1    one for one reduction and I'm not sure exactly how that

2    was calculated, but in essence they would be reducing

3    the long-term disability payments to or by the amount,

4    roughly the amount that I would be earning.

5        Q    Suppose Accenture didn't take you back, but

6    you were still going to receive partial disability

7    payments, do you have any idea of how much that would

8    be, what proportion of your salary?

9        A    Would you please restate the question?

10       Q    Sure.  What I'm trying to figure out is if

11   you were still out on leave--

12       A    Uh-hum.

13       Q    --that were partially disabled rather than

14   totally disabled, do you have any idea how much Aetna

15   would owe you every month?

16       A    I do not know the answer to that.  All

17   discussions with Aetna at that point were on the basis

18   of being employed because that was my goal and it

19   remains my goal to this point.

20       Q    Okay.  Are you currently employed?

21       A    I am.

22       Q    For whom do you work?

23       A    I work for Bennett Avionics.

24       Q    B-e-n-n-e-t-t?

25       A    Correct, A-v-i-o-n-i-c-s.

31

1        Q    Okay.  And where is that located?

2        A    That is located in East Granby, Connecticut.

3    It's a small family business owned and operated by my

4    father.

5        Q    And what do you do there?

6        A    I sell avionics which is aviation electronics

7    for small aircraft, navigation, communication, radar

8    and the like.

9        Q    And who are your clients, customers?

10       A    Uhm, both retail and wholesale clients, the

11   retail clients would be pilots and the wholesale

12   customers would be fellow avionic shops across the

13   country and around the world.

14       Q    And how many hours a week do you work?

15       A    I am working approximately four to five hours

16   a day, five days a week.

17       Q    And what are your duties and responsibilities

18   there?

19       A    I am responsible for our website and Internet

20   sales.

21       Q    So describe for me an average day at Bennett

22   Avionics; what time do you get there and what do you do

23   during the day and what time do you leave?

24       A    I typically work from nine to one and I

25   answer phone calls from customers, e-mail from

32

1    customers, monitor where our items are in the repair

2    process.

3        Q    Do you repair as well as sell?

4        A    No, I do not.  I'm not qualified for that.

5        Q    Does the company repair as well as equipment?

6        A    We outsource the repair of these items.

7        Q    So the company both sells new equipment--

8        A    Actually, no.  Excuse me for interrupting.

9    Our basis is strictly used equipment.

10            COURT REPORTER:  I'm sorry?

11            THE WITNESS:  Strictly used avionics.

12   BY MS. KAPPELMAN:

13       Q    So do you sell used avionics, or repair used

14   avionics, or both?

15       A    We both buy and sell used avionics with

16   repair and certification in between and again, that

17   repair and certification is out-sourced.

18       Q    So you work from nine to one?

19       A    Roughly.

20       Q    And you handle customer calls and inquiries

21   by the website?

22       A    Correct.

23       Q    What else do you do?

24       A    Did I also mention managing and maintaining

25   our website?

34

1   Q   Does that involve programming?

2   A   It does involve some programming with the

3   HTML language.

4   Q   Do you utilize any of the skills that you

5   were using in your job at Accenture?

6   A   I did learn some HTML programming with

7   Accenture, yes.

8   Q   Anything else that you did with Accenture

9   that you are applying now?

10  A   The business is obviously completely

11  different.  I think I am using the same -- first of

12  all, some of the computer skills that I built as

13  Accenture as well as some of the organization and

14  structured thinking skills that I polished there as

15  well.

16  Q   And how are you compensated by Bennett

17  Avionics?

18  A   I'm compensated on a commission basis.

19  Q   And how does that work?

20  A   I am compensated a portion of the profits we

21  make on each item.  Additionally, I work out of my home

22  and home office.  Bennett Avionics had run out of

23  space, so I'm also compensated some rent.

24  Q   Okay.  From nine to one you work out of your

25  home office?

1   A   Correct.

2   Q   And correct me if I'm wrong, but people

3   approach you with to either buy or sell avionics

4   equipment?

5   A   Correct.

6   Q   And if you either buy it or sell it, you make

7   a commission?

8   A   I make a commission only when I sell it, but

9   the buying is important obviously, because if you don't

10  have something to sell you can't sell it.

11  Q   But you are compensated when you sell?

12  A   Correct.

13  Q   And how long have you been at this job?

14  A   I started a training period -- I've been

15  formally employed there.  The training period started

16  November 1 of 2001; and I do not recall when the

17  training period ended, but it was on or about the

18  timeframe that I learned from Accenture that I was

19  going to be terminated and also that Aetna had

20  terminated my long-term disability claim.  So it was

21  sometime in the spring, late spring of 2002.

22  Q   So let me get this straight, while you were

23  waiting to see if Aetna could find you a job, you had

24  already started training with your dad's company?

25  A   First of all, I think you mean Accenture was

35

1   trying to find me a job?  I started a training program.

2   The reason for that is that I had first--

3   Q   First let me interrupt you.  Is that a yes or

4   no, that yes, you started the training program while

5   you were waiting for Accenture to find you a job?

6   A   Yes, I had.

7   Q   Go on.  Why is that?

8   A   That is because my doctor had cleared me for

9   work and in an effort to restart my life the best thing

10  for me was to try to -- try to maintain a work

11  environment, particularly, mentally from the

12  concentration aspect.  I've been trying for as many

13  months to get a job back with Accenture as I'm sure you

14  have seen from the documentation without success.  I

15  had tried to simulate a work environment at home and

16  there is only so much you can do.  I don't think I was

17  too successful at that.

18      At that point the handwriting was on the wall

19  that things were not going to work out with Accenture

20  and so I first wanted to start or continue my recovery

21  by trying to get into a work environment and also build

22  some skills if things did not work out with Accenture.

23  Q   So other than your dad's company have you

24  worked with anyone else since you finished your leave

25  with Accenture?

36

1   A   No, I have not.

2   Q   And while you were on your leave, which we

3   will talk about in more detail, did you have any other

4   outside jobs?

5   A   No, I did not.

6   Q   And how much have you made per year from your

7   dad's company in earnings or commissions?

8   A   I would say I'm averaging about a thousand

9   dollars a month.  I believe my tax return was one of

10  the requested documents, so there may be more details

11  in that.

12  Q   And does that include the rent, or is the

13  rent in addition?

14  A   It does not include the rent.

15  Q   And how much are you paid for rent?

16  A   The rent is five hundred dollars a month.

17  Q   So you are paid five hundred dollars a month

18  for rent because you are working out of your home and

19  then you make your commissions on top of that?

20  A   Correct.  The rent started roughly September

21  of 2002 and as I mentioned the thousand dollars a month

22  in commissions.  That's an average as with any sales

23  cycle, there's slower months and better months.

24  Q   And you referenced your tax returns?

25      MS. KAPPELMAN:  I am going to ask the

38

1    court reporter to mark these 9A, 9B, 9C, 9D, 9E
2    and 9F and 9G?
3        (Whereupon, the referred to Tax
4        Returns were marked for identification as
5        Defendant's Exhibits Nos. 9A through 9G.).
6        MR. MAHONEY:  Are these in the
7    correct order?
8        MS. KAPPELMAN:  Yes.
9    BY MS. KAPPELMAN:
10       Q    Directing your attention, sir, to what we
11   have marked as 9A through 9G, take a moment to review
12   these documents and could you identify them for the
13   record?
14       A    These are the tax returns my wife and I filed
15   with IRS from 1996 through 2002.
16       Q    And if you could direct your attention to the
17   back page, the W2 form for 2000?
18       A    Yes, sure.
19       Q    It appears that in the year 2000 you were
20   paid $36,399.96 from Aetna; do you see that?
21       A    I do.
22       Q    Is that for your long-term disability claim?
23       A    Yes, it is.
24       Q    And do you know as you sit here what
25   proportion of your salary at Accenture that

1    constitutes?
2        A    To the best of my recollection, I had opted
3    for the benefit, the long-term disability benefit, of
4    70 percent of pay and again, to the best of my
5    recollection since that was paid and I don't recall
6    whether that was paid for with a pre-tax or after tax
7    dollars, but as a result this LTD benefit was after
8    tax.
9        Q    Okay.  And above that you will see there's an
10   amount that went to Amy your wife from the Connecticut
11   General Life Insurance Company?
12       A    I do.  I see that.
13       Q    Do you know, does she work for them?
14       A    She does.
15       Q    Okay.  And what is her job for them?
16       A    She works in CIGNA's Information Protection
17   Department.
18       Q    So that wasn't an insurance payout; that was
19   her paycheck?
20       A    That is her employment, correct.
21       Q    If you could direct your attention to 2001,
22   the last page reflecting the W2's?
23       A    (Witness looking for page).
24   BY MS. KAPPELMAN:
25       Q    In 2002 Aetna paid you from your return

39

1    $37,431.26 and again, that was for your long-term
2    disability claim?
3        A    Correct.
4        Q    And what is this other W2 from Aetna, Wages,
5    Tips And Other Compensation for $403.35, do you know?
6        A    That is from Accenture, not from Aetna, if
7    I'm looking at the right document.
8        Q    Okay.  What does that constitute?
9        A    That -- let me double-check this.  There was
10   an issuance of if not stock I believe it was called
11   either the RSU's or E units within Accenture.  It was
12   an employee ownership plan.  Those were shares that
13   were outstanding to me and when I was terminated they
14   became uh -- ownership transferred to me and this was
15   the tax implication of that.
16       Q    And if I could direct your attention to the
17   last page of all the documents which is the W2's for
18   2002?
19       A    I do not have 2002.
20       Q    Directing your attention to Exhibit 9H.  If
21   you look at the last page of that exhibit it reflects
22   the W2's for 2002 and in here it reflects that you
23   received $6,404.76 from Harley Bennett Aviation; is
24   that your dad's company?
25       A    Yes, it is.  That is the actual name of the

40

1    company.  We have changed it to Bennett Avionics in a
2    more informal setting to make it easier for people to
3    remember.
4        Q    Okay.  I believe that you told me that in
5    September of 2002 you started to get rent of five
6    hundred dollars a month; is that reflected in this Wage
7    And Compensation Statement?
8        A    I remember discussing the rent with our
9    attorney -- excuse me, not our attorney, our
10   accountant; and I think that there was a separate
11   declaration of that.  So no, I do not believe the rent
12   is included in that.
13       Q    But you declared that on your income tax
14   returns?
15       A    Yes, I don't see it here, but it was declared
16   to the IRS.
17       Q    And it appears that in 2002 you received
18   $13,356.75 in payments from Aetna.  Again, was that
19   your long-term disability payments?
20       A    It was.
21       Q    And did they stop at some point in 2002?
22       A    That's correct.  That's why the number is
23   lower than in the previous two years.
24       Q    Do you recall when they stopped in 2002?
25       A    I'm sure that is included in our documents

1    that have been requested, but it's somewhere in the
2    late spring, early spring/late winter timeframe.
3         Q    And other than the money that comes from
4    Bennett Avionics, do you have any other income coming
5    in since the spring of 2002 other than your wife's
6    income?
7         A    I was going to say first of all, my wife and
8    then whatever income our investments produce which is
9    also included in here and like most people it's not
10   been too much lately.  One point I would like to bring
11   up is when looking at the Harley Bennett Avionics
12   Consulting, or Aviation Consulting, the number is lower
13   than what I have told you for a couple of reasons.
14   One, the training program was unpaid for quite some
15   time, for several months; and then also when I was
16   ramping up the sales were quite a bit slower as I was
17   building our website and our infrastructure.
18        Q    So your dad didn't even compensate you while
19   you were building the website or doing the training?
20        A    My dad runs a small business and is not able
21   to compensate people unless they are contributing
22   directly to the bottom line.  In the meantime I was
23   learning the business to the point where I could
24   contribute.
25        Q    Okay, I will just put these together.

1         MR. MAHONEY:  Is that 9H or 9G?
2         MS. KAPPELMAN:  You're right.  We're
3    missing F here.  This should be, 2001 should be
4    9F and 2002 should be 9G.  No problem.
5    BY MS. KAPPELMAN:
6         Q    After you graduated from Clarkson in 1992,
7    what was your first job out of college, sir?
8         A    My first job out of college was with at the
9    time Anderson Consulting, Accenture today.  I graduated
10   in May of -- in May of 1992 and went to work for again,
11   then Anderson Consulting in August of 2002.
12        MS. KAPPELMAN:  I'd like to ask the
13   court reporter to mark this as the next
14   exhibit, please?
15             (Whereupon, the referred to
16        document was Marked For Identification as
17        Defendant's Exhibit No. 10).
18   BY MS. KAPPELMAN:
19        Q    Directing your attention to what's been
20   marked as Exhibit 10.  It looks like an application to
21   Anderson Consulting.  Do you recognize this document?
22        A    Yes, this appears to be my employment
23   application with Anderson Consulting.
24        Q    Is that your signature on the second page?
25        A    Yes, it is.

43

1         Q    And it's dated October 29, 1991; is that your
2    handwriting?
3         A    Yes, it is.
4         Q    Does that comport with your recollection that
5    you applied for a position with Anderson and filled out
6    this application in October of 1991?
7         A    Yes, it does.  That makes sense to me, yes.
8         Q    Okay.  And if you could just take a quick
9    moment to review your application.  Was everything
10   contained on the application true and correct when you
11   submitted it to Anderson?
12        A    At that time everything was true and correct
13   to the best of my knowledge and it still remains so.
14        Q    If you look under your employment record it
15   says that you worked for NCR Corporation?
16        A    Correct.
17        Q    What did you do for NCR Corporation?
18        A    I was attending Clarkson University at the
19   time and I participated in a program called Semester
20   And Industry where essentially I was an intern.  I went
21   to school one summer and I worked that following fall
22   for NCR in Ithica.  I worked in their I believe it was
23   called Informations Systems And Support area doing
24   application development and programming.
25        Q    And how about Mill's Pride, what did you do

44

1    for them?
2         A    I did PC support for them.  They had a
3    showroom with somewhere between ten and twenty PC's and
4    I was responsible for maintaining those PC's.
5         Q    Was this also while you were in college?
6         A    To the best of my recollection that was the
7    summer between my freshman and sophomore years, yes.
8         Q    And is everything else true and correct to
9    the best of your knowledge on this application?
10        A    To the best of my knowledge, yes, it is.
11        Q    How did you learn about the opening with
12   Anderson Consulting?
13        A    I heard about Anderson Consulting through
14   friends and associates at Clarkson University.  I
15   attended a job fair where Anderson Consulting had a
16   booth and I spent some time talking to the recruiters
17   and ultimately decided that was my first choice for
18   employment out of Clarkson.
19        Q    Did you have a job interview?
20        A    I did.  I had several actually.
21        Q    Do you recall who you interviewed with?
22        A    My initial interview was with a gentleman
23   from the Rochester office, but I do not recall his
24   name.
25        Q    And what did he say to you and what did you

1    say to him about the position?

2        A    Our conversation as I recall it today was not

3    so much about the position but about me.  He had an

4    interesting interviewing style.  He said in essence we

5    have forty-five minutes for this interview.  We'll save

6    five or ten minutes for questions at the end.  Why

7    should I hire you?  Go.

8        And so most of the conversation was about my

9    qualifications and experiences and what I could add to

10   Anderson Consulting, now Accenture.

11       Q    And what position were you hired for?

12       A    I was hired as -- the names changed over the

13   years, but I believe I was called an analyst initially.

14       Q    And what were the duties and responsibilities

15   of an analyst?

16       A    That's a complicated question because no two

17   engagements that we were assigned to were the same.  If

18   on an engagement it was going to be anything from

19   developing and managing relationships with clients,

20   gathering user requirements, design, detail design of

21   computer programs, preparation of presentations.

22       Q    So it was computer and information technology

23   work?

24       A    Yes, and I've participated in engagements

25   both where we built computer systems as well as more

---

1    strategic engagements such as we looked at

2    re-engineering the remittance processing department of

3    SNET in New Haven or also I participated in an

4    engagement in looking at re-engineering the Away From

5    Homeland Office Division of AT&T, but also built

6    computer systems on other -- on other projects.  And

7    what I was leading up to was that then the

8    responsibilities, if not on a project and in the

9    office, could range from training and trying to better

10   ourselves and gain skills to participating in proposals

11   and development of new work as well as recruiting.

12       Q    How many other interviews did you have for

13   the position with Accenture?

14       A    I had that one interview on campus at

15   Clarkson University as I mentioned earlier.  I then had

16   a conversation on the phone I believe with Jill

17   Berkwitz and I was invited to an office visit in

18   Hartford where I participated in both formal and

19   informal interviews, the latter of which occurring over

20   lunch.  I don't recall how many it was, but it was at

21   least half a day long.

22       Q    And what position.  Strike that.  What was

23   the location of the office that you were hired into?

24       A    The office was at One Financial Plaza, the

25   gold building in Hartford, Connecticut.

---

47

1        Q    And to whom did you report?

2        A    Upon being hired?

3        Q    Right.

4        A    I reported as a pool of staff consultants.  I

5    did not until assigned to a project answer directly to

6    a supervisor.

7        Q    And about how many projects would you be on

8    at one time?

9        A    It depends on the level of the person in

10   question.  If we're talking about me, when I was at

11   entry level, typically that would be one project at a

12   time.

13       Q    Were you hired into a particular market unit?

14       A    At that time the term "market unit" did not

15   exist.  I was hired into, and again these names changed

16   as well, but it was their technical specialty division.

17   Originally it was called the Advanced Systems Group and

18   the named changed after that to -- I don't recall what

19   it changed to after that.

20       Q    And how many hours a week were you working?

21       A    Like many of my other answers that depends on

22   what I was doing, what project I was on, and whether or

23   not I was staffed.

24       Q    Were you compensated on an hourly basis or

25   with a salary?

---

48

1        A    The compensation was salaried, but with

2    overtime in essence making it appear as if it was

3    hourly compensation and the way it worked was that the

4    first I believe 80 hours of overtime were unpaid

5    counting as vacation and anything beyond that I was

6    paid at my standard rate.

7        Q    And do you recall what your standard rate was

8    the time you were hired in 1991?

9        A    I was hired, if not exactly approximately

10   $29,000 a year.  I don't recall what that worked out to

11   on an hourly basis.

12       Q    Now, I believe you told me that you graduated

13   in 1992 from Clarkson; is that correct?

14       A    I did.

15       Q    So on your first interview you filled out

16   your application in October of '91 before you had

17   graduated?

18       A    As is the typical custom there and I suspect

19   at many other colleges, the interviewing and

20   application process takes place throughout the senior

21   year.

22       Q    So when did you actually begin working for

23   Anderson Consulting?

24       A    I began working for Anderson Consulting in

25   August of 2000 -- no, I keep saying, in August of 1992.

49

1    Excuse me.

2                    MS. KAPPELMAN:  I'd like to ask the

3        court reporter to mark this as the next

4        exhibit, please?

5                    (Whereupon, the referred to

6                    document was Marked For Identification as

7                    Defendant's Exhibit No. 11).

8    BY MS. KAPPELMAN:

9        Q    Directing your attention, sir, to what's been

10    marked as Bennett Exhibit 11 for your deposition.  It

11    appears to be the job description for an analyst in the

12    Technology Competency Group; do you see that?

13        A    Please give me a moment to review this.  This

14    is indeed the summary of an analyst within the

15    Technology Competency Group.  This document never

16    directly applied to me because by the time of the

17    Technology Competency Group I was no longer at the

18    analyst level.  I was at the consultant level which is

19    one step up from this.

20        Q    And how did your job as a consultant with

21    Technology Competency Group differ from the job

22    description that's outlined here?

23        A    My job was quite a bit different in terms of

24    job supervision that I would supervise a number of

25    people performing at the analyst level both Anderson

50

1    Consulting employees as well as client personnel.  In

2    addition, I had a number of different responsibilities

3    such as planning, budgeting both time, mainly time, but

4    sometimes dollars as well, managing relationships with

5    more senior level client personnel, managing and

6    maintaining relationships with vendors, being more

7    involved in the decision making process and a little

8    bit further removed from the hands-on technology

9    application?

10        Q    Take a moment to review the description for

11    the analyst for the Technology Competency Group and let

12    me know how that differed from your job as an analyst

13    with the Advanced Systems Group?

14                    (Witness looking at document).

15        A    This would be a high level description of an

16    analyst in the Advanced Systems Group as well I think

17    when I was first hired and as I mentioned I think one

18    of the reasons this document is somewhat vague at a

19    high level is because their responsibilities depended

20    greatly based on the project that you were assigned to.

21        Q    So what would you say your average weekly

22    hours would be on a busy project?

23        A    At which level?

24        Q    As an analyst?

25        A    On a busy project it could be anywhere from

51

1    well, we really didn't start considering a busy project

2    until you were up in the fifty hour range, anywhere

3    from fifty to a hundred hours a week.

4        Q    And was anybody working part-time as an

5    analyst in the Advanced Systems Group when you were

6    there?

7        A    I don't recall.

8        Q    And how about when you got promoted, were you

9    in a consulting position; is that what you were saying?

10        A    The term was then called consultant, correct.

11    That's the position that I described before.

12        Q    And as a consultant what were your average

13    hours on a busy week on a busy project?

14        A    Are you asking me what my hours were or what

15    they typically were?

16        Q    No, you?

17        A    I would say I worked anywhere I worked well

18    up into the seventy or eighty hours a week.

19        Q    And was that typical for a consultant at your

20    level at that time in the Technology Competency Group?

21        A    It depended on the project and it also

22    depended on the stage of the project, but it was

23    certainly possible.

24        Q    And did you know anybody while you were a

25    consultant in the Technology Competency Group that was

52

1    doing that job part-time?

2        A    I recall people mainly pregnant women or

3    women back from maternity leave working on a part-time

4    basis or doing job sharing.

5        Q    Do you remember any particular pregnant women

6    or people on a part-time basis who were doing the job

7    of consultant?

8        A    I don't recall any names at this point, no.

9        Q    Do you remember anything that you could

10    describe about those people other than names,

11    department, who they reported to, what projects they

12    were on, anything that would help us locate them?

13        A    Sure.  I think there was one or two on the

14    Vista Project at ITT Hartford.

15        Q    And these folks were working part-time?

16        A    I believe so.  I believe there were also some

17    individuals working on internal projects in the office,

18    quality measures or tracking client satisfaction.

19        Q    And they were also consultants in the

20    Technology Competency Group?

21        A    That I don't recall at this point.

22        Q    And my question is about folks that were

23    consultants in the Technology Competency Group.  Were

24    the folks that were working part-time on the Vista

25    project consultants in the Technology Competency Group?

54

1    A    I do not recall, but there were many, many
2    people on that project.
3    Q    As you sit here today do you remember any
4    specifics about anybody who was a consultant in the
5    Technology Competency Group that was doing that job
6    part-time?
7    A    I don't know of anybody on that project that
8    I can think of at this point that was doing that.
9    However, I know of many, many people performing at
10   that--
11   Q    That wasn't my question.  I am just going to
12   ask you to answer only the question that I ask you,
13   okay?
14   A    Okay.
15   Q    At the time that you were hired as an analyst
16   in the Advanced Group did you mention that you had any
17   impairment or disability?
18   A    At the time I was hired I had no impairment
19   or disability.  No, I did not mention that.
20   Q    Did you request an accommodation from anybody
21   to perform the functions of your job?
22   A    No, I did not.
23   Q    Were you able to perform the functions of
24   your job?
25   A    I was.

1    Q    At some point you got promoted.  Do you
2    remember when that was?
3    A    It was after approximately two years of
4    employment, but I do not recall the date.
5    Q    Did you have an orientation when you were
6    hired as an analyst?
7    A    I did.
8    Q    How long did that take?
9    A    There was A one day orientation in the
10   office.  Then there was I believe three weeks of self
11   guided study and then that launched into the three week
12   CAP program out in St. Charles, Illinois as I mentioned
13   earlier.
14   Q    And during your one day orientation do you
15   recall who gave you the orientation?
16   A    It was a number of different people for
17   various responsibilities.  I seem to recall Jill
18   Berkwitz.  There was someone who had talked to us about
19   the phone system and voicemail.  There were people who
20   talked to us about benefits, but I do not recall their
21   names at this point.
22   Q    Were you provided with any written materials
23   at that time during the orientation?
24   A    I was.
25   Q    Were you provided with a company handbook?

55

1    A    Yes, I was.
2    Q    Did you have an opportunity to review company
3    policies?
4    A    Yes, I did.
5    Q    Were some of those policies concerning
6    discrimination and harassment?
7    A    I don't recall at this point.
8    Q    Did they explain to you who to complain to if
9    you had a problem with discrimination or harassment?
10   A    I don't recall being told that, no.
11   Q    And did you receive any programs or systems
12   training while you were an analyst at Accenture?
13   A    The training that I mentioned previously,
14   yes.
15   Q    What programs or what systems were you an
16   expert on or trained to use as an analyst?
17   A    In addition to a variety of office
18   applications and office productivity applications I was
19   an expert in foundation which was Anderson Consulting's
20   client server application development tool.
21   Q    Do you remember the names of any of the
22   office productivity applications which you were able to
23   use?
24   A    Microsoft Excel, Office, Power Point.
25   Q    So basically the Microsoft office?

56

1    A    Correct.
2    Q    And then in addition to that foundation?
3    A    A foundation I also did some work with Visual
4    Basic and Power Builder.
5    Q    Anything else that you can remember that you
6    were an expert on as an analyst?
7    A    I had also done some data base design with a
8    -- with a relational data base.  I forget the name.
9    Q    And during the period of time that you were a
10   consultant and were you a consultant at the time that
11   you went out on leave?
12   A    Yes, I was.
13   Q    So your two jobs at Anderson were analyst and
14   then consultant, correct?
15   A    Those were my two levels.  The two jobs
16   varied greatly based on the project that I was assigned
17   to at the time.
18   Q    So you had two titles?
19   A    Correct.
20   Q    When you held the title of consultant were
21   there any additional programs or systems on which you
22   became expert other than the ones that you listed for
23   me here?
24   A    I became more familiar with File Net and
25   Oracle.

57

58

1    Q    Do you recall what do you did with File Net
2    and Oracle that caused you to become more conversant?
3    A    Sure.  With File Net I managed a relationship
4    between the Vista project and File Net and both File
5    Net and Oracle I was responsible for three teams of
6    developers building the applications using less tools,
7    so routinely looking at the problems they were having
8    as well as helping them solve them and making sure
9    their designs met the user specifications.
10    Q    And do you know the time period that you were
11    working with Oracle using 1997 when you went out on
12    leave as a guide?
13    A    Both of those were for the duration of the
14    Vista project which I was on and I believe I left in
15    either January 1997 or December 1996 and I joined the
16    Vista project before the previous Thanksgiving.  So I
17    will say sometime in November of 1995.
18    Q    So November of 1995 to about December of '96?
19    A    To the best of my recollection today, yes.
20        MS. KAPPELMAN:  I'd like to ask the
21    court reporter to mark this as the next
22    exhibit?
23        (Whereupon, the referred to
24    document was Marked For Identification as
25    Defendant's Exhibit No. 12).

BY MS. KAPPELMAN:
1    Q    Directing your attention, Mr. Bennett, to
2    what's been marked as 12, it's a letter to you dated
3    July 1, 1993 from a Roger Gelfenbien?
4    A    G-e-l-f.
5    Q    Who is Mr. Gelfenbien?
6    A    Mr. Gelfenbien was the managing partner of
7    Anderson Consulting's Hartford office at the time.
8    Q    And it says here that "as of July 1993 your
9    compensation was increasing from 29 to 33,000 a year."
10    Do you see that?
11    A    I do.
12    Q    Does that comport with your recollection that
13    at that time in or about actually September of '93 you
14    were earning $33,000?
15    A    That is correct to my recollection.
16    Q    Did you have an opportunity to earn bonuses
17    as well?
18    A    As I discussed previously both at the analyst
19    and consultant ranks the overtime structure was such
20    that after the first eighty hours you were paid on an
21    hourly basis while technically not a bonus per say in
22    lump sum, it was additional payment above that amount.
23    Q    So is it fair to say that you regularly
24    worked more than eighty hours a week as an analyst?

59

60

1    A    That's not what I said.
2    Q    How often would you say you kicked into that
3    overtime rate in a year?
4    A    Well, when I mentioned eighty hours--
5        THE WITNESS:  Thank you.
6    A    --that was per year, not per week.  Every
7    year I was into that I worked more than eighty hours of
8    overtime routinely.
9    Q    And do you have any sense of how many hours
10    of overtime you worked per year as an analyst?
11    A    No, I do not.  I'm sure your client's records
12    would show that, but I don't know.
13        MS. KAPPELMAN:  I'd like to ask the
14    court reporter to mark this as the next
15    exhibit?
16        (Whereupon, the referred to
17    document was Marked For Identification as
18    Defendant's Exhibit No. 13).
19    BY MS. KAPPELMAN:
20    Q    Directing your attention, sir, to what's been
21    marked as Defendant's 13 for your deposition.  It's a
22    letter to you from a William D. Greene dated August 8,
23    1994.  Who is Mr. Greene?
24    A    To the best of my recollection at this point
25    the Advanced Systems Group between the Hartford and

1    Boston offices had been combined for efficiency and
2    Bill Greene was the partner based out of Boston who was
3    running that group.
4    Q    But you were still physically in Hartford?
5    A    I was based out of Hartford, but I went to
6    whatever project I was sent and staffed on.
7    Q    And at that time does this comport with your
8    recollection that in September of 1994 you got a raise
9    from 33,000 to $37,500 per year?
10    A    Well, I don't remember the exact numbers, but
11    yes, that seems reasonable to me.
12    Q    During this period of time were you still an
13    analyst or had you become a consultant?
14    A    I do not recall.  As I mentioned previously
15    the promotion occurred approximately two years after I
16    -- after two years of employment, but I don't recall if
17    that was before or after this document.
18        MS. KAPPELMAN:  I'd like to ask the
19    court reporter to mark this as the next
20    exhibit, please?
21        (Whereupon, the referred to
22    document was Marked For Identification as
23    Defendant's Exhibit No. 14).
24    BY MS. KAPPELMAN:
25    Q    Directing your attention, sir, to what's been

61

1  marked as Exhibit 14 for your deposition.  It is a

2  letter to you again from a Mr. Gelfenbien in August of

3  1995; do you recognize this document?

4      A    I do.  It appears to be the subsequent years

5  raise letter.

6      Q    Does it comport with your recollection that

7  in September of 1995 you received a raise from $37,500

8  to 43,000 a year?

9      A    Again, I don't recall the exact figures at

10  this point, but that seems reasonable to my

11  recollection.

12      Q    As of August of 1995 did you have any

13  disability or problem performing the functions of your

14  job?

15      A    I had been out sick on a project called the

16  Seatips project.  I was actually on that project for

17  two periods.  During one of those periods I experienced

18  what in hindsight I recognized as the early symptoms of

19  working too many hours, getting run down and my body

20  not being able to cope with the copper toxicity.

21          However, I thought I had Mononucleosis or was

22  otherwise sick and I had reported that to anyone at

23  Anderson beyond the fact that my immediate supervisor

24  at that time Mark Raymond was well aware of my

25  troubles, but I was not on disability.

62

1      Q    And do you remember when that was?

2      A    It was definitely during my first stint with

3  the Seatips project.  It was in the Hartford office and

4  it was in the autumn timeframe, but I do not recall

5  which year that was.

6      Q    Were you a consultant or an analyst at that

7  point?

8      A    I'm sorry.  I don't recall.

9      Q    And when you say working "too many hours,"

10  about how many hours were you working in that job per

11  week?

12      A    I do not recall the number of hours, but

13  again, I'm sure your client has the employment records

14  to look that up, but it was a potential of overtime

15  hours.  We were in a crunch period trying to complete

16  the development and testing of a computer system.

17      Q    And how often would you say that consultants

18  or analysts got into crunch periods as part of the

19  functions of their job at Anderson Consulting?

20      A    Again, it depended on the project, but it was

21  fairly common.

22          MS. KAPPELMAN:  Why don't you mark

23      that first?

24          (Whereupon, the referred to

25          document was Marked For Identification as

63

1          Defendant's Exhibit No. 15).

2  BY MS. KAPPELMAN:

3      Q    Directing your attention, sir, to what's been

4  marked as Exhibit 15 from your deposition do you

5  recognize that letter to you dated August 9, 1996?

6      A    This appears to be my raise letter from the

7  subsequent year.  Yes, I do recognize it.  Although, I

8  don't remember the exact figures, they do seem

9  reasonable.

10      Q    Okay.  So does it comport with your

11  recollection that in September of 1996 you started to

12  earn $51,500 a year?

13      A    Again, I don't recall the exact figure, but

14  that does seem reasonable to me, yes.

15      Q    And at the time you went on leave in 1997

16  your salary would have been the same as it was in

17  September of 1996?

18      A    Correct, with the obvious addition of any

19  overtime I had worked and at the time that I went out

20  on disability I was unable to work overtime.

21      Q    Right.  And why were you unable to work

22  overtime at the time you went out on disability?

23      A    At that point I was unable to work regular

24  time let alone overtime.

25      Q    And it's pretty common as a consultant to get

64

1  into crunch time and have to work overtime hours?

2      A    Yes, it is.

3      Q    At some point you started to develop these

4  symptoms that you talked to me about, failure to be

5  able to concentrate, weakness, twitches and fatigue,

6  correct?

7      A    The list is that I described to you earlier

8  today and that's what I can remember at this point.

9      Q    Are there any other symptoms that you

10  developed prior to 1997?

11      A    Prior to 1997 or during 1997?

12      Q    Prior to 1997?

13      A    As I mentioned when I was on my first

14  engagement with the Seatips project I got run down

15  enough that I was beginning to feel symptoms.  At that

16  point it was mainly the fatigue.  The full set of

17  symptoms did not become manifest until I was on the

18  Vista project in 1996.

19      Q    And are there symptoms other than the ones

20  that you have just outlined for me that you suffered in

21  1996?

22      A    Would it be possible for you to read back the

23  list to be sure?

24      Q    Failure to be able to concentrate, weakness,

25  twitches and fatigue.

1    A    Tingliness in my extremities, a feeling of
2    heaviness in my extremities and at that point also in
3    my cheeks, and there may be other symptoms, but that's
4    what I recall at this point.
5    Q    Did you go see a doctor for those symptoms?
6    A    I did.
7    Q    When did you first see a doctor for your
8    symptoms?
9    A    I first saw a doctor sometime during the
10   autumn of 1996.  I went to my primary care physician.
11   Q    And who was that?
12   A    It was Dr. Steven Dietrich at the time.
13   Q    Okay.  And what did Dr. Dietrich do when you
14   went to see him, Dr. Dietrich?
15   A    He ran some blood tests.  Again, as I
16   mentioned, how I felt on the Seatips project I thought
17   maybe I had Mononucleosis and some other tests, could
18   determine nothing wrong based on those tests except for
19   some elevated liver enzymes.  He suggested that I come
20   back some months later to perform a re-test and that
21   was not satisfactory to me because I didn't want to
22   wait several months.  I was having trouble, a great
23   deal of trouble making it through a regular day.
24   Q    So what did you do next?
25   A    I went to other doctors in hopes of pursuing

1    an answer.  I think Dr. Dietrich is a fine doctor, but
2    my problem was a little bit out of the ordinary for his
3    family practice.
4    Q    So who is the next doctor that you saw?
5    A    I believe the next doctor that I saw was a
6    doctor by the name of Dennis Miller in Branford.
7    Q    And what was Dr. Miller's specialty?
8    A    Dr. Miller ran or participated in a family
9    practice, but he had developed a reputation for being a
10   little bit investigative.
11   Q    And what did Dr. Miller do?
12   A    He ran some tests that were again
13   inconclusive.  He sent me to a neurologist.
14   Q    Do you know what kind of tests he ran?
15   A    Mainly blood work.
16   Q    Did they test for anemia?
17   A    I believe they did, yes.
18   Q    And when did you see Dr. Miller?
19   A    I don't recall the exact date, but it must
20   have been sometimes during the winter of 1997.
21   Q    So January, February or March of 1997?
22   A    I don't remember the exact dates, but in that
23   ballpark.
24   Q    And what conclusions did Dr. Miller come to
25   about your condition?

67

1    A    He was also unable to diagnose me.
2    Q    So what was the next thing that you did?
3    A    At that point we couldn't even be sure if
4    there wasn't something environmental that was making me
5    sick in our apartment, so my wife and I decided to take
6    some time away to see if that improved things.
7    Q    Where were you living at the time?
8    A    We were living in Avon Mill Apartments in
9    Avon, Connecticut.
10   Q    So what did you do?
11   A    We actually flew down to see her parents in
12   Florida and within hours of arriving my symptoms
13   worsened greatly.  I wound up hospitalized in an effort
14   to try to determine what the problem was.  That was
15   again inconclusive, but while I was in the hospital I
16   talked to my wife's sister.  She had a roommate in
17   college whose husband was extremely ill I believe with
18   cancer, but I never pressed on what the diagnosis was.
19   He had received a great deal of help from a doctor in
20   Orange, Connecticut by the name of Robban Sica, Dr.
21   Robban Sica; and again, she to even a greater degree
22   had a reputation as a doctor who would investigate or
23   pursue all avenues to try to determine what the problem
24   was.
25   Q    What was Dr. Sica's specialty?

68

1    A    I don't know if she has a specialty beyond a
2    very comprehensive understanding of medicine and the
3    human body and a willing to probe a little bit deeper
4    than the average doctor.
5    Q    Now, in your Interrogatory Disclosure in
6    response to No. 9, you disclosed Dr. Robban Sica at
7    quote, The Center For The Healing Arts, unquote; is
8    that where she is?
9    A    To the best of my knowledge, yes.
10   Q    And do they practice non-traditional medicine
11   there?
12   A    She has a foot in both doors.  I would say
13   that her approach is primarily traditional medicine,
14   but unlike a lot of doctors she is not afraid or
15   hesitant to try alternative complimentary approaches.
16   Q    And what tests -- when did you see Dr. Sica?
17   A    We saw her upon coming back from Florida I
18   would say approximately March or April of 1997.
19   Q    And what tests did Dr. Sica run?
20   A    She ran a wide variety of tests including
21   blood work, as you mentioned before for anemia, mono,
22   Lyme's Disease.  She ran a number of endocrinology
23   tests for thyroid and other hormone levels and she
24   tried to put me on a number of different medicines and
25   supplements to see what I would respond to and

1   ultimately when I was not responsive that's when she
2   reached the conclusion that there was probably a
3   toxicity that was blocking the absorption of some of
4   these substances.
5       Q    Did she do a test to determine whether there
6   was toxicity?
7       A    She did not, but she sent me to another
8   doctor by the name Eugene Zampieron.
9       Q    Z-a-m-p-i-e-r-o-n; and where was Dr.
10  Zampieron?
11      A    I believe his office was located in
12  Middlebury, Connecticut.
13      Q    Is it now in Woodbury Connecticut?
14      A    I do not know if he still runs that practice
15  or not.  Woodbury might be his home address.  I believe
16  I actually got that address from his website.
17      Q    Okay.  And Dr. Zampieron what was his
18  specialty?
19      A    He is a naturopath, an M.D.
20      Q    And did Dr. Zampieron run any tests?
21      A    He did.  He ran a battery of tests the most
22  conclusive of which was a hair test which identified
23  greatly elevated levels of copper.  The hair test
24  apparently is a way to determine tissue levels short of
25  a biopsy and previous tests had not turned up the

1   copper because it was stored away deep in my tissue,
2   not in active circulation.
3           The medical theory that my doctors have
4   developed is that I picked up the copper from well
5   water, but I was no longer drinking that water and so
6   the copper was not actively circulating, but it was
7   stored away in my tissues.
8       Q    And are there doctors other than Dr.
9   Zampieron that came up with that theory?
10      A    He was the one that initially came up with
11  that theory and subsequent tests and treatments by a
12  Dr. Robban Sica confirmed the diagnosis.
13      Q    What other tests did Dr. Robban Sica do to
14  confirm the diagnosis?
15      A    He began a series of chelation, an attempt to
16  bind the copper and pull it out both orally and
17  intravenously, and then the copper levels were measured
18  routinely both through blood serum and through urine
19  collection, and the copper was released and excreted at
20  a staggeringly high level.
21          MS. KAPPELMAN:  I'd like to ask the
22      court reporter to mark this as the next
23      exhibit?
24          (Whereupon, the referred to
25          document was Marked for Identification as

71

1           Defendant's Exhibit No. 16).
2           THE WITNESS:  May I take a short
3       break before we begin the next question?
4           MS. KAPPELMAN:  Sure, absolutely.
5           THE WITNESS:  Thank you very much.  I
6       appreciate it.
7           (Off the record at 11:05 a.m. to
8           11:14 a.m.)
9           MS. KAPPELMAN:  Back on the record.
10  BY MS. KAPPELMAN:
11      Q    Mr. Bennett, you say in paragraph 6 of your
12  Complaint in this Action that in December of 1996 you
13  found yourself "no longer able to perform everyday
14  personal and professional activities."  Do you recall
15  that allegation?
16      A    That sounds reasonable, yes.
17      Q    Which of your everyday personal activities
18  were you unable to perform in December of 1996?
19      A    At that point I was unable to have the extra
20  energy to for example to visit with family or friends.
21  I was having trouble reading mail; so nothing exotic,
22  but anything that would require concentration or energy
23  around the house or at that point around the apartment.
24      Q    And which of your everyday professional
25  activities were you unable to perform in December of

72

1   1996?
2       A    Again, my job required a high degree of
3   concentration and I was unable to bring that to bear at
4   that point.  I also had trouble at the beginning of the
5   day and it only went downhill from there during the
6   course of the day.  So it was a matter of both duration
7   and ability to concentrate.
8       Q    So is it fair to say that the job as an
9   analyst in the Technology -- or a consultant in the
10  Technology Competency Group required a high degree of
11  concentration?
12      A    Yes, it does.
13      Q    And required a high degree of energy?
14      A    Yes, it does.
15      Q    In paragraph 6 of your Complaint you go on to
16  say that you suffered from "cognitive impairments,
17  difficulty concentrating, reading, talking and
18  writing."  Would you agree with me that as a consultant
19  in the Technology Competency Group you had to do a lot
20  or reading, talking and writing?
21      A    Are we talking about the December of 1996
22  timeframe?
23      Q    At any time pretty much; as a consultant in
24  the Technology Competency Group would you agree with me
25  that job requires a lot of reading, talking and

1    writing?

2       A    It does.  That's why I was unable to perform

3    my functions.

4       Q    And you also claim that you experienced

5    "weakness, fatigue, paresthesia and muscle

6    vesiculations"?

7       A    Correct.

8       Q    What are muscle vesiculations?

9       A    I'm not a doctor, but I believe that's the

10   muscle twitches.

11      Q    And did that prohibit you from doing your

12   job?

13      A    The biggest problem was the concentration,

14   but they all contributed.

15      Q    And of those symptoms which are the ones that

16   you are still having today?

17      A    I have all those symptoms today to a lesser

18   degree to a degree that allows me to participate in

19   employment at that consultant level on a part-time

20   basis.

21      Q    So you can concentrate part-time?

22      A    Yes.

23      Q    And you can have enough energy to work

24   part-time?

25      A    Yes.

---

1       Q    And did your physician I think it was Sica

2    who diagnosed it or Zampieron?

3       A    Zampieron diagnosed it initially.  Sica has

4    been my attending physician that really coordinated my

5    care.

6       Q    Did either of them give you a sense of how

7    long the condition would last when they saw in late '96

8    and early 1997?

9       A    In late 1996 and early 1997, they did not

10   have the diagnosis to give me a timeframe for.

11      Q    Okay.  And did you have other conditions in

12   late 1996 and early 1997 for which you were being

13   treated?

14      A    No, I did not.

15      Q    Directing your attention to what's been

16   marked as Exhibit 16 for your deposition which is a one

17   page letter from a Dr. Sica to Pam Johnson at Anderson

18   Consulting; do you see that?

19      A    I do.

20      Q    It's dated May 23, 1997.  Have you had an

21   opportunity to see this letter before?

22      A    Not in some time, but yes, I have seen it.

23      Q    Okay.  And when did you first have occasion

24   to see it?

25      A    I imagine shortly after it was mailed.

---

75

1       Q    Okay.  So sometime in May of 1997?

2       A    Correct.

3       Q    And was it mailed to you, or did you get a

4    carbon copy?

5       A    I suspect I got a copy.  I don't know for

6    certain, but that would be reasonable.

7       Q    Did you ask Dr. Sica to mail this letter to

8    Pam Johnson?

9       A    I don't recall doing so.

10      Q    But you were aware that it happened in or

11   about May of 1997?

12      A    Correct.

13      Q    Okay.  If the letter it says "Todd Bennett

14   has been under care of my office since April 21, 1997,"

15   and just stopping there does that comport with your

16   recollection that that's when you first went to see Dr.

17   Sica?

18      A    That sounds reasonable, yes.

19      Q    And it says that you went there "complaining

20   of fatigue, weakness, chronic sinusitis and multiple

21   allergies."  Do you see that?

22      A    I do.  I regard that as an incomplete list

23   because it does not include the symptoms we've

24   discussed previously.

25      Q    Right, but it also does include chronic

---

76

1    sinusitis.  Do you recall that that was one of the

2    things you were suffering from in May of 1997?

3       A    Actually, a very good point.  I would like to

4    amend my previous testimony, if I may, that during the

5    fall of 1996 I did have very bad sinus problems and I

6    was under the treatment of Dr. Dietrich for a variety

7    of antibiotics to knock out those sinus conditions.  I

8    had forgotten that.

9       Q    And it says, "Multiple allergies."  Do you

10   recall that in late 1996 and early 1997 you were

11   suffering from multiple allergies?

12      A    That was regarded as a possible cause of the

13   sinus problems, that the allergies were causing buildup

14   or backup, or I don't know the exact term which then

15   became infected.

16      Q    Did any of your doctors tell you that chronic

17   sinusitis might cause fatigue or weakness?

18      A    I recall visiting an allergist by the name of

19   Dr. Kroll I believe in December of 1996 or thereabouts

20   and I -- to the best of my recollection we discussed

21   that; however, the problems that I was experiencing

22   were of a magnitude that made that highly unlikely.

23      Q    But did a doctor tell you that it is possible

24   that your chronic sinusitis might be causing difficulty

25   concentrating, reading, weakness and fatigue?