78

```
 1        A    A doctor told me that the sinusitis through
 2   the pain and/or pressure might cause a degree of
 3   discomfort, nothing however like what I was
 4   experiencing at the time.
 5        Q    As you sit here now do you know that those
 6   are some effects of the sinusitis?
 7        A    I would maintain having had both sinusitis
 8   and copper poisoning that they are in no way
 9   comparable.
10        Q    Okay.  And you were taking antibiotics
11   apparently in this time in May of 1997, correct?
12        A    No, I believe I was -- I had run the course
13   of antibiotics during the fall of 1996.  I think it was
14   a spectrum of three or four different types, but I do
15   not believe that I was still on antibiotics at this
16   time.
17        Q    Directing your attention to the middle of
18   this letter which says "testing has shown
19   hypothyroidism and candida enteritis secondary to
20   antibiotics for which he is receiving treatment."  So
21   is it fair to say that you were having some sort of
22   like a yeast infection which is the candida enteritis?
23        A    That is a yeast infection in the digestive
24   tract and Dr. Sica's theory or medical diagnosis was
25   that the broad spectrum of antibiotics that I have been
```

```
 1   on throughout the previous fall had killed the -- for
 2   lack of a better term -- the good bacteria in the
 3   digestive tract that would keep the yeast in check.
 4        Q    Did anybody ever tell you that hypothyroidism
 5   and candida enteritis could cause weakness, fatigue
 6   difficulty concentrating and other cognitive
 7   impairments?
 8        A    Definitely not the candida, that was manifest
 9   through some diarrhea which while unpleasant was not --
10   was not one of my main symptoms.
11        Q    The question is whether anybody told you that
12   the infection in your belly and the hypothyroidism
13   could cause weakness, fatigue, difficulty
14   concentrating, et cetera?
15        A    I understand the question.  As I said, no one
16   ever told me that for candida.  I was giving up to the
17   hypothyroidism.  I do not recall whether I was told
18   that or not.
19        Q    Since that time have you done any individual
20   independent research about hypothyroidism or candida
21   enteritis to see what the symptoms are of those?
22        A    No, I have not.
23        Q    Have you done any independent investigation
24   as to what some of the symptoms or side effects of
25   chronic sinusitis or multiple allergies would be?
```

79

```
 1        A    No, I have not because I don't suffer from
 2   these things any longer.
 3        Q    And again, did your doctors, Dr. Sica or Dr.
 4   Zampieron, give you any idea about how long they
 5   thought you might be unable to perform the functions of
 6   your job as a result of the diagnosis they gave you?
 7        A    They gave me an idea, but I think it's
 8   important to take into account when looking at this
 9   document that in essence this document is wrong, that
10   this was his initial cut, Dr. Sica's initial cut, at a
11   diagnosis which turns out to be incorrect.  Actually, I
12   had not even seen Dr. Zapieron at this point.  Dr. Sica
13   had no idea that the problem was copper toxicity at
14   this point.
15        Q    So as of May 1997 you didn't know that you
16   had copper toxicity?
17        A    That is correct.
18        Q    At some point you requested a medical leave
19   of absence correct?
20        A    I did.
21        Q    Yes?
22        A    Yes, excuse me.
23             MS. KAPPELMAN:  I'd like to ask the
24        court reporter to mark this as the next
25        exhibit, please?
```

80

```
 1             (Whereupon, the referred to
 2        document was Marked For Identification as
 3        Defendant's Exhibit No. 17).
 4   BY MS. KAPPELMAN:
 5        Q    Directing your attention to what's been
 6   marked as Exhibit 17 for your deposition.  Do you
 7   recognize this document?
 8             (Witness looking at document).
 9        A    I do.
10        Q    Is this a document that you filled out?
11        A    I filled out the first page.  I do not
12   believe that I filled out the second page.  The second
13   page appears to be the signature of Dr. Dennis Miller
14   where he talked about continued investigation.
15        Q    Okay.  So is that your signature on the first
16   page?
17        A    Yes, it is.
18        Q    Where it's dated?
19        A    Yes, it is.
20        Q    So did you sign and date this on February 14,
21   1997?
22        A    It appears I did, yes.
23        Q    And it says that you anticipate the start
24   date for your leave as December 1996 in the middle of
25   the page?
```

81

1     A    It does.

2     Q    As you sit here today do you recall that you

3  began your medical leave of absence in December of

4  1996?

5     A    My recollection of it is that it was not that

6  cut and dry from a timeline standpoint, that I was in

7  and out of work making every effort to be productive

8  both on the productive both on the project and then

9  when I left that back in the office and I was not out

10 of office fulltime until I believe -- until I believe

11 April of 1997.

12    Q    Okay.  So in April of 1997 you went out on

13 leave fulltime?

14    A    Correct, initially on short term and then on

15 long term.

16    Q    And it was about a month later Dr. Sica wrote

17 what we have as Exhibit 16 which she still only saw

18 chronic sinusitis and multiple allergies and candioa

19 enteritis, correct?

20    A    What is the date on that again?

21    Q    May 23, 1997.

22    A    Correct.

23    Q    As you sit here today when did you get your

24 diagnosis as copper toxicity?

25    A    I do not recall the date.  It was definitely

82

1  during 1997, but I do not recall the date.

2     Q    And when Dr. Zampieron diagnosed your copper

3  toxicity did he give you an idea of how long you should

4  be out of work, how long you would be suffering from

5  your symptoms?

6     A    No, he did not.

7     Q    No sense on that?

8     A    I remember discussing that with him because I

9  very much wanted to get better and I very much wanted

10 the symptoms I was experiencing to stop and my

11 recollection is that he was unable to provide that

12 answer because every individual is different in terms

13 of your body's desire to retain the copper as well as

14 the copper level they're experiencing.

15    Q    And did he suggest a course of treatment to

16 rid yourself of copper toxicity?

17    A    He did.

18    Q    And what was the course of treatment that he

19 proposed?

20    A    He proposed in concert with Dr. Sica a dual

21 treatment strategy using both natural and traditional

22 medicine to attack this.  His approach was -- actually,

23 let me start first with the traditional medicine

24 approach through Dr. Sica which as I have mentioned was

25 to chelate and bind the copper through both oral and

83

1  intravenous means and pull it out.

2     Q    So let me just interrupt you.  For non

3  doctors that means to give you medication which would

4  draw the copper to it and cause you to excrete the

5  copper--

6     A    Exactly.

7     Q    --to get it out of your system?

8     A    Correct.

9     Q    And that's spelled C-h-e-l-a-t-i-n-g, a

10 chelating agent?

11    A    C-h-e-l-a-t-i-n-g, correct, I believe.

12    Q    Okay.

13    A    So that was the traditional tract.  The

14 natural tract to go along with that and the

15 complimentary tract was while -- while that was

16 occurring to try to increase my body's ability to

17 excrete that primarily through sweating.  So I would go

18 through both hydro-therapy and sauna treatments where

19 depending on the treatment I would either sit in very

20 hot water periodically or sit in a sauna periodically

21 to increase my body's temperature, sweat profusely and

22 get into a shower to cool off my body to a more

23 comfortable level and repeat the process.

24    Q    Did you ever determine where you might have

25 picked up such increased copper toxicity?

84

1     A    The theory that my doctors have developed is

2  that I got it from well water growing up in East

3  Granby.

4     Q    Is there anyone else that you know in your

5  family, for example, that has increased copper

6  toxicity?

7     A    Not that I'm aware of, no.

8     Q    Do you have brothers and sisters?

9     A    I have one brother.

10    Q    How old is he?

11    A    He is 30.

12    Q    How about your mom and dad, are they still

13 alive?

14    A    They are.

15    Q    Do any of them have problems with copper

16 toxicity?

17    A    Not that I'm aware of.

18    Q    Are you still in touch with any of your

19 neighbors from East Granby?

20    A    Some.

21    Q    Okay.  Do any of them to your knowledge have

22 problems with copper toxicity?

23    A    Not that I'm aware of.

24    Q    Have you done any investigation with the Town

25 of East Granby about why there may have been or if they

85

1    have any information about excess copper in the water?

2    A    I have not contacted the town.  What I have

3    investigated is that I grew up in an area with a high

4    water table near the first copper mine in America

5    closer to even another copper mine and really the whole

6    Northeast is ground rich in copper and anybody with a

7    well has this potential exposure.

8    Q    Right, but my question why you, Todd Bennett,

9    are having such severe problems and nobody else in your

10   family or in your neighborhood?

11   A    Okay.  That's the first time you've addressed

12   that--

13   Q    Right.

14   A    --in that manner.  The reason I believe for

15   that is that I have a greater tendency to attract and

16   retain a greater amount of copper than my body needs

17   genetically.  I have been through some testing at the

18   University of Michigan where they have a center that

19   specializes in Wilson's Disease which is a genetic

20   disorder where bodies retain additional copper.  And

21   the theory that my doctors have developed is that I do

22   not have full blown Wilson's Disease, but I have

23   something between a normal affinity for copper and

24   Wilson's.

25   Q    And which doctors have come up with that

86

1    theory?

2    A    Dr. Sica.

3    Q    Okay.  At some point you applied for

4    long-term disability benefits from Aetna, correct?

5    A    Correct.

6    Q    When did that occur, if you can recall?

7    A    I cannot tell you the exact day, but I was on

8    short term disability from then Anderson to now

9    Accenture starting in October of 1997.  I believe that

10   lasted for approximately three months.  So it would be

11   sometime during the late spring or summer of 1997, but

12   I can't give you the exact date.

13   Q    Let's start again.  You believe you started

14   on short term disability with Anderson when?

15   A    I believe April of 1997.

16   Q    And you were on that for two or three months

17   until you applied for long-term disability?

18   A    The long-term disability was applied for and

19   I think I had some part in the application process and

20   I think Anderson/Accenture did as well.

21   Q    Now, at the time you applied for long-term

22   disability had you had your diagnosis of copper

23   toxicity?

24   A    I do not know.

25   Q    Okay.

87

1                MS. KAPPELMAN:  I'd like to ask the

2         court reporter to mark this as the next

3         exhibit, please?

4                (Whereupon, the referred to

5         document was Marked For Identification as

6         Defendant's Exhibit No. 18).

7    BY MS. KAPPELMAN:

8    Q    Directing your attention, sir, to what's been

9    marked as Exhibit 18 for your deposition.  Could you

10   take a moment to review this document and identify if

11   for the record, if you can?

12                (Witness looking at document).

13   A    This appears to be the response from Aetna to

14   my application for long-term disability approving that

15   disability claim.

16   Q    So at some point prior to August 30, 1997,

17   you applied for long-term disability benefits; is that

18   fair?

19   A    That is fair.

20   Q    Okay.  And you received this notice saying

21   that you in fact had qualified for the same, right?

22   A    That's what this appears to be, yes.

23   Q    Did your doctors participate in that process

24   certifying that you were unable to perform the

25   functions of your job?

88

1    A    I do not recall.

2    Q    And is it fair to say that as of this point

3    in August of 1997 you were completely unable to perform

4    the functions of your job?

5    A    That is correct.

6    Q    And if you turn to page 2 it outlines your

7    monthly benefit from July 1997 to May 9, 2035, and it

8    goes in steps as you can see?

9    A    Uh-hum.

10   Q    Right?

11   A    Correct.  Excuse me.

12   Q    Okay.  It also says that on the first page

13   "if you are still eligible for long-term disability

14   benefits on April 7, 2002 it will be necessary for you

15   to meet a more stringent any occupation definition of

16   disability."  Did you understand what they meant by

17   that?

18   A    I believe I did at the time.  I'm not

19   familiar with the documentation at the moment.

20   Q    It goes on to say in this document, "To

21   qualify for LTD benefit eligibility in April 2002 you

22   will have to provide objective medical evidence that

23   you're unable to perform any reasonable occupation for

24   which you are qualified or you could become qualified

25   as opposed to just your job."  Did you understand that

89

1  that was the distinction in April of 2002?

2      A    I did.

3      Q    Okay.  And how long were you out on long-term

4  disability leave?

5      A    Based on this document from the initial

6  payment on July 6, 1997 until sometime as I have

7  testified in late winter or early spring of 2002,

8  actually probably until this April 7, 2002 date that

9  they reference.

10     Q    Okay, but I believe that you mentioned to me

11  that you tried to come back to work at some point and

12  you made contact?

13     A    With Accenture, that is correct.

14     Q    Do you recall when that was?

15     A    To the best of my recollection, I made

16  initial contact on January 31st of 2001 to Michelle

17  Holt.

18     Q    So you received disability benefits until the

19  winter of '02, correct?

20     A    That approximate timeframe, yes.

21     Q    Okay.  And from July 6, 1997 until January

22  2001, when you contacted Michelle Holt, you were out on

23  long-term disability leave?

24     A    Correct, and then past that as you've

25  indicated.

90

1  and you weren't feeling enough, we were ready

2  to come back to work until at least January 2001?

3      A    I didn't feel ready and I had not received

4  medical clearance from my doctors until then.

5      Q    Okay.  January, okay.  That's a period of

6  about three and, you know, three and a half years, July

7  1977 until January 2001?

8      A    It's several years.

9      Q    What did you do during the period from July

10  1997 until January 2001 with yourself during the day?

11     A    My abilities were greatly limited at that

12  point.

13     Q    When you would wake up in the morning what

14  time would you wake up?

15     A    I don't recall at this point.  My primary

16  focus on that during that period was to improve my

17  health.  And so the doctors' appointments took a lot of

18  my time as did both the traditional and natural methods

19  that I previously outlined.

20     Q    How old were you in July of 1997?

21     A    I was 27.

22     Q    So just give me an example of an average day

23  between July of 1997 and January 2001?

24     A    I would if I had a doctor's appointment

25  obviously attend that.  If not, I would depending on

91

1  where I was in the treatment course do the

2  hydro-therapy or the sauna.  You're looking for an hour

3  to hour day and I was unable to do much in those days.

4  For example, during the earlier part of that period I

5  was so sick that if I visited my family on the weekend

6  for an hour or two I was unable to do much of anything

7  for the following week.

8      Q    Is that pretty much the way it was through

9  until January 2001, or was there a period of time where

10  things got significantly better?

11     A    There's never been a period of time when

12  things have gotten significantly better.  It's been a

13  slow process.  And 2001 that's when my doctors and I

14  thought that I had improved enough to the point where

15  part-time employment was feasible and honestly would do

16  more help for me at that point than good -- excuse me,

17  do more help for me than harm; whereas, before then it

18  would have done more harm than good.

19     Q    So from July 1997 until January 2001 you

20  didn't have any other income coming in other than your

21  70 percent LTD benefit?

22     A    As evidenced by my Tax Returns we had my

23  wife's salary and whatever our investments earned, but

24  I was not earning any other money beyond that.  I had

25  no employment.

92

1      Q    And did you have any hobbies?  Did you go to

2  the gym?  Did you play any sports?

3      A    I went to the gym mainly for the sauna.  I

4  did my very best to keep active with computers using

5  the Internet to monitor news and trends.

6      Q    And which gym did you go to?

7      A    I went to two gyms.  One was in Unionville,

8  Connecticut.

9      Q    Do you remember the name of it?

10     A    I'm sorry I don't and I don't believe they

11  are in business any more.  It was in the center of

12  Unionville behind the Friendly's in a plaza by the

13  river down below.

14          The second gym that I went to I believe is

15  called the Windsor Racquet Club.  It's a gym and racket

16  sports facility in Windsor, Connecticut.

17     Q    And what are the kinds of things you would do

18  when you went to the Windsor Racquet Club?

19     A    At the Windsor Racquet Club I would do

20  sessions where I would both sit in the sauna and then

21  shower to cool off repeatedly or sit in a whirlpool and

22  then go to the sauna -- to the shower and cool off

23  repeatedly in an effort to ramp up my excretions of the

24  copper.

25     Q    Did you work out on any machines?

1     A     No, I did not.  I was unable to.

2     Q     At either the gym in Unionville or in

3     Windsor?

4     A     I did not use any machines.  In either case I

5     was not able to and the story was the same for

6     Unionville except they did not have a whirlpool, so it

7     was just the sauna.

8     Q     Okay.  So what were the circumstances that

9     led you to believe that you could go back to work at

10    Accenture in January of 2001?

11    A     It had always been my goal to come back and I

12    had improved enough to the point where I thought it

13    made sense to have an evaluation.  So I went to the

14    Gaylord Hospital in Wallingford, Connecticut, the

15    Gaylord Rehabilitation Center, and they performed an

16    evaluation on me.

17    I had speech therapy, physical therapy,

18    occupational therapy.  The results from that were

19    combined and the attending physician there was Dr.

20    Gerald Kaplan I believe his name is.  He's the doctor

21    who based on those results cleared me for a return to

22    work.

23    Q     And do you know when you first saw Dr.

24    Kaplan?

25    A     I do not, but it was definitely while I was

93

attending Gaylord.

2     Q     And how many times would you say you saw Dr.

3     Kaplan?

4     A     I do not know the exact number, but I would

5     say I have seen him on the order of two to four times.

6     My interaction with him was mainly at the conclusion of

7     my treatment and evaluation there where he summarized

8     the results and recommended a course of action.

9     MS. KAPPELMAN:  I'd like to ask the

10    court reporter to mark this as the next

11    exhibit, please?  I'm sorry.  Bear with me for

12    a moment.  I would like to see if I have other

13    copies of this.

14    (Whereupon, the referred to

15    document was Marked For Identification as

16    Defendant's Exhibit No. 19).

17    (Videographer had to go off record to

18    change tape at 11:40 a.m. and went back on

19    the record at 11:44 a.m.)

20    BY MS. KAPPELMAN:

21    Q     Mr. Bennett, during the period of your leave

22    from June of 1997 and before you contacted anyone at

23    Accenture in January of 2001, did you keep in touch

24    with folks at the company?

25    A     I contacted or communicated with a handful of

94

95

1     friends, but not much.  I would say a lot of my

2     relationships at the time were Anderson Consulting

3     people or other friends, I just did not have the energy

4     for that.

5     Q     Okay.  Did you know that during the period of

6     your disability Anderson went through a number or

7     reorganizations?

8     A     I did.

9     Q     How did you learn about that?

10    A     Listening to voicemails mainly.

11    Q     Were you still listening to voicemails from

12    the company during the three and a half years you were

13    on leave?

14    A     I was for the first part of that period.

15    After some time they turned my voice-mailbox off, but

16    I'm not sure exactly when that was.  But between

17    receiving voicemails and also talking to these I guess

18    a handful of friends, I was aware and I'm not surprised

19    because Anderson at that point was a company that

20    tended to reinvent itself fairly regularly.

21    Q     Were you aware during the period of your

22    leave that Anderson had suffered an economic downturn?

23    A     I don't believe it did suffer an economic

24    downturn, certainly not before I contacted them in

25    2001.

96

1     Q     Okay.  So as you sit here today you don't

2     know that there was any economic downturn in the

3     company's business during your period of leave?

4     A     Are you talking about the period of my entire

5     leave or the period before I contacted them to come

6     back to work?

7     Q     Let's take two periods.  Prior to January of

8     2001 were you familiar with any sort of economic

9     downturn in Accenture's business?

10    A     Prior to January 2001, no, I'm not aware of

11    any.

12    Q     From January 2001 until you brought this

13    lawsuit in December 2002, are you familiar with any

14    economic downturn in Accenture's business?

15    A     I am.  I read that in the response to the

16    various petitions that went back and forth.  I think

17    that's mainly where I first learned about it.

18    Q     But you didn't learn of it independently

19    through friends or contacts in the industry?

20    A     I knew that there were some other changes

21    going on such as the company going public and I think

22    -- I think it was apparent that the economy as a whole

23    was beginning to slow down, but I was not aware of

24    anything in particular with Accenture.

25    Q     Were you aware that during the period of your

1 leave Accenture had gone through a number of work force
2 reductions?
3     A   Which period are you referring to at this
4 point?
5     Q   Let's start with the period up until January
6 of 2001?
7     A   No, I'm not.  I was not aware of that.
8     Q   Were you aware that from January 2001 to
9 December of 2002 when you brought your lawsuit
10 Accenture had gone through additional work force
11 reductions?
12     A   I don't recall when, but at some point I
13 became aware of that, yes.
14     Q   And how did you become aware of that?
15     A   I probably read about it on the Internet, but
16 like I said I couldn't tell you when.
17     Q   Were you aware that folks from the period of
18 January 2001 until December of 2002 in your own
19 consulting group were laid off?
20     A   Would you please state the dates again?
21     Q   Sure.  The January 2001 period to December
22 2002 I believe you told me you were aware during that
23 period of time that Anderson had gone through
24 reductions in force?
25     A   Uh -- at some point during that period I

1 became aware of it, but I do not have any knowledge of
2 any individuals who were impacted from it, but in terms
3 of a global organization standpoint, yes, I became
4 aware of that.
5     Q   In the information that you read which
6 allowed you to become aware of the reductions in force
7 did it say anything about folks in your position, that
8 is, consultants in the technology group getting laid
9 off?
10     A   I don't believe that anything I read was
11 nearly that specific.
12     Q   Did you become aware that other folks who had
13 held your position had gotten laid off between January
14 '01 and December 2002?
15     A   I had really lost contact with most people,
16 most of my associates at Accenture at that point, and
17 the main source of information like I said was what I
18 read which was generally available or the information I
19 learned from -- from the notes that you are referring
20 to.  Late in that period I believe I did, but certainly
21 when I was initially trying to get my job back.
22     Q   Did anybody tell you or did you learn through
23 the media or any other source that Accenture had gone
24 into a hiring freeze between the period of January of
25 2001 and December 2002?

99

1     A   I was not aware of that until I read that in
2 a response in one of the petitions that's been outlined
3 so far.
4     Q   So nobody between January 2001 and December
5 2002 when you brought this lawsuit told you that
6 Accenture had gone into a hiring freeze?
7     A   Let me amend my answer.  I definitely read
8 about it in the document that I mentioned before.  It's
9 possible that it came up in one of my conversations
10 with Michelle Holt and Accenture, but I could not tell
11 you the date of that.
12     Q   And during the period of your leave from July
13 1996 -- I'm sorry, July 1997 to January 2001, did
14 Accenture change its business units in any other way or
15 the way that it structured its business in any other
16 way?
17     A   I'm sure there were changes, but I will leave
18 those up to your client to document.
19     Q   Were you aware during your leave that
20 Accenture had created market units during the period of
21 your leave?
22     A   Again, are we talking about the period before
23 I tried to come back or?
24     Q   The period before you tried to come back
25 January 2001?

100

1     A   I do not know if I was aware of that or not,
2 but new names and new structures and new organizations
3 whether they were materially different or not were
4 fairly common.
5     Q   So did you learn of any other changes within
6 Accenture that had occurred while you were on leave; in
7 other words, while you were on leave and let me make a
8 better question.  While you were on leave and let's say
9 for the period July 1997 until January 2001, did you
10 learn of any changes that were happening within
11 Accenture that might have affected you in any way?
12     A   I was not aware of any changes that would
13 have precluded my return to employment.
14     Q   Did you speak to anyone that you had worked
15 with prior to going out on leave while you were on
16 leave?
17     A   I spoke to friends while I was out on leave.
18 I'm not sure if I spoke to anybody who I had worked on
19 the same project with or not.
20     Q   Who did you speak to while you were on leave?
21     A   I spoke to Nick Nichols and Jay Vilanew
22 (phonetic sp.)
23     Q   And what was Nick's position?
24     A   And by the way I have not talked to either
25 one in some time.  Last I knew Nick Nichols was working

101

1  on a project in New York City with Marsh McClennan &
2  Company as a consultant as was Jay Vilenew.  He was a
3  consultant and last I knew he was working on a project
4  I believe for Pepsi and he ultimately went to work for
5  Pepsi.
6      Q    Did either Nick or Jay tell you while you
7  were on leave that Accenture was going through some
8  significant changes?
9      A    If they described any changes to me I don't
10  recall anything that in my mind would have precluded
11  any opportunity to come back to work.
12      Q    So you don't recall any changes about
13  Accenture putting aside precluding opportunities for
14  you to return to work?
15      A    For the period before I attempted to come
16  back to work?
17      Q    Right, prior to January of 2001?
18      A    I knew of changes, but not of any changes
19  that I thought would have any impact on my ability to
20  return to work.
21      Q    What changes did you know of putting aside
22  what you thought about them?
23      A    Sure.  Let me maybe clarify that a little
24  bit.  I don't recall exactly which changes I heard
25  about.  I would not have been at all surprised because

102

1  it was a company that, you know, changed names and
2  divisions, you know, on an almost an annual basis.
3  Uh-hum, I don't recall of being aware of any specific
4  changes.
5      Q    How about systems and technologies, did
6  Anderson change systems and technologies on a regular
7  basis?
8      A    Technologies are always evolving.  What is
9  used on any one project it depends on the project.
10      Q    So it's fair to say that Accenture tried to
11  keep abreast of all the latest technologies and
12  systems?
13      A    Accenture doesn't necessarily use the latest
14  technologies, but certainly technologies that are a
15  positive impact on their clients' bottom lines.
16      Q    Did you determine whether the systems
17  programs and technologies had changed during the period
18  of your leave from June 1997 to when you contacted them
19  in January of '01?
20      A    I knew that some of the -- some of the
21  technologies had changed; however, the underlining
22  design principles are fairly transferrable.
23      Q    Did you know whether they were still using
24  the same office foundation system that they were using
25  before you went on leave?

103

1      A    I did not know if they were using it or not.
2  I'm sure they were.
3      Q    Did you know whether they were still using
4  Visual Basic in January of 2001?
5      A    Again, I don't know if I knew of any specific
6  examples, but I would be shocked if they weren't
7  somewhere.
8      Q    Did you know if they were still using Power
9  Builder in January of 2001?
10      A    The same answer there.
11      Q    Okay.  Did you try to find out whether they
12  were using File Net in January of 2001?
13      A    As a matter of fact, I know they were because
14  I know it was part of a subsequent proposal.
15      Q    Okay.  Do you know if they were still using
16  the same Oracle systems on which you were expert?
17      A    The same answer for File Net.
18      Q    Yes.
19      A    I knew that it was part of a subsequent
20  proposal.
21      Q    So when you applied in January of 2001, did
22  you make any efforts to determine whether you were
23  up-to-date on any technologies and systems which
24  Accenture had developed or started applying since July
25  1997?

104

1      A    I knew that my technical skills were a little
2  dated, but I also knew that many of the same products I
3  used were still in use potentially in that updated
4  version.  I knew that Anderson/Accenture had an
5  excellent training program designed to get intelligent
6  people up to speed quickly and I was confident I could
7  do that.
8      Q    So when you say that you knew your technology
9  skills were dated, how did you know that?
10      A    Because as I mentioned technology --
11  technology marches on.  The low level details can
12  change.  The high level design concepts and the
13  application of that technology is not as transient as
14  some of the low level details.
15      Q    So, for example, Accenture was using
16  PeopleSoft when you came back in 2001, correct?
17      A    I believe they were, yes.
18      Q    For some projects?
19      A    Correct.
20      Q    Was that something that you were conversant
21  with?
22      A    No, it's not.
23      Q    Had you ever used it before?
24      A    No, I have not.
25      Q    Had you ever been trained on it?

1    A    No, I have not.

2    Q    Were there any other technologies which

3    Accenture was using in early 2001 which you had never

4    used before?

5    A    I don't know how I can answer that question

6    because I don't know the list of technologies that they

7    were using.

8    Q    So you don't know?  The answer is you don't

9    know as you sit here today if there were technologies

10   that Accenture was using in 2001 that you had never

11   used before?

12   A    With thousands and thousands of engagements

13   going on, I don't know what they had.  I did know that

14   my skills were transferrable.  My skills were updatable

15   and many of my skills were up of a high enough level

16   that the underlying technology was less transient.

17   Q    But you didn't have expertise on all of the

18   new systems and programs that Accenture was using when

19   you came back from leave; is that correct?

20   A    To use PeopleSoft as an example like the

21   other that they had been brought in, I'm sure I would

22   have needed some training on PeopleSoft and I would

23   have come up to speed very quickly.

24   Q    But as you sit here today you don't know if

25   there were any other technologies or programs that

1    Accenture was using in early 2001 that you had never

2    used before?

3    A    Again, with thousands of engagements going on

4    I don't know what technologies were in use.

5    Q    And during the period of your leave from July

6    1997 until January '01 when you first contacted them,

7    what had you done to update your technology during that

8    period and to make sure you stayed current?

9    A    I had again using mainly the Internet kept up

10   with trends in the industry and I had done some work

11   with HTML which I mentioned which is website and

12   obviously E-Commerce was the exploding field then in

13   websites.  I had done no specific training on anything,

14   but I was well aware of what was happening in the

15   industry and conversant enough to be able to come back

16   up to speed quickly.

17   Q    And when you say you had kept up with trends,

18   what had you done during that period of time to keep

19   your skills fresh and by that period of time I'm

20   talking about June 1997 to January 2001?

21   A    As I think I mentioned my skills had become

22   somewhat dated, however, my low level skills.  My

23   higher level skills were very transferrable and I kept

24   myself informed enough that I was able to come up to

25   speed quickly.

107

1    Q    My question was what did you do to keep up

2    with the trends?

3    A    Are you asking me did I take any training

4    while I was out on leave?

5    Q    Well, that would be one thing.

6    A    I did not take any training while I was out

7    on leave.

8    Q    Okay.  What did you do to keep up with the

9    trends?  There must be something that you did that

10   you're referring to?

11   A    As my ability permitted as I think I

12   mentioned I read on the Internet what was happening in

13   the industry.

14   Q    So you read articles on the Internet?

15   A    As my ability permitted it, yes.

16   Q    Okay.  What else did you do to keep up?

17   A    I think that was the extent of it.

18   Q    Okay.  And what sites did you look at to read

19   articles about what was going on in your industry?

20   A    I don't think I can come up with a conclusive

21   list at this point, but places like Information Week,

22   PC Week World, Info World, PC Magazine, C Net, Slash

23   Dot, and some other places.

24   Q    And how many hours a day would you say or how

25   many hours a week would you say you spent quote,

108

1    keeping up with trends and reading articles on the

2    Internet?

3    A    I don't have an answer for you for that

4    because it was a variable thing based on how much

5    energy my previous activities had taken from me.

6    Q    And what is the most time you would spend in

7    a week doing that activity?

8    A    I'm sorry.  I don't have an answer for that.

9    Q    Was it an hour a week, or was it twenty hours

10   a week?

11   A    I would say it was definitely on the lower

12   end of that range, but I don't have a number for you.

13   Q    And again, was there anything and when you

14   say you became conversant with HTML, what did you do

15   during this period of time to become conversant with

16   HTML?

17   A    Before I went out on short term disability

18   when I was in and out of the office in an effort to try

19   to continue working.  I did some training on HTML.  I

20   also did some pro bono work for Hartford Hospital where

21   we did some websites.  I think it was for the cardiac

22   unit, either cardiac or cancer.  And so then I would

23   read a little bit about HTML and then take those sites

24   that I had previously built and changed them or tweaked

25   them a little bit to see how the changes were

109

2  Q    And were you doing this between July 1997 and

3  January 2001?

4  A    I was as time and energy permitted.

5  Q    And how much pro bono work would you say you

6  did during that period of time?

7  A    Actually, I think I misunderstood your

8  previous question.  When you said did I do this, I

9  thought you were referring to the learning and

10  experimenting with HTML that I did on my own time.  The

11  pro bono work that I did was before I went out on short

12  term disability and that was in the winter of 1997.

13  Q    I'm really concerned about what you did

14  during the leave of absence?

15  A    I thought you were, but I didn't want to be

16  misleading.

17  Q    Okay.  During the leave of absence what did

18  you do to keep up with your HTML skills?

19  A    Okay.  While I was on leave of absence I did

20  not do any pro bono work.  I did what I described where

21  I would take pages that I previously built and learn

22  how HTML worked and experiment with the changes

23  applying them to pages I had previously developed.

24  Q    And how many hours a week would you say you

25  did that?

---

110

1  ... the range of but again,

2  it was towards the lower end of your one to twenty

3  range.

4  Q    Was it less than ten a week?

5  A    Yes.

6  Q    Was it less than five a week?

7  A    Uhh -- I don't have a number, but I suspect

8  it was.

9  Q    And when you would say you would learn how it

10  worked, how would you train yourself?

11  A    I would make a change to a web page on the

12  programming side and display it and see how it looked

13  differently.

14  Q    Okay.  Other than what you've told me here

15  today did you do anything else to keep up with trends

16  in the technology industry while you were on leave?

17  A    I believe I was also receiving a number of

18  magazines at that time again, Info World.  Actually,

19  most of them were complimentary magazines through my

20  association with at the time Anderson Consulting and I

21  would review those again, energy permitting, but I did

22  not do any training.

23  Q    Anything other than what you told me?

24  A    To the best of my recollection, that's a

25  complete list.

---

111

1  Q    Okay.  Directing your attention to what we've

2  marked as Exhibit 19 for your deposition, can you

3  identify this document for me?

4  A    This appears to be my notes that I kept as I

5  worked with Accenture to return from long-term

6  disability.

7  Q    And why did you keep these notes?

8  A    Initially, mainly to stay organized also as

9  an effort as my doctors had suggested at the time to

10  try to create as business like an environment to try to

11  further my recovery.

12  Q    Okay.  And when did you first speak to a

13  lawyer in connection with your concerns about going

14  back to work?

15  A    It was in the late winter-early spring

16  timeframe of 2002 I met with a number of different --

17  different law firms before settling with Williams and

18  Pattis.

19  Q    And with respect to these notes did you take

20  them contemporaneous with events or after the fact?

21  A    I took them either as I was on the phone or

22  shortly after I hung up the phone with very few

23  exceptions.

24  Q    And when did you first contact Accenture to

25  inform them that your physician had released you to

---

112

1  work?

2  A    To the best of my knowledge, it was the

3  January 31st date indicated.

4  Q    And do you know who you spoke to?

5  A    Michelle Holt.

6  Q    Do you know what her title was at Accenture

7  then?

8  A    I do not know.

9  Q    And how did you know who to contact when you

10  wanted to come back?

11  A    I think I contacted her first because she had

12  been involved in staffing previously and I didn't know

13  if she would be the right person, but it seemed like a

14  good place to start.

15  Q    And what did you say to her and what did she

16  say to you during that first conversation that you had

17  with her in January of '01?

18  A    As you see my notes are incomplete for that

19  conversation, but to the best of my recollection, I

20  informed her where I stood in terms of my recovery, the

21  fact that I had been cleared to work or at least maybe

22  not in written fashion to Accenture, but verbally

23  cleared to work by my doctors that I had every interest

24  and intention of resuming my career with Accenture.

25  Q    And in your notes it says, "HR team note from

1  doctor, condition set up for success." Do you know
2  what that note meant?
3      A    I believe it meant that Michelle was going to
4  the people at HR, that they would need written
5  authorization from a doctor approving me to return to
6  work and I recall initially particularly with Dr.
7  Kaplan but also with Dr. Sica talking about how it was
8  important that conditions be set up for success upon my
9  return in order to facilitate my recovery as opposed to
10  setting me back and I remember communicating with
11  Michelle and that seemed like a good idea for all
12  parties involved.
13      Q    And it says here, "Restriction parking,
14  travel local/far," what were those notes about?
15      A    At the recommendation of my doctors for
16  example, it was recommended that I park in the garage
17  at the building so that I did not spend valuable energy
18  walking across Hartford that I could be applying to
19  work at -- at Accenture.
20          As far as travel it was the fact that the
21  local travel or regional travel would be acceptable,
22  but any kind of distance travel would both -- uh -- it
23  would take energy again that could be used for more
24  productive purposes as well as not be a condition for
25  success and also possibly cause me to miss any doctors'

1  appointments.
2      Q    Are consultants often asked to travel to the
3  client's site?
4      A    Clients generally go where the work is;
5  although, there's been an increasing trend as I
6  participated in the Seatips project that sometimes the
7  work is done at a central location either for
8  convenience or to minimize cost and with the advent of
9  conference calls and e-mails I think it's easier and
10  easier to work at a distance.
11      Q    What proportion would you say of the projects
12  that you worked on involved travel to the client's
13  site?
14      A    I need to think not just in terms of -- of a
15  number, but also in terms of duration of the projects.
16  I would say--
17      Q    Actually, I'm asking for a number?
18      A    The number of projects?
19      Q    Right.  What proportion of the projects that
20  you worked on as a consultant involved travel to a
21  client's site?
22      A    Okay, any travel at all?
23      Q    Outside of the Hartford/Springfield area?
24      A    At the moment I can recall two projects
25  outside that area.  I just need to figure out how many

115

1  in total I had.  I may be overlooking an engagement as
2  I go back through it, but it appears to my experience
3  to be about a third of my projects.
4      Q    Required travel outside of the
5  Hartford/Springfield area?
6      A    Correct.
7      Q    Okay.  And in your notes here on page 1 of
8  Exhibit 19 you say "times, days of week, quiet
9  location, environment."
10      A    Uh-hum.
11      Q    What did you mean by that?
12      A    These are all again, conditions for success.
13  Times was what hours of the day would make the most
14  sense.  For example, my doctors had recommended that I
15  start at nine instead of eight so that I wouldn't spend
16  valuable energy fighting rush hour traffic, for
17  example.  Days of the week was Monday, Wednesday,
18  Friday so that I would have an opportunity to recover
19  in between.  This is when I was cleared to work three
20  days a week as opposed to four.  And the quiet location
21  and environment was to try to set up an environment or
22  a work situation where I would be best able to apply my
23  ability to concentrate.
24      Q    It says, "Monday, Wednesday, Friday, three
25  hours nine to twelve."  Is that what you were saying

116

1  you were willing to work?
2      A    That's what my doctors initially recommended
3  and that's what the original work release to Accenture
4  suggested.
5      Q    So do you recall it's got three dates here,
6  "Michelle Holt, January 31 '01, 2-14-01 and 2-22-01,"
7  are those the dates of your conversations with Michelle
8  about returning?
9      A    I believe they are.
10      Q    And during those conversations do you recall
11  telling her that your doctor said you could come back
12  to work as long as you could park near the building and
13  not have to travel beyond the Hartford/Springfield
14  area, work Monday, Wednesday and Friday from nine to
15  twelve in a quiet environment?
16      A    I do recall telling her that, yes.
17      Q    So that was what she was charged with,
18  finding you a job with those restrictions?
19      A    That was and please understand that that
20  changed over time as I recovered and I was later on
21  cleared to work five days a week, four hours a day.
22          MS. KAPPELMAN:  I'd like to ask the
23  court reporter to mark this as the next
24  exhibit, please?
25          (Whereupon, the referred to

117

1    document was Marked For Identification as

2    Defendant's Exhibit No. 20).

3    BY MS. KAPPELMAN:

4        Q    So she asked you to get a letter from your

5    doctor saying that stuff, right?

6        A    That was a condition of my return to work,

7    yes.

8        Q    Okay.  Directing your attention to what we've

9    marked as Exhibit 20 for your deposition, can you

10   identify that document for the record, please?

11       A    This appears to be my clearance to return to

12   work from Dr. Gerald Kaplan at Gaylord to Paula Miller

13   at the Benefit Center of Accenture.

14       Q    And this was a letter that your doctor sent

15   explaining the restrictions on your return to work

16   correct?

17       A    Yes, this is the letter that Accenture had

18   requested and if I recall there was some back and forth

19   in terms of both sides trying to get and state the

20   information that they required, but I believe this is

21   the result of that effort.

22       Q    Okay.  So what the doctor says here is that

23   you can work "three hours a day, three days a week, and

24   then increase to four hours a day, three days a week,"

25   and you are supposed to work "Monday, Wednesday and

118

1    Friday 9:00 a.m. to noon," right; is that what that

2    letter says?

3        A    I'm just reviewing it.  That's correct.

4        Q    It also says you are only supposed to be

5    assigned to your home office and not sent to other

6    locations until you are reassessed, right, and that you

7    be set up in an office that minimizes possible

8    distractions?

9        A    That's what it says.  The reference to home

10   office I think is a bit -- a bit misleading in that it

11   implies just the One Financial Plaza office as opposed

12   to the Hartford/Springfield area.

13       Q    And did you talk to Michelle Holt after she

14   received this letter?

15       A    I believe I did, yes.

16       Q    And what did she say to you and what did you

17   say to her about these restrictions?

18       A    I recall discussing them with her and her

19   understanding and agreement that this is what -- what

20   the doctors were recommending for me.

21       Q    Did she mention to you during this period of

22   time that the company was going through a reduction in

23   force?

24       A    I don't recall.

25       Q    Did she mention to you that the company,

119

1    parts of the company at least, were in a hiring freeze?

2        A    I don't recall that.

3        Q    Did you have a conversation about the fact

4    that the kind of job that you were hired to do didn't

5    fit necessarily within the nine to twelve, three day a

6    week timeframe?

7        A    I remember discussing with her that the job

8    may not, but my ability to assist somebody doing that

9    job who needed some help was more feasible.

10       Q    Okay.  Did she mention to you that your

11   technical skills were not as up-to-date as someone's at

12   the company were?

13       A    I remember discussing with her what my skills

14   were and uh -- and what we could do upon my return to

15   quickly get me back up to speed.

16       Q    Okay.  And it says if you could direct your

17   attention--

18       A    May I refer back to the notes if that's what

19   you're reading from?

20       Q    Yes.  If I could direct your attention to

21   Exhibit 19 the third page.  It reflects a conversation

22   with Michelle Holt on March 26, 2001; do you see that

23   in the middle of the page?

24       A    I do.

25       Q    And it says, "Want to make sure not

120

1    jeopardizing long-term disability."  What did you mean

2    by that?

3        A    I think what I meant was that I was trying to

4    play by the rules and follow a proper procedure so that

5    both Accenture and Aetna and I would work towards the

6    partial disability arrangement.

7        Q    So you wanted to be able to keep getting

8    disability payments, but go back to work Monday,

9    Wednesday, Friday?

10       A    I wanted to as the contract with Aetna

11   provides I wanted to move from an area of total

12   disability to partial disability in an effort to get

13   back on with my life.

14       Q    So you wanted to continue to receive

15   disability payments but come back to work Monday,

16   Wednesday, Friday nine to twelve?

17       A    I wanted to play by the rules towards partial

18   disability.

19       Q    Is there any part of my statement that isn't

20   true; you wanted to continue to receive disability

21   payments, but come back to work Monday, Wednesday,

22   Friday nine to twelve?

23       A    If you change disability to partial

24   disability, I agree with you.

25       Q    Okay.  So when it says "long-term disability"

121

```
 1   ing the note you wrote "will we make sure I'm not
 2   jeopardizing long-term disability," what you meant by
 3   that is that you want to make sure you can still
 4   receive partial disability payments?
 5        A   Correct.
 6        Q   Okay.  At this point in March of 2001 what
 7   were your symptoms?
 8        A   My symptoms have never really changed.  It's
 9   a matter of degree.
10        Q   Okay.  How were you limited in your day to
11   day ability to perform functions in March of 2001 by
12   you condition?
13        A   I could at that point perform functions
14   reasonably well, but the limitations was the amount of
15   mental and physical energy that it would take out of me
16   to perform those functions.  So it's not a matter of
17   what I could do.  It's a matter of how well and how
18   long I could do it.
19        Q   Okay.  And how long could you do the
20   functions of your job in March of 2001?
21        A   I hadn't had an opportunity to test this
22   recommendation, but the recommendation, and I bought
23   into it, was to try it Monday, Wednesday, Friday for
24   three hours a day and go from there as my ability
25   improved.
```

122

```
 1   did the kind of project that you were
 2   usually put on as a consultant for Accenture lend
 3   itself to doing them only Monday, Wednesday and Friday
 4   from nine to twelve?
 5        A   The kind of projects I was on were populated
 6   by people who desperately could have used the
 7   additional help that I could provide in that timeframe.
 8        Q   Isn't if fair to say though that very few
 9   projects only need you on them Monday, Wednesday and
10   Friday from nine to twelve, that usually when you go to
11   a client to do a project it's fulltime with the client
12   until it's done?
13        A   I think the assumption that you are making
14   with that question is that you are the primary person
15   doing that job and what I thought made the most sense
16   was for me to come back and assist somebody who
17   performed the job that I had done before who was badly
18   overworked, probably not performing at peak efficiency.
19        Q   So were you going to come back not as a
20   consultant; is that what you're saying?
21        A   I was going to come back in any capacity and
22   I think I made that clear to them that I wanted to
23   resume my career, but whatever I had to do to get my
24   foot in the door was fair.  However, my goal obviously
25   was to get back to consulting, yes.
```

123

```
 1        Q   So you made it clear that you were willing to
 2   come back as an analyst?
 3        A   I don't know if I used the term analyst, but
 4   I think I made it clear both for my health recovery and
 5   for my career the best thing for me was to come back to
 6   work.
 7        Q   Okay.  And what did Ms. Holt do between March
 8   of 2001 and November of 2001 to try to find a job that
 9   would accommodate the restrictions that your doctor set
10   forth on Exhibit 20?
11        A   I think that information would probably best
12   come from her, but--
13        Q   No, I'm asking you.
14        A   I understand that.
15        Q   What is your knowledge about what Michelle
16   Holt did?  Strike that.  Were you touch with Ms. Holt
17   between March of 2001 and November 2001?
18        A   Yes, I was.
19        Q   And your notes reflect that you were in touch
20   with her, let's just go through the dates, March 30,
21   April 9, April 18, April 20, April 25, April 26, April
22   30, May 1, May 7, May 15, May 16, May 21; do you know
23   the date of this voicemail message that Amy typed up?
24        A   She typed this up as she was helping me
25   prepare a message that I ultimately left for Mark
```

124

```
 1   Raymond on May 22, 2001.
 2        Q   So when you say in this message, "I know
 3   there have been a ton of changes to the firm and would
 4   love to get your perspective on those changes as well
 5   as any insights you may have about my return to work
 6   and potential assignments," what were the ton of
 7   changes to the firm that you're referring to in May of
 8   2001?
 9        A   The single biggest change was the change to
10   the name and the impact that had on our clients and
11   work in our separation from Arthur Anderson.
12        Q   So that was really the biggest change you
13   were referring to in "a ton of changes," you were
14   referring to the change to the name?
15        A   As I said, that was -- that was the most --
16   the most obvious one.  Beyond that at some point
17   Michelle had told me that the company was preparing for
18   an initial public offering which surprised me because
19   it had been a partnership for its -- for its duration.
20   I don't recall if that was another one of the changes.
21   The market units change, I don't recall if I knew about
22   that at this time or not.
23        Q   So it's fair to say that at least from March
24   2001 until May 2001 you had a lot of contact with
25   either Michelle Holt or Janice?
```

126

1    A    I made getting my job back my job.  I took it
2  very seriously, yes.
3    Q    My question is it's fair to say between March
4  of 2001 and May of 2001 you had a lot of contact with
5  Michelle Holt and Janice?
6    A    I did.
7    Q    And who is Janice?
8    A    Janice Beebe is Michelle Holt's executive
9  assistant or was at that time.
10    Q    Okay.  And so were you familiar with the
11  efforts that Michelle Holt was making to try to find
12  you replacement employment during this period of time?
13    A    I knew that -- let's put it this way, I knew
14  what she told me.
15    Q    Okay.  And what did she tell you?
16    A    Well, as evidenced by Document 19 that they
17  were working on finding a spot for me.
18    Q    Okay.  Did she tell you she spoke with Andrew
19  Burns the People's Matters Representative for the
20  Resources MU Unit in Hartford?
21    A    Are you referring to a particular date?
22    Q    No.  Did she tell you that in trying to find
23  you a position which met your restrictions she spoke to
24  the People's Matters Representative for the Resources
25  Market Unit in Hartford?

1    A    I do not recall if she told me that or not.
2    Q    Did she tell you that Mr. Burns told her that
3  he had no resources positions available in the
4  Connecticut office?
5    A    I do not recall being told that.
6    Q    Is it fair to say that you wouldn't have
7  accepted a position outside of Connecticut at this
8  point in time?
9    A    It would depend on the distance.
10    Q    So if you were to be sent to Boston, would
11  you go in early 2001?
12    A    In early 2001 I don't think that would have
13  met my doctor's recommendations.
14    Q    Right.  It actually doesn't meet his
15  recommendations--
16    A    Correct?
17    Q    --in Exhibit 20, correct?
18    A    Right, as I said.
19    Q    So basically the only positions that you were
20  open to with your restrictions were the ones in
21  Connecticut?
22    A    If you're talking about a position where I
23  physically was attending, yes.  If you're talking about
24  something with conference calls, e-mails,
25  video-conferencing, et cetera, I think that opened up a

127

1  variety of other opportunities.
2    Q    So are you saying that you could have worked
3  in San Francisco, but from your Connecticut office,
4  worked for someone in San Francisco from your
5  Connecticut office?
6    A    Yes, I believe I could or I could have
7  assisted somebody working in San Francisco.
8    Q    Did Ms. Holt tell you that she had contacted
9  Amy Salvatore the People's Matters Representative for
10  the Communications And High Technologies Market Unit?
11    A    The name is vaguely familiar to me, but I do
12  not recall any other details.
13    Q    Do you recall Michelle telling you that Ms.
14  Salvatore didn't have any communications positions
15  available in the Connecticut office?
16    A    I'm sorry.  I don't recall that.
17    Q    Do you recall that Ms. Holt spoke with Olga
18  Conway within the Financial Services Market Unit?
19    A    I do not recall that and let me -- let me
20  back up a step, if I may; when Michelle would tell me
21  the efforts that she was making a lot of times she
22  would not refer -- sometimes she would refer to people
23  by name, but often times she would not.
24    Q    Okay.  Why don't you tell me what you
25  remember about what Michelle told you about the efforts

128

1  she was making to find a job for you within the
2  restrictions you had provided?
3    A    Okay.  I remember that she was talking with
4  Marty Strong on an internal project.  I know that she
5  talked with Mark Raymond, Marty Kohl and Rick Hedgewood
6  about a number of government opportunities.  I know
7  that there was also an agreement at one point that the
8  government market unit would take me back even if
9  unassigned.
10    Q    Tell me what she said to you about her
11  conversations with Marty Strong in her efforts to find
12  you a position?
13    A    May I refer to the notes, or are you asking
14  me to do this from memory?
15    Q    Absolutely, refer to anything that would
16  refresh your recollection--
17    A    Okay.
18    Q    --about what Michelle Holt told you about her
19  opportunities to find you replacement employment within
20  the restrictions you provided?
21          (Witness looking at notes).
22    A    I'm not seeing it in these notes.  Either I
23  missed it or it's not included.
24    Q    Look at May 1, 2001, the bottom of the page
25  it says "two possibilities, government," and then

129

2    A.   Okay, thank you for finding that for me.

3    Q    Yes.

4    A    My recollection much as the note suggests is

5    that Marty needed some help as the notes mention "was

6    in crunch mode," and Michelle was looking to set up a

7    conversation for ways that I could assist her in that.

8    Q    And what happened with that?

9    A    I do not recall if that conversation ever

10   took place.  I don't have a recollection of it.

11   Q    What else do you remember that Michelle Holt

12   did to try to find you work in this timeframe?

13   A    She granted me permission to attend a

14   government community meeting where I had a chance to

15   meet some other members of the government community and

16   network.  Based on her conversations with me she talked

17   to people at both the local and market level and maybe

18   even the national level trying to find opportunities

19   for me and/or get agreement for me to come back

20   unstaffed to work on one, training and getting my

21   skills quickly back up to speed or to work on proposals

22   to sell new work.

23   Q    Did she tell you why she was having a hard

24   time finding a position for you?

25   A    At some point she told me that the company

130

1    being run very lean, and I initially missed that and I

2    think the phrase that she used was that the company was

3    being run very lean.

4    Q    So they weren't hiring a lot of new people;

5    is that what you took from that?

6    A    I took that to mean they didn't want people

7    who were unstaffed, not necessarily that they weren't

8    hiring them, but they wanted people to be staffed and

9    that's why their preference would be to get me directly

10   on a project, but they also did agree to take me back

11   if not.

12   Q    Okay.  You say here, "One possibility May 1,

13   2001 was in the government market unit with Mark

14   Raymond."  Do you see that in revenue services?

15   A    I do.

16   Q    Okay.  What happened with that opportunity

17   that she tracked down for you?

18   A    There were a number of government

19   opportunities and some of them were not won.  Others

20   kept getting delayed past the point where I was

21   ultimately terminated.

22   Q    Okay.  So in your notes you have a message to

23   Mark Raymond that we were just looking at where you

24   talk about "a ton of changes"?

25   A    Are you referring to the list on May 22nd?

131

1    Q    The one that Amy typed up for you?

2    A    That was notes.  If you want to look at the

3    actual call, it's on the next page.

4    Q    On May 22nd, okay.  You said, "I have been

5    working with Michelle Holt for several months to make

6    it happen."  When you say you have been working with

7    her, so Michelle Holt was trying to find you a position

8    for several months, right?

9    A    Based on me contacting her in January and

10   this being in May, yes.

11   Q    Okay.  And all those phone calls that you had

12   with her?

13   A    Correct.  Again, I can't -- I can only tell

14   you what she told me she was doing--

15   Q    Right.

16   A    --but that's my understanding of it.

17   Q    Okay.  And you say your "progress is slow.  I

18   am in an unusual situation.  I want to return

19   part-time."

20   A    Uh-hum.

21   Q    That was an unusual situation for Accenture?

22   A    Unusual in the sense that as you have

23   indicated most people are there on a fulltime basis.

24   What I was looking to do to come back in any capacity

25   including assisting somebody who is overworked.

132

1    Q    Now, if you look at the bottom of the page it

2    says that on May 30th you actually had a really good

3    conversation with Mark Raymond.

4    A    Uh-hum.

5    Q    Right?

6    A    That's what the note says, yes.

7    Q    And it says he was going to try to find a

8    role for you on a government ERP job using Oracle or

9    File Net, which were the two things that you said you

10   were conversant on, right?

11   A    Correct, I used those on a previous

12   engagement.

13   Q    And he invited you to a government community

14   meeting?

15   A    That's correct.

16   Q    What happened with his efforts to try to find

17   a role for you using Oracle and File Net?

18   A    As I mentioned before, there were a couple of

19   government opportunities and in my conversations with

20   Michelle I lost track of what happened to which one.  I

21   don't know if that was something that Accenture lost or

22   it was delayed past the point where I was terminated or

23   they just didn't find a match for me.  I can't tell you

24   that.

25   Q    So despite his efforts either they didn't

1    have the opportunity or it wasn't a good match for you?

2        A    Well, it didn't happen.  Let's put it that

3    way.

4        Q    Did you get the impression that Mark wasn't

5    telling you the truth when you spoke to him on May 30

6    and that he wasn't looking for an opportunity for you?

7        A    Not at all.

8        Q    Did you get the impression in any of these

9    conversations with Michelle Holt that she wasn't truly

10   trying to find an opportunity for you within your

11   restrictions?

12       A    I was certainly frustrated by the lack of

13   progress.

14       Q    But listen to my question, it's very

15   important; did you get the impression during any of

16   these many conversations you reported with Michelle

17   Holt that she wasn't telling you the truth that she was

18   truly trying to find you an opportunity with your

19   restrictions?

20       A    I believe she was trying.  I don't know how

21   hard or how big a priority it was for her or other

22   people based on how slow things moved.

23       Q    Okay, but you believe she was trying?

24       A    I believe she was trying and I have no reason

25   to believe she was lying to me.  She's a good person.

---

1        Q    And she did tell you she was unable to find a

2    match for your skill set with your restrictions?

3        A    I know that Accenture gave up the search and

4    terminated before -- before finding something.

5        Q    Do you remember her telling you that Mark

6    Raymond could not assign you to the government market

7    unit because you didn't have any knowledge of the

8    PeopleSoft Program, the software that the government

9    market unit used on its Connecticut projects in 2001?

10       A    Are you referring to a particular date?

11       Q    I'm referring to any date.  Do you remember

12   having any conversation with Michelle Holt where she

13   told you that it wasn't going to work out for you with

14   Mark Raymond in the government market unit because you

15   weren't conversant with the PeopleSoft Program which

16   was the software that the government market unit

17   currently used at that time on its Connecticut

18   projects?

19       A    Your question is a global question.  I do

20   remember a conversation with Michelle Holt about

21   PeopleSoft.  I believe it was in the context of a

22   particular engagement, not their inability to take me

23   back at any time anywhere.

24       Q    Okay.  What exactly do you remember about

25   what Michelle told you about PeopleSoft?

---

                                    135

1        A    My recollection is that there was an

2    opportunity with PeopleSoft for a project for somebody

3    who knew PeopleSoft and I got the impression that

4    uh--that Accenture was not willing to make the

5    reasonable accommodation for me to do a brief amount of

6    training and come back up to speed quickly on that.

7        Q    So the government market unit you don't

8    understand that the government market units uses

9    PeopleSoft on all of its Connecticut projects?

10       A    It's not a matter of whether I understand it

11   or not.  I don't know what they use on projects

12   throughout the world.

13       Q    And Michelle didn't tell you that; are you

14   saying that Michelle never told you that the government

15   market unit uses PeopleSoft on all of its projects?

16       A    That wouldn't make any sense.  That would be

17   like trying to solve every problem with a hammer if

18   you're trying to drive a screw.

19       Q    So it wouldn't make any sense for the

20   government market unit to use PeopleSoft on its

21   Connecticut projects?

22       A    I know for a fact that's not the only

23   solution they used because of the Oracle and File Net

24   proposal.

25       Q    What are the other solutions, what are all

---

                                    136

1    the other solutions that the government market unit

2    uses?

3        A    You're asking me a question I do not know the

4    answer to.

5        Q    Right.  Do you know whether you are

6    conversant in the other solutions that the government

7    market unit uses?

8        A    I know that if there's something I'm not, I

9    would get back up to speed on it very quickly.

10       Q    But as you sit here today you don't know if

11   you were conversant in 2001 in all of the technologies

12   that the government market unit was using?

13       A    You're asking me a question that I can't

14   answer because there are thousands of projects and I

15   don't know what technologies are in use.

16       Q    Right.  At some point Michelle Holt told you

17   that she couldn't find a position for you; is that

18   correct?

19       A    At some point she told me -- actually she

20   initially told my wife that -- that Accenture was

21   terminating me.

22       Q    At some point did it become clear that she

23   wasn't able to find a job for you with your skills and

24   your doctor's restrictions?

25       A    There was a point where it certainly wasn't

137

2  hoped that my doctor's approval to ease the
3  restrictions to the point to where I was working four
4  hours a day, five days a week would open up additional
5  opportunities, but that did not occur.
6      Q    On August 13, 2001 you have a note which says
7  "left message with Janice Beebe.  I called, please call
8  back.  She called back with no progress."  Do you see
9  where I am reading from?
10     A    I do and the she being Michelle Holt.
11     Q    "She had talked to the government HR rep, no
12 current positions, told her that I was getting
13 increased pressure from Aetna, told her 'I can't be the
14 only employee who is gone for a while who needs to come
15 back part-time.'  Her response was 'You left two
16 reorganizations ago.'"
17          Does that refresh your recollection that at
18 least in August of 2001 Michelle told you that there
19 had been two reorganizations at Accenture while you
20 were away on leave?
21     A    Yes.
22     Q    Does it refresh your recollection at least
23 that in August of 2001 she said "there were no current
24 positions available in the government department"?
25     A    I took that to mean that they were going to

138

1  and that things certainly weren't looking good.
2      Q    If you turn the page it was at least clear by
3  August 20 of 2001 that the government wasn't able to
4  find a home for you with your skill set and your
5  restrictions, correct?
6      A    You're referring to August 20?
7      Q    Right.
8      A    Correct.  As I said before, I took that to
9  mean that obviously things were going poorly and that
10 the agreement to take me back unstaffed was not going
11 to happen.
12     Q    In the bottom of this same page it says that
13 "November 7,2001 Michelle told Amy you were being laid
14 off."
15     A    Correct.
16     Q    Okay.
17     A    And I think that she would not have -- I
18 think that Michelle was a little bit uncomfortable with
19 telling that to Amy and not to me, but they know each
20 other.  They met previously and I think she was
21 comfortable with that.  It was actually on the next day
22 that Michelle informed me; although, clearly I knew
23 what was happening from my conversation with my wife.
24     Q    And when did you start your training program

139

1  with your dad's company?
2      A    I started that on November 1, 2001.
3      Q    Okay.  So just before you found out you were
4  laid off?
5      A    Yes.
6      Q    And when did you start receiving compensation
7  from your dad's company?
8      A    It was well into 2002, but I do not know the
9  date.  I'd have to look it up, or I'm sure my tax
10 return may give an indication.
11     Q    Okay.  At any point between March 5, 2001 and
12 November 7 of 2001--
13     A    Can I ask you to say those dates again,
14 please?
15     Q    Yes.  At any point between March 5, 2001 and
16 I'm picking that date because it's the date of Dr.
17 Kaplan's letter--
18     A    Okay.
19     Q    --that we've marked as Exhibit 20--
20     A    Okay.
21     Q    --and the day of your termination November of
22 2001, at any point during that period did Dr. Kaplan
23 update the restrictions on your work?
24     A    Let me correct something and then I'll answer
25 your question.  The correction is I was told verbally

140

1  in November of 2001 that I was being terminated, but it
2  dragged on for quite some time afterwards.
3      Q    Okay.
4      A    As far as Dr. Kaplan.
5      Q    Fine, but I'm still keeping with the same
6  timeframe.
7      A    Understood; I do not know if Dr. Kaplan sent
8  another letter.  I did not see this letter.  This first
9  one went directly between him and Accenture.  I do not
10 know if a second letter went, but I do know for a fact
11 that I informed Michelle of my -- my increased ability
12 and capacity.
13     Q    And when did you inform Michelle of your
14 increased ability and capacity?
15          MR. MAHONEY:  Page 24.
16          THE WITNESS:  Thank you.  August 24,
17     2001 of page 10 of my notes.
18 BY MS. KAPPELMAN:
19     Q    And what did you say to Michelle on August
20 24, 2001 and what did she say to you during that
21 conversation?
22     A    I explained to her to the best of my
23 recollection that my condition had improved enough to
24 the point where in consultation with my doctors this
25 was the a approved schedule and that again, the plan

**Page 141**

2     there. Underneath the question mark in writing, I
3     believe I asked Michelle if that was needed in writing
4     or not and I -- I tend to recall that she did not think
5     so. I was satisfied that I had at least told her.
6     Maybe she had given up finding me a position at that
7     point but.
8          Q    Did she tell you she had given up finding you
9     a position at that point?
10          A    Honestly, that's speculation on my part. I
11     don't know.
12          Q    She didn't?
13          A    I don't know, no.
14          Q    So August 24, 2001 you could start working
15     five days a week for four hours a day?
16          A    That was what my doctors cleared me for with
17     the expectation that I would see how I would go and
18     ramp up from there.
19          Q    Okay. At any point in time between August
20     24, 2001 and the day you were terminated in November of
21     2001 orally, did that improve and again, did you tell
22     her that you had improved more?
23          A    No, I did not and the reason for that is
24     because I did not have an opportunity to test -- test
25     that plan out to see how I would respond.

**Page 142**

1     termination Michelle's understanding was that you could
2     only work twenty hours a week, five days, four hours a
3     day?
4          Q    (blank)
5          A    That is correct.
6          Q    And that's what she was trying to
7     accommodate?
8          A    To the best of my understanding, yes.
9          Q    How were you notified of the termination?
10          A    I was notified orally as -- as I mentioned
11     and as the notes indicate and that it dragged on for
12     quite some time as -- thank you. Good idea. May I
13     stand up and get some water?
14          Q    Sure.
15               (Witness standing up and getting
16               glass of water).
17               THE WITNESS: I was notified orally
18     in November 2001. I received it in writing
19     months, months later. There had been a lot of
20     back and forth about that.
21     BY MS. KAPPELMAN:
22          Q    Who notified you in November of 2001 that you
23     were being laid off?
24          A    Michelle Holt.
25          Q    And did she speak to you or to Amy?

**Page 143**

1          A    She spoke to Amy on the 7th and I spoke with
2     her subsequent to that I believe on the 8th.
3          Q    And on the 8th when you spoke to her did you
4     ask her a series of questions to follow-up on?
5          A    I did and that is indicated by my notes
6     handwritten page 11.
7          Q    Okay. And did she in fact follow-up on the
8     questions that you asked her?
9          A    It took months, but yes.
10          Q    So she told you you were being terminated on
11     November 8 and you spoke to her and you asked her to
12     follow-up on a number of questions, correct?
13          A    Correct.
14          Q    And those questions are outlined on
15     handwritten 11, correct?
16          A    Correct.
17          Q    And they had to do with severance and out
18     placement?
19          A    Not that they had to do it, but that was
20     among the questions that I asked.
21          Q    And they also related to your long-term
22     disability insurance and confirming that you would
23     still get coverage, right?
24          A    That was a topic of conversation.
25          Q    Your 401(k) benefits?

**Page 144**

1          A    Again, these are questions and concerns that
2     I raised at the point.
3          Q    Right.
4          A    I had never been fired before and I wanted
5     to--
6          Q    I just want to get out on the record the
7     things that you asked her to follow-up on?
8          A    Fair enough.
9          Q    How your discharge was going to be reported
10     in your employment file, right?
11          A    Correct.
12          Q    You asked her to follow-up whether you would
13     get a pink slip, what kind of documentation you would
14     get and were you being treated differently?
15          A    That's correct.
16          Q    And you also asked her about COBRA and other
17     benefits, right?
18          A    Correct.
19          Q    So she told you you were being laid off, but
20     you asked her to follow-up on a number of things?
21          A    May I go back to this previous page?
22          Q    Sure.
23          A    I also really tried to understand why I was
24     being let go because I was not costing Accenture
25     anything at this point. I was receiving no salary, no

2    back and I guess the question within that question is

3    why are you giving up looking?

4         Q    And you spoke to if you could just turn a

5    couple of pages?

6         A    Sure.

7         Q    You spoke to Ms. Holt a number of times;

8    November, December, January of 2002, February 2002, and

9    she was getting back to you on some of the questions

10   you had asked her in the November 8th conversation?

11        A    Correct.

12        Q    And then ultimately you got your termination

13   letter, correct?

14        A    Some months later I did.  I do not know the

15   date and there are two dates.  There was a letter that

16   I was being terminated and then there was an effective

17   date which I think was not until June of 2002.

18        Q    If you could direct your attention to your

19   March 8, 2002 entry in your notes where it says,

20   "Michelle Holt."  So it looks like you spoke to her

21   again on that date, right?

22        A    Yes, I did.

23        Q    And you say, "I'm better, but still not ready

24   for fulltime, forty hours."  Do you see that?

25        A    I do.

---

1    of November 7th when I still weren't

1    ready for fulltime employment?

3         A    That's correct.

4         Q    And it goes on to say, "No hurry to terminate

5    based on policy."

6         A    May I follow-up on the previous point?

7         Q    Sure.

8         A    As we've discussed I was still operating

9    under the doctor's recommendation of doing four hours a

10   day, five days a week; and then based on that

11   performance and experience ramping up from there.  That

12   was still the operating plan.

13        Q    What does this note mean, "No hurry to

14   terminate based on policy.  No relationship, case

15   closed and no insurance"?

16        A    What I meant by that was that this had

17   dragged on for so long that not only was I being

18   terminated, but I thought that if I was altogether let

19   go by Accenture it would hurt my standing with Aetna.

20   One of the -- one of the damages I'm claiming against

21   Accenture is that in their inability to take me back on

22   a part-time basis Aetna saw no light at the end of the

23   tunnel.

24             I don't know whether they say either as no

25   effort on my part or not enough effort on my part and

---

1    my thinking here was that this termination has gone on

2    so long, this is ridiculous, but let me hang on because

3    at least I've got some sort of relationship with you

4    which may -- may impact my relationship with Aetna.

5         Q    After you received notice that you were being

6    laid off, what did you do to find replacement

7    employment after November of 2002, November 8, 2002?

8         A    I continued the training program.

9         Q    I mean November 2001?

10        A    Okay, thank you.

11        Q    November 8, 2001?

12        A    Thank you.  I continued the training program

13   with my father's company that we've mentioned earlier

14   and that led to -- let to part-time employment there.

15        Q    Did you try to find jobs as an ITP,

16   Information Technologies Professional, anywhere else?

17        A    I did not.

18        Q    Have you ever tried to find another job as an

19   Information Technologies Professional since November of

20   2001?

21        A    No, I have not.

22        Q    So you didn't try to find any other

23   replacement employment other than going into your dad's

24   company?

25        A    No, I did not.  The reason for that is

---

1    because looking for a job is certainly a fulltime

2    experience and I was not ready for that level yet.

3         Q    Did Ms. Holt or any other manager at

4    Accenture make disparaging remarks about your

5    impairment?

6         A    No.

7         Q    Do you have any evidence that Ms. Holt was

8    not truly trying to find you a position which fit your

9    restrictions from the period of January 2001 until

10   November 7, 2001?

11        A    I only have my notes and conversations with

12   her and I take her at her word.

13        Q    Are you claiming that the actions of

14   Accenture or its managers caused you emotional

15   distress?

16        A    I am.

17        Q    And what are the manifestations or symptoms

18   of your emotional distress?

19        A    The biggest thing is the frustration in my

20   inability to get employment and further my recovery, a

21   deep sense of frustration, definitely some loss of

22   sleep.

23        Q    And the loss of sleep is not due to your

24   other conditions?

25        A    Correct, the other conditions have never

149

2  Q   Okay.  Anything else that's a manifestation

3  of the alleged emotional distress caused by your

4  termination from Accenture?

5  A   There may be other things, but that's all I

6  can remember sitting here at the moment.

7  Q   How often have you had trouble sleeping as a

8  result of your emotional distress suffered?

9  A   During the period when I was trying to go

10  back to work it was quite often.  I would go to bed and

11  my mind would just race and I got in the habit of

12  instead I would just stay up a little bit later until I

13  was good and tired and could just -- just sleep through

14  that.

15  Q   So what period of time are we talking about,

16  January 2001 until when?

17  A   I would say until August or so where it

18  became apparent that things weren't looking good.

19  Q   August of 2001?

20  A   Correct.

21  Q   Then did your problems sleeping improve?

22  A   Yes, my frustration level probably went up,

23  but it was pretty clear that things weren't going to

24  work out at that point.

25  Q   Any other symptoms or manifestations of the

150

1  emotional distress arising out of your termination from

2  Accenture?

3  A   A fair degree of embarrassment that as I

4  think my employment records show I was a -- was a

5  quality employee and it had gotten to the point where I

6  dreaded being asked by anyone if I had gone back to

7  work yet.

8  Q   Right.  Well, you were out on leave for three

9  and a half years.

10  A   Correct.

11  Q   Did you dread being asked while you were out

12  on leave for three and a half years if you had gone

13  back to work?

14  A   Not nearly as much because I knew I wasn't

15  able to work then.

16  Q   I see.  So when you were able to work Monday,

17  Wednesday, Friday nine to twelve and somebody would ask

18  you if you had gone back to work, you suffered

19  embarrassment because you hadn't?

20  A   Correct.

21  Q   Anything else as a symptom of your emotional

22  distress?

23  A   As I said before there may be other things,

24  but that's what I can recall sitting here today.

25  Q   Have you seen a doctor or any kind of medical

151

1  healthcare provider for this emotional distress?

2  A   No, I have not.  I think as I have evidenced

3  in my Interrogatories I'm not a -- I'm not a

4  complaining person by nature.  I tend to internalize

5  things and I have not seen a doctor.

6  Q   Have you gotten any prescriptions for

7  medication to treat the symptoms of your emotional

8  distress?

9  A   No, I have not.

10  Q   Was there anything else in your life that was

11  going on that could have been causing you some stress?

12  A   No, the recovery from my illness and trying

13  to go back to work was definitely the focus of my life

14  at that point.

15  Q   So the fact that you were having such trouble

16  with your health was that causing you stress?

17  A   Honestly, at that point my health had

18  improved enough that that's why I was looking to go

19  back to work in the first place.  So it was an ongoing

20  process, but it's not that my, you know, my health

21  declined in any way while I was trying to regain work.

22  Q   Did you suffer manifestations of stress while

23  you were in poor health and when you went out on

24  disability leave for three and a half years?

25  A   I suffered from some frustration that

152

1  initially being undiagnosed, but it was at a much lower

2  level; so I would say no at least in comparison.

3  Q   Do you smoke cigarettes, sir?

4  A   I do not.

5  Q   Do you drink alcohol?

6  A   Only very occasionally and while I was deep

7  into my recovery not at all.

8  Q   Do you have any hobbies?

9  A   I like to spend a lot of time outdoors as

10  much as possible.  I'm interested in computers, cars,

11  cameras, fishing, skiing.

12  Q   Did you go fishing or skiing during the

13  period you were on leave from July of 1997 until

14  January of 2001?

15  A   I think I probably went fishing once or

16  twice.  Skiing I probably went once in late winter of

17  2001 for a portion of a day.

18  Q   And where did you go skiing?

19  A   I went to Okemo in Vermont.

20  Q   And where did you go fishing when you went?

21  A   Again, I think I went twice.  Once was at a

22  pond in Avon, a park.  I don't recall.  It's not far

23  from the town dump.  Actually, it's nicer than it

24  sounds and then the second time was at a pond on Wells

25  Road in Granby near where I currently live.

153

```
1   distress or depression?
2       A   No, I have not.
4       Q   What is your relationship with your attorney?
5   Are you paying them on an hourly basis, or is he
6   getting a portion of any recovery?
7       A   He's on retainer.
8       Q   So you've paid him a retainer?
9       A   Correct.
10      Q   Of how much?
11      A   $5,000.
12      Q   And then is there an agreement that he will
13  get any portion of a settlement recovery?
14      A   Correct.
15      Q   Is that a third?
16      A   I believe it is.
17      Q   Have you taken any written statement from any
18  witnesses--
19      A   No, I have not.
20      Q   --in support of your claims?
21      A   No, I have not.
22      Q   Have you spoken to any Accenture employees
23  since November of 2001 about your claims in this
24  action?
25      A   Not about this action, I believe I had some
```

154

```
1   up loose ends for my termination, but definitely not
2   about this action.  I understand that we reserve the
3   right to do so later on, but I don't believe that's
4   happened at this point.
6           MS. KAPPELMAN:  I would like to take
7       five minutes to go through my notes?
8           THE WITNESS:  Certainly.
9           (Off the record at 12:50 p.m.)
10          MS. KAPPELMAN:  Back on the record.
11  BY MS. KAPPELMAN:
12      Q   Mr. Bennett, in the Responses To
13  Interrogatories No. 17 asks the name and address of
14  every employer you made formal or informal application
15  for employment to.  In response to Interrogatory No. 17
16  it asks for all the employers that you have applied to
17  since January 11, 1996; and you identify Unifi, Inc.
18  from Greensboro, North Carolina.  Who is Unifi, Inc.
19      A   It's actually Unifi and they are a textile
20  company down in Greensboro.
21      Q   Okay.  You didn't identify that for me when
22  we talked earlier.  Did you just forget about that?
23      A   In response to which question?
24      Q   Any question, whether you have had any or
25  sought any employment since you've left your position
```

155

```
1   with Accenture?
2       A   If I'm recalling the question correctly it
3   was since I was terminated and this was well before
4   then.
5       Q   Okay.  So you sought another job with Unifi,
6   Inc. in August of 1996?
7       A   That's correct.
8       Q   What sort of a job were you looking for?
9       A   It was an information technology position.
10      Q   Okay.  So you were out looking for another
11  job in August of 1996?
12      A   I was feeling very poorly at that stage on
13  the project and was thinking that the long hours that I
14  was working was part of it and I was hoping that if I
15  could find another -- another project that would be a
16  little more reasonable in terms of hours I would begin
17  to feel better.
18      Q   What were the questions that caused you to
19  withdraw from consideration?
20      A   I believe -- I believe I include that as the
21  documents that were requested, but among them were
22  responses to career path, I think a real feel that the
23  company was not really moving forward with a -- with
24  their information technology or setting up a career
25  path for people to advance.  The training and
```

156

```
1   advancement possibilities seemed limited.
2       Q   So there were concerns you had about Unifi?
3       A   Correct.
4       Q   Okay.  And you talked about having
5   conversations with Michelle Holt about your request for
6   accommodation.  We talked about that today and we
7   talked about that Dr. Kaplan provided
8   setting forth your restrictions, correct?
9       A   Correct, much later than this Unifi we're
10  talking about?
11      Q   Right, put Unifi aside.
12      A   Fair enough.
13      Q   Now, I'm talking about your request for
14  accommodation from Accenture.
15      A   Yes.
16      Q   For your condition?
17      A   Yes.
18      Q   In January 2001, from January 2001 until
19  November of 2001, did you communicate with any other
20  current or former Accenture employee about your need
21  for accommodation other than Michelle, Janice and Mark
22  Raymond?
23      A   I do not recall at this point any
24  conversations beyond what was documented in my
25  handwritten notes.  I do not recall any other
```

157

2    nature outside the formal process.

3    Q   And you actually had an interview with Mark

4    Raymond for the government relations position, correct?

5    A   I don't believe I did, no.

6    Q   So you never had any interviews between

7    January 2001 until November of 2001 for a new position?

8    A   I don't think Mark needed to interview me.  I

9    had worked for him previously and we had a pretty good

10   relationship.

11   Q   But listen to the question, did you have any

12   interviews for positions between January of 2001 to

13   November of 2001?

14   A   No, I did not.

15         MS. KAPPELMAN:  I have nothing

16   further.

17         MR. MAHONEY:  I have no questions.

18         (Whereupon, the deposition was

19         adjourned at 1:15 p.m.)

158

I, TODD BENNETT, have read the foregoing transcript of the testimony given and it is true and accurate to the best of my knowledge as originally transcribed and/or noted on the attached Errata Sheet.

_____
TODD BENNETT

Subscribed to and sworn to before me on this _____ day of _____ , 2003.

_____
Notary Public

My Commission expires:

_____

U.S. DISTRICT COURT; DISTRICT OF CONNECTICUT; IN RE: TODD BENNETT VS. ACCENTURE, LLP; CIVIL ACTION NO. 3:03CV0080AVC.
ALEEN M. STANTON, SEPTEMBER 15, 2003.

159

C E R T I F I C A T E

STATE OF CONNECTICUT

COUNTY OF NEW HAVEN

I, Aleen M. Stanton, a Notary Public in and for the State of Connecticut, do hereby certify that the above proceedings were reported by me stenographically and this transcript represents a true and accurate transcription of said proceedings.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

Dated at Madison, Connecticut, this 7 day of June 2003.

_____
Aleen M. Stanton, LSR
Notary Public
CT License No. 00196

My Commission Expires:
5-31-2005