1    parts of the company at least, were in a hiring freeze?

2        A    I don't recall that.

3        Q    Did you have a conversation about the fact

4    that the kind of job that you were hired to do didn't

5    fit necessarily within the nine to twelve, three day a

6    week timeframe?

7        A    I remember discussing with her that the job

8    may not, but my ability to assist somebody doing that

9    job who needed some help was much more feasible.

10       Q    Okay.  Did she mention to you that your

11   technical skills were not as up-to-date as someone's at

12   the company were?

13       A    I remember discussing with her what my skills

14   were and uh -- and what we could do upon my return to

15   quickly get me back up to speed.

16       Q    Okay.  And it says if you could direct your

17   attention--

18       A    May I refer back to the notes if that's what

19   you're reading from?

20       Q    Yes.  If I could direct your attention to

21   Exhibit 19 the third page.  It reflects a conversation

22   with Michelle Holt on March 26, 2001; do you see that

23   in the middle of the page?

24       A    I do.

25       Q    And it says, "Want to make sure not

1    jeopardizing long-term disability."  What did you mean

2    by that?

3        A    I think what I meant was that I was trying to

4    play by the rules and follow a proper procedure so that

5    both Accenture and Aetna and I would work towards the

6    partial disability arrangement.

7        Q    So you wanted to be able to keep getting

8    disability payments, but go back to work Monday,

9    Wednesday, Friday?

10       A    I wanted to as the contract with Aetna

11    provides I wanted to move from an area of total

12    disability to partial disability in an effort to get

13    back on with my life.

14       Q    So you wanted to continue to receive

15    disability payments but come back to work Monday,

16    Wednesday, Friday nine to twelve?

17       A    I wanted to play by the rules towards partial

18    disability.

19       Q    Is there any part of my statement that isn't

20    true; you wanted to continue to receive disability

21    payments, but come back to work Monday, Wednesday,

22    Friday nine to twelve?

23       A    If you change disability to partial

24    disability, I agree with you.

25       Q    Okay.  So when it says "long-term disability"

1    in this note on page 3 "want to make sure I'm not

2    jeopardizing long-term disability," what you meant by

3    that is that you want to make sure you can still

4    receive partial disability payments?

5        A    Correct.

6        Q    Okay.  At this point in March of 2001 what

7    were your symptoms?

8        A    My symptoms have never really changed.  It's

9    a matter of degree.

10       Q    Okay.  How were you limited in your day to

11   day ability to perform functions in March of 2001 by

12   you condition?

13       A    I could at that point perform functions

14   reasonably well, but the limitations was the amount of

15   mental and physical energy that it would take out of me

16   to perform those functions.  So it's not a matter of

17   what I could do.  It's a matter of how well and how

18   long I could do it.

19       Q    Okay.  And how long could you do the

20   functions of your job in March of 2001?

21       A    I hadn't had an opportunity to test this

22   recommendation, but the recommendation, and I bought

23   into it, was to try it Monday, Wednesday, Friday for

24   three hours a day and go from there as my ability

25   improved.

1      Q    Did the kind of projects that you were

2    usually put on as a consultant for Accenture lend

3    itself to doing them only Monday, Wednesday and Friday

4    from nine to twelve?

5      A    The kind of projects I was on were populated

6    by people who desperately could have used the

7    additional help that I could provide in that timeframe.

8      Q    Isn't if fair to say though that very few

9    projects only need you on them Monday, Wednesday and

10   Friday from nine to twelve, that usually when you go to

11   a client to do a project it's fulltime with the client

12   until it's done?

13     A    I think the assumption that you are making

14   with that question is that you are the primary person

15   doing that job and what I thought made the most sense

16   was for me to come back and assist somebody who

17   performed the job that I had done before who was badly

18   overworked, probably not performing at peak efficiency.

19     Q    So were you going to come back not as a

20   consultant; is that what you're saying?

21     A    I was going to come back in any capacity and

22   I think I made that clear to them that I wanted to

23   resume my career, but whatever I had to do to get my

24   foot in the door was fair.  However, my goal obviously

25   was to get back to consulting, yes.

1    Q    So you made it clear that you were willing to
2    come back as an analyst?
3    A    I don't know if I used the term analyst, but
4    I think I made it clear both for my health recovery and
5    for my career the best thing for me was to come back to
6    work.
7    Q    Okay.  And what did Ms. Holt do between March
8    of 2001 and November of 2001 to try to find a job that
9    would accommodate the restrictions that your doctor set
10   forth on Exhibit 20?
11   A    I think that information would probably best
12   come from her, but--
13   Q    No, I'm asking you.
14   A    I understand that.
15   Q    What is your knowledge about what Michelle
16   Holt did?  Strike that.  Were you touch with Ms. Holt
17   between March of 2001 and November 2001?
18   A    Yes, I was.
19   Q    And your notes reflect that you were in touch
20   with her, let's just go through the dates, March 30,
21   April 9, April 18, April 20, April 25, April 26, April
22   30, May 1, May 7, May 15, May 16, May 21; do you know
23   the date of this voicemail message that Amy typed up?
24   A    She typed this up as she was helping me
25   prepare a message that I ultimately left for Mark

1    Raymond on May 22, 2001.

2        Q    So when you say in this message, "I know

3    there have been a ton of changes to the firm and would

4    love to get your perspective on those changes as well

5    as any insights you may have about my return to work

6    and potential assignments," what were the ton of

7    changes to the firm that you're referring to in May of

8    2001?

9        A    The single biggest change was the change to

10    the name and the impact that had on your clients and

11    work in our separation from Arthur Anderson.

12        Q    So that was really the biggest change you

13    were referring to in "a ton of changes," you were

14    referring to the change to the name?

15        A    As I said, that was -- that was the most --

16    the most obvious one.  Beyond that at some point

17    Michelle had told me that the company was preparing for

18    an initial public offering which surprised me because

19    it had been a partnership for its -- for its duration.

20    I don't recall if that was another one of the changes.

21    The market units change, I don't recall if I knew about

22    that at this time or not.

23        Q    So it's fair to say that at least from March

24    2001 until May 2001 you had a lot of contact with

25    either Michelle Holt or Janice?

1    A    I made getting my job back my job.  I took it

2    very seriously, yes.

3    Q    My question is it's fair to say between March

4    of 2001 and May of 2001 you had a lot of contact with

5    Michelle Holt and Janice?

6    A    I did.

7    Q    And who is Janice?

8    A    Janice Beebe is Michelle Holt's executive

9    assistant or was at that time.

10    Q    Okay.  And so were you familiar with the

11    efforts that Michelle Holt was making to try to find

12    you replacement employment during this period of time?

13    A    I knew that -- let's put it this way, I knew

14    what she told me.

15    Q    Okay.  And what did she tell you?

16    A    Well, as evidenced by Document 19 that they

17    were working on finding a spot for me.

18    Q    Okay.  Did she tell you she spoke with Andrew

19    Burns the People's Matters Representative for the

20    Resources MU Unit in Hartford?

21    A    Are you referring to a particular date?

22    Q    No.  Did she tell you that in trying to find

23    you a position which met your restrictions she spoke to

24    the People's Matters Representative for the Resources

25    Market Unit in Hartford?

1     A     I do not recall if she told me that or not.

2     Q     Did she tell you that Mr. Burns told her that

3     he had no resources positions available in the

4     Connecticut office?

5     A     I do not recall being told that.

6     Q     Is it fair to say that you wouldn't have

7     accepted a position outside of Connecticut at this

8     point in time?

9     A     It would depend on the distance.

10     Q     So if you were to be sent to Boston, would

11     you go in early 2001?

12     A     In early 2001 I don't think that would have

13     met my doctor's recommendations.

14     Q     Right.  It actually doesn't meet his

15     recommendations--

16     A     Correct?

17     Q     --in Exhibit 20, correct?

18     A     Right, as I said.

19     Q     So basically the only positions that you were

20     open to with your restrictions were the ones in

21     Connecticut?

22     A     If you're talking about a position where I

23     physically was attending, yes.  If you're talking about

24     something with conference calls, e-mails,

25     video-conferencing, et cetera, I think that opened up a

1    variety of other opportunities.

2        Q    So are you saying that you could have worked

3    in San Francisco, but from your Connecticut office,

4    worked for someone in San Francisco from your

5    Connecticut office?

6        A    Yes, I believe I could or I could have

7    assisted somebody working in San Francisco.

8        Q    Did Ms. Holt tell you that she had contacted

9    Amy Salvatore the People's Matters Representative For

10   the Communications And High Technologies Market Unit?

11       A    The name is vaguely familiar to me, but I do

12   not recall any other details.

13       Q    Do you recall Michelle telling you that Ms.

14   Salvatore didn't have any communications positions

15   available in the Connecticut office?

16       A    I'm sorry.  I don't recall that.

17       Q    Do you recall that Ms. Holt spoke with Olga

18   Conway within the Financial Services Market Unit?

19       A    I do not recall that and let me -- let me

20   back up a step, if I may; when Michelle would tell me

21   the efforts that she was making a lot of times she

22   would not refer -- sometimes she would refer to people

23   by name, but often times she would not.

24       Q    Okay.  Why don't you tell me what you

25   remember about what Michelle told you about the efforts

1   she was making to find a job for you within the

2   restrictions you had provided?

3       A    Okay.  I remember that she was talking with

4   Marty Strong on an internal project.  I know that she

5   talked with Mark Raymond, Marty Kohl and Rick Hedgewood

6   about a number of government opportunities.  I know

7   that there was also an agreement at one point that the

8   government market unit would take me back even if

9   unassigned.

10      Q    Tell me what she said to you about her

11  conversations with Marty Strong in her efforts to find

12  you a position?

13      A    May I refer to the notes, or are you asking

14  me to do this from memory?

15      Q    Absolutely, refer to anything that would

16  refresh your recollection--

17      A    Okay.

18      Q    --about what Michelle Holt told you about her

19  opportunities to find you replacement employment within

20  the restrictions you provided?

21              (Witness looking at notes).

22      A    I'm not seeing it in these notes.  Either I

23  missed it or it's not included.

24      Q    Look at May 1, 2001, the bottom of the page

25  it says "two possibilities, government," and then

1    "internal."

2        A    Okay, thank you for finding that for me.

3        Q    Yes.

4        A    My recollection much as the note suggests is

5    that Marty needed some help as the notes mention "was

6    in crunch mode," and Michelle was looking to set up a

7    conversation for ways that I could assist her in that.

8        Q    And what happened with that?

9        A    I do not recall if that conversation ever

10    took place.  I don't have a recollection of it.

11        Q    What else do you remember that Michelle Holt

12    did to try to find you work in this timeframe?

13        A    She granted me permission to attend a

14    government community meeting where I had a chance to

15    meet some other members of the government community and

16    network.  Based on her conversations with me she talked

17    to people at both the local and market level and maybe

18    even the national level trying to find opportunities

19    for me and/or get agreement for me to come back

20    unstaffed to work on one, training and getting my

21    skills quickly back up to speed or to work on proposals

22    to sell new work.

23        Q    Did she tell you why she was having a hard

24    time finding a position for you?

25        A    At some point she told me that the company

1     was preparing for an initial public offering and I

2     think the phrase that she used was that the company was

3     being run very lean.

4         Q   So they weren't hiring a lot of new people;

5     is that what you took from that?

6         A   I took that to mean they didn't want people

7     who were unstaffed, not necessarily that they weren't

8     hiring them, but they wanted people to be staffed and

9     that's why their preference would be to get me directly

10    on a project, but they also did agree to take me back

11    if not.

12        Q   Okay.  You say here, "One possibility May 1,

13    2001 was in the government market unit with Mark

14    Raymond."  Do you see that in revenue services?

15        A   I do.

16        Q   Okay.  What happened with that opportunity

17    that she tracked down for you?

18        A   There were a number of government

19    opportunities and some of them were not won.  Others

20    kept getting delayed past the point where I was

21    ultimately terminated.

22        Q   Okay.  So in your notes you have a message to

23    Mark Raymond that we were just looking at where you

24    talk about "a ton of changes"?

25        A   Are you referring to the list on May 22nd?

1      Q    The one that Amy typed up for you?

2      A    That was notes.  If you want to look at the

3   actual call, it's on the next page.

4      Q    On May 22nd, okay.  You said, "I have been

5   working with Michelle Holt for several months to make

6   it happen."  When you say you have been working with

7   her, so Michelle Holt was trying to find you a position

8   for several months, right?

9      A    Based on me contacting her in January and

10  this being in May, yes.

11     Q    Okay.  And all those phone calls that you had

12  with her?

13     A    Correct.  Again, I can't -- I can only tell

14  you what she told me she was doing--

15     Q    Right.

16     A    --but that's my understanding of it.

17     Q    Okay.  And you say your "progress is slow.  I

18  am in an unusual situation.  I want to return

19  part-time."

20     A    Uh-hum.

21     Q    That was an unusual situation for Accenture?

22     A    Unusual in the sense that as you have

23  indicated most people are there on a fulltime basis.

24  What I was looking to do to come back in any capacity

25  including assisting somebody who is overworked.

1    Q    Now, if you look at the bottom of the page it

2    says that on May 30th you actually had a really good

3    conversation with Mark Raymond.

4    A    Uh-hum.

5    Q    Right?

6    A    That's what the note says, yes.

7    Q    And it says he was going to try to find a

8    role for you on a government ERP job using Oracle or

9    File Net, which were the two things that you said you

10   were conversant on, right?

11   A    Correct, I used those on a previous

12   engagement.

13   Q    And he invited you to a government community

14   meeting?

15   A    That's correct.

16   Q    What happened with his efforts to try to find

17   a role for you using Oracle and File Net?

18   A    As I mentioned before, there were a couple of

19   government opportunities and in my conversations with

20   Michelle I lost track of what happened to which one.  I

21   don't know if that was something that Accenture lost or

22   it was delayed past the point where I was terminated or

23   they just didn't find a match for me.  I can't tell you

24   that.

25   Q    So despite his efforts either they didn't

1   have the opportunity or it wasn't a good match for you?

2       A    Well, it didn't happen.  Let's put it that

3   way.

4       Q    Did you get the impression that Mark wasn't

5   telling you the truth when you spoke to him on May 30

6   and that he wasn't looking for an opportunity for you?

7       A    Not at all.

8       Q    Did you get the impression in any of these

9   conversations with Michelle Holt that she wasn't truly

10  trying to find an opportunity for you within your

11  restrictions?

12      A    I was certainly frustrated by the lack of

13  progress.

14      Q    But listen to my question, it's very

15  important; did you get the impression during any of

16  these many conversations you reported with Michelle

17  Holt that she wasn't telling you the truth that she was

18  truly trying to find you an opportunity with your

19  restrictions?

20      A    I believe she was trying.  I don't know how

21  hard or how big a priority it was for her or other

22  people based on how slow things moved.

23      Q    Okay, but you believe she was trying?

24      A    I believe she was trying and I have no reason

25  to believe she was lying to me.  She's a good person.

1    Q    And she did tell you she was unable to find a

2    match for your skill set with your restrictions?

3    A    I know that Accenture gave up the search and

4    terminated before -- before finding something.

5    Q    Do you remember her telling you that Mark

6    Raymond could not assign you to the government market

7    unit because you didn't have any knowledge of the

8    PeopleSoft Program, the software that the government

9    market unit used on its Connecticut projects in 2001?

10    A    Are you referring to a particular date?

11    Q    I'm referring to any date.  Do you remember

12    having any conversation with Michelle Holt where she

13    told you that it wasn't going to work out for you with

14    Mark Raymond in the government market unit because you

15    weren't conversant with the PeopleSoft Program which

16    was the software that the government market unit

17    currently used at that time on its Connecticut

18    projects?

19    A    Your question is a global question.  I do

20    remember a conversation with Michelle Holt about

21    PeopleSoft.  I believe it was in the context of a

22    particular engagement, not their inability to take me

23    back at any time anywhere.

24    Q    Okay.  What exactly do you remember about

25    what Michelle told you about PeopleSoft?

1        A    My recollection is that there was an

2    opportunity with PeopleSoft for a project for somebody

3    who knew PeopleSoft and I got the impression that

4    uh--that Accenture was not willing to make the

5    reasonable accommodation for me to do a brief amount of

6    training and come back up to speed quickly on that.

7        Q    So the government market unit you don't

8    understand that the government market units uses

9    PeopleSoft on all of its Connecticut projects?

10       A    It's not a matter of whether I understand it

11   or not.  I don't know what they use on projects

12   throughout the world.

13       Q    And Michelle didn't tell you that; are you

14   saying that Michelle never told you that the government

15   market unit uses PeopleSoft on all of its projects?

16       A    That wouldn't make any sense.  That would be

17   like trying to solve every problem with a hammer if

18   you're trying to drive a screw.

19       Q    So it wouldn't make any sense for the

20   government market unit to use PeopleSoft on its

21   Connecticut projects?

22       A    I know for a fact that's not the only

23   solution they used because of the Oracle and File Net

24   proposal.

25       Q    What are the other solutions, what are all

1    the other solutions that the government market unit

2    uses?

3         A    You're asking me a question I do not know the

4    answer to.

5         Q    Right.  Do you know whether you are

6    conversant in the other solutions that the government

7    market unit uses?

8         A    I know that if there's something I'm not, I

9    would get back up to speed on it very quickly.

10         Q    But as you sit here today you don't know if

11    you were conversant in 2001 in all of the technologies

12    that the government market unit was using?

13         A    You're asking me a question that I can't

14    answer because there are thousands of projects and I

15    don't know what technologies are in use.

16         Q    Right.  At some point Michelle Holt told you

17    that she couldn't find a position for you; is that

18    correct?

19         A    At some point she told me -- actually she

20    initially told my wife that -- that Accenture was

21    terminating me.

22         Q    At some point did it become clear that she

23    wasn't able to find a job for you with your skills and

24    your doctor's restrictions?

25         A    There was a point where it certainly wasn't

1    looking good and it wasn't looking promising and I had

2    hoped that my doctor's approval to ease the

3    restrictions to the point to where I was working four

4    hours a day, five days a week would open up additional

5    opportunities, but that did not occur.

6         Q    On August 13, 2001 you have a note which says

7    "left message with Janice Beebe.  I called, please call

8    back.  She called back with no progress."  Do you see

9    where I am reading from?

10        A    I do and the she being Michelle Holt.

11        Q    "She had talked to the government HR rep, no

12   current positions, told her that I was getting

13   increased pressure from Aetna, told her 'I can't be the

14   only employee who is gone for a while who needs to come

15   back part-time.'  Her response was 'You left two

16   reorganizations ago.'"

17             Does that refresh your recollection that at

18   least in August of 2001 Michelle told you that there

19   had been two reorganizations at Accenture while you

20   were away on leave?

21        A    Yes.

22        Q    Does it refresh your recollection at least

23   that in August of 2001 she said "there were no current

24   positions available in the government department"?

25        A    I took that to mean that they were going to

1    back out on their agreement to take me back unstaffed

2    and that things certainly weren't looking good.

3        Q    If you turn the page it was at least clear by

4    August 20 of 2001 that the government wasn't able to

5    find a home for you with your skill set and your

6    restrictions, correct?

7        A    You're referring to August 20?

8        Q    Right.

9        A    Correct.  As I said before, I took that to

10   mean that obviously things were going poorly and that

11   the agreement to take me back unstaffed was not going

12   to happen.

13       Q    In the bottom of this same page it says that

14   "November 7,2001 Michelle told Amy you were being laid

15   off."

16       A    Correct.

17       Q    Okay.

18       A    And I think that she would not have -- I

19   think that Michelle was a little bit uncomfortable with

20   telling that to Amy and not to me, but they know each

21   other.  They met previously and I think she was

22   comfortable with that.  It was actually on the next day

23   that Michelle informed me; although, clearly I knew

24   what was happening from my conversation with my wife.

25       Q    And when did you start your training program

EXHIBIT D

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

TODD BENNETT                          :

VS.                                   :        NO. 3:03CV80(AVC)

ACCENTURE, LLP                        :        MARCH 29, 2004

## PLAINTIFF'S RULE 56(a)(2) STATEMENT OF MATERIAL FACTS IN DISPUTE

**A.    Plaintiff's Response to Defendant's Rule 56(a)(1) Statement**

1.    Accenture is a global management and technology consulting firm. *See* Affidavit of Toni L. Corban, hereinafter "Corban Aff.," filed simultaneously herewith at ¶ 5.  **AGREE.**

2.    The Company's primary mission is to help clients become more successful in their own businesses and operations. Corban Aff. at ¶ 6. **AGREE.**

3.    The Company serves the major global industries through its five Market Units (Resources, Communications and High Technologies, Financial Services, Products and Government) and a number of Global Service Lines. Corban Aff. at ¶ 7.  **AGREE.**

4.    Todd Bennett began his employment as an analyst in Accenture's Connecticut office, located in Hartford, on August 17, 1992. See Deposition of Todd Bennett dated August 29, 2003, hereinafter "Bennett Dep.," attached as

Exhibit A to Affidavit of Lynn A. Kappelman filed simultaneously herewith, at pages 48–49.[1]  **AGREE.**

5.    Mr. Bennett was 22 years old at the time. Bennett Dep. at 21.  **AGREE.**

6.    Prior to August 2002, Accenture's Hartford office was the Company's only location in Connecticut.  **AGREE.**

7.    Soon thereafter he became a staff consultant. Bennett Dep. at 45-50.  **AGREE.**

8.    As a staff consultant, Mr. Bennett primarily was responsible for solving the business problems of his Accenture clients by directing them to the most effective technologies to meet their business needs. Bennett Dep. at 49-50; Corban Aff. at ¶ 11. **AGREE.**

9.    Specifically, Mr. Bennett worked with clients at their own facilities to maintain and solve problems with their computer systems. Bennett Dep. at 45-46; Corban Aff. at ¶ 12. **AGREE.**

10.    On average, he would work seventy to eighty hours a week in this position. Bennett Dep. at 50-52. **AGREE IN PART.  Employees at Accenture are compensated for their overtime.  For the first 80 hours each year, employees received compensatory time.  After 80 hours, the plaintiff**

---

[1]    Prior to August 2002, Accenture's Hartford office was the Company's only location in Connecticut. Corban Aff. at ¶ 9.

received extra compensation at an hourly rate based upon his annual salary.  Ex. 7, Plaintiff's Affidavit, §§ 3-4.

11.    It was fairly common to work long hours as an analyst or a consultant at Accenture. Bennett Dep. at 61-63; Corban Aff. at ¶ 13.  **AGREE IN PART. The plaintiff was paid extra compensation for overtime after the first 80 hours annually.  For the first 80 hours, employees received compensatory time. Ex. 7, Plaintiff's Affidavit, ¶3.**

12.    Mr. Bennett performed reasonably well, and the Company promoted him once and granted him annual salary increases. Bennett Dep. at 58-62; Corban Aff. at ¶ 14. **DISAGREE.  Plaintiff's work was described as "consistently outstanding" by his supervisor since his employment commenced at Accenture.  Plaintiff's Exhibit 1.**

13.    In or about December 1996, Mr. Bennett took several intermittent sick leaves claiming fatigue and weakness. Bennett Dep. at 64-68; Corban Aff. at ¶ 15. **DISAGREE.  Sick leave was not intermittent, but consistent as of the pay period ending 12/15/96, continuing  through the pay period ending April 15, 1997; averaging 30 hours per pay period. Ex. 2**

14.    Mr. Bennett applied for a short-term disability leave on February 14,  1997, and began that leave on April 7, 1997. *See* Application For Family and/or

3

Personal Medical Leave of Absence attached to the Corban Aff. as Exhibit A;
Bennett Dep. at 74,79-81. **AGREE.**

15.     According to correspondence from Mr. Bennett's physician, Dr. Robban
Sica, Mr. Bennett suffered from hypothyroidism and candida enteritis, which
caused him fatigue, weakness, chronic sinusitis and multiple allergies. *See* letter
from Dr . Robban Sica, dated May  23, 1997, attached to the Corban Aff. as
Exhibit B; *see also* Bennett Dep. at 74-76.

16.     By letter, Dr. Sica stated that he expected Mr. Bennett to recover within
two to three months. *See* Exhibit B attached to Corban Aff. **AGREE IN PART.**
**Dr. Sica revised her diagnosis and her opinion subsequently. Ex. 4**

17.     Thereafter, Mr. Bennett submitted a long- term disability leave application
to Accenture's insurance carrier on June  17,  1997. Corban Aff. at ¶ 19.
**AGREE.**

1.     Accenture's long-term disability insurance carrier approved Mr. Bennett's
application and he began long-term disability leave on July 7, 1997. Bennett Dep.
at 86; *see* letter from Daniel Dolyak, dated August  30, 1997  attached to the
Corban Aff. as Exhibit C.  **AGREE.**

19.     In  1997, Dr. Zampierson diagnosed Mr. Bennett with "copper toxicity."
Bennett Dep. at 81-83. **AGREE.**

20.     Mr. Bennett surmises that he developed this condition from the well water

in East Granby, Connecticut where he grew up. Bennett Dep. at 84-85. **AGREE.**

21.    No other members of his family, and none of his neighbors, have had any similar problems with copper toxicity. Bennett Dep. at 84-86**. AGREE.**

22.    Mr. Bennett received Long-Term Disability benefits from July 6, 1997 until April 7, 2002. Bennett Dep. at 89; Corban Aff. at ¶ 21. **AGREE.**

23.    During this four and a half year period, Mr. Bennett would spend his time during the day at two gyms in Unionville, Connecticut and Windsor, Connecticut, where he used the sauna, shower and whirlpool to "ramp up his excretions of copper." Bennett Dep. at 91-93. **DISAGREE. Plaintiff was involved in many other activities, such as receiving chelation therapy at the University of Michigan Metal Toxicology Clinic, to leach the copper out of his body. Ex. 3, Ex. 4.**

24.    During Mr. Bennett's medical leave from 1997 to 2001, Accenture made several organizational changes. Bennett Dep. at 95-98; Corban Aff. at ¶ 22. **AGREE.**

25.    The largest change occurred in the Spring of 2000 when Accenture deployed its practice personnel, including consultants, into various Market Units based on industry. Corban Aff. at ¶ 23. **AGREE.**

26.    Because Mr. Bennett did not focus on a particular industry at the time he began his disability leave, Accenture could not yet assign him to a Market Unit.

Corban Aff. at ¶ 24. **AGREE.**

27.    Mr. Bennett, however, remained assigned to the Hartford office. Corban

Aff. at ¶ 25. **AGREE.**

28.    On January 31, 2001, Mr. Bennett, now 27 years old, called Michele Holt,

an EEO Officer in the Hartford office, and informed her that his physician had

released him to return to work on a modified schedule. Bennett Dep. at 89-90,

112-113; *see also* Affidavit of Michele Holt, hereinafter "Holt Aff.," filed

simultaneously herewith at ¶ 7. **AGREE.**

29.    In response, Ms. Holt explained to Mr. Bennett that she would initiate the

appropriate reinstatement procedures and call him back. Bennett Dep. at 113;

Holt Aff. at ¶ 8.    **AGREE.**

30.    Shortly thereafter, Ms. Holt called Mr. Bennett and asked him to provide

documentation to Accenture from his physician concerning Mr. Bennett's ability to

return to work. Bennett Dep. at 113; Holt Aff. at ¶ 9.    **AGREE.**

31.    Mr. Bennett requested that Accenture ask his physician directly for the

documentation. Holt Aff. at ¶ 10. **AGREE.**

32.    On February 28,2001, Paula Miller, Hartford Benefits Contact, sent a

request to Mr. Bennett's physician, Dr. Jerrold Kaplan, asking for Mr. Bennett's

return to work date, restrictions on his work, and the duration of his restrictions.

Holt Aff. at ¶ 11; *see also* fax from Paula Miller, dated February 28, 2001,

attached to the Holt Aff. as Exhibit A.

**AGREE.**

33.    Dr. Kaplan sent a letter on March 5, 2001 to Ms. Miller, stating that Mr.

Bennett could begin working on March 12, 2001 on a limited basis. *See* letter from

Dr. Jerrod Kaplan, dated March 5,2001, attached to the Holt Aff. as Exhibit B.

**AGREE.**

34.    Specifically, Dr. Kaplan outlined Mr. Bennett's restrictions, stating in

relevant part:

> [Mr. Bennett] can work three hours per day, three days
> per week for the first two weeks and then increase to
> four hours per day, three days per week for the next
> two weeks. He should continue at that level until he is
> re-evaluated at Gaylord Hospital. In order to make his
> transition the most successful, I would suggest that his
> three hours per day be done for a 9 a.m. to 12 noon
> shift, Monday, Wednesday, and Friday. When the
> extra hour is added in two weeks, I would suggest that
> it be done also on a Monday, Wednesday , Friday
> schedule. . . . He should be assigned just to his home
> office and not be sent to other locations until he is
> reassessed at Gaylord Hospital. I would recommend
> that he be set up in an office that minimizes possible
> distractions. It would be helpful for Mr. Bennett to have
> parking available at his office location so that his
> fatigue can be minimized.

Exhibit B attached to Holt Aff.

**AGREE.**

7

35.    Ms. Holt immediately began looking for a position within the Company to accommodate Mr. Bennett's medical restrictions and his skill set. Bennett Dep. 115-121; Holt Aff. at ¶ 14. **DISAGREE. In their response to plaintiff's interrogatories to defendant, the defendant produced paltry evidence of any effort to locate a temporary part-time assignment for the plaintiff. Ex. 5**

36.    In 2001, the essential job functions of analyst or consultant included, but were not limited to, ability to lift light materials, proficiency in applicable technologies; understanding in systems integration and interactive design; ability to work overtime, as required; ability to travel to different client locations; ability to work during business hours; proficiency in written and verbal communication skills; ability to work creatively and analytically in a problem-solving environment; ability to work independently in work and/or client settings; and ability to speak and write English proficiently. Holt Aff. At ¶6. **AGREE.**

37.    By this time, Mr. Bennett had been out of work for approximately four years and had no experience or training on Accenture's current systems. Bennett Dep. 103-108; Holt Aff. at ¶ 15.    **DISAGREE. The defendant was using Oracle and File Net in 2001 and the plaintiff had experience with both systems. Ex. 12, Plaintiff's deposition, pps. 102-106.**

38.    Indeed, the technology Mr. Bennett used prior to his disability leave was significantly outdated. Bennett Dep. 103-108; Holt Aff. at ¶ 16.

**AGREE.**

39..    During 2001, Accenture suffered an economic downturn, during which it implemented several workforce reductions in its Consulting and Business Practices. Bennett Dep. at 96-99; Holt Aff. at ¶ 17.    **AGREE.**

40.    In response to its economic situation, Accenture also issued a hiring freeze in its Business Practices group and deferred the start dates for its new hires. Bennett Dep. at 97-99; Holt Aff. at ¶ 18. **AGREE.**

41.    Despite these economic restrictions, between March 2001 and November 2001, Ms. Holt contacted each of Accenture's five Consulting Market Units ("MUs") in the Hartford office in an effort to find Mr. Bennett a position in Connecticut. Holt Aff. at ¶ 19.    **AGREE.**

42.    For example, she spoke with Andrew Burns, the People Matters ("PM") Representative for the Resources MU in Hartford. Holt Aff. at ¶ 20.  Mr. Burns had no Resources positions available in the Connecticut office. Holt Aff. at ¶ 20. **AGREE.**

43.    Ms. Holt contacted Amy Salvatore, the PM Representative for the Communications and High Technologies MU . Holt Aff. at ¶ 21. Likewise, Ms. Salvatore did not have any Communications positions available in the Connecticut office. Holt Aff. at ¶ 21. **AGREE.**

44.    Within the Financial Services MU, Ms. Holt spoke with Olga Conway, the PM Representative for the Banking and Insurance Group in Hartford, and Hilary McCracken, the PM Representative for the Health Services Group in Hartford, and learned that there were no opportunities for employment available at all in either department. Holt Aff. at ¶ 22. **AGREE.**

45.    Similarly, there were no employment opportunities available in the Products MU in Connecticut. Holt Aff. at ¶ 23. **AGREE.**

46.    Ms. Holt also contacted Tara Parisi, the PM Representative for the Government MU in Hartford. Holt Aff. at ¶ 24. The Government MU in Hartford had a possible employment opportunity for Mr. Bennett and, therefore, Mark Raymond, an Associate Partner in the Government MU, contacted Mr. Bennett to come in for a meeting. Bennett Dep. 127-133; Holt Aff. at ¶ 24.    **AGREE.**

47.    Mr. Raymond met with Mr. Bennett on June 1, 2001. Bennett Dep. 127-133; Holt Aff. at ¶ 25. However, Mr. Raymond could not assign Mr. Bennett to his MU because Mr. Bennett did not have any knowledge of the Peoplesoft program, the software that the Government MU currently uses on its Connecticut projects. Holt Aff. ¶25. **DISAGREE. Peoplesoft was not the only program used by the Government Unit in Connecticut. It may have been used in one contract with the state. Ex. 12, Plaintiff's deposition, pps. 134-136. In any case, since the plaintiff was a computer expert and he would have had no**

10

difficulty in digesting the Peoplesoft program, in the same manner that other similarly trained Accenture employees learn to adapt to new software programs.  (See 1996 annual review, Ex. 1)

48.      In June 2001, knowledge of the  Peoplesoft program was an essential function of the position. Holt Aff. at ¶ 25. **DISAGREE. See Response to No. 47, above.**

49.      Ms. Holt even searched beyond the Consulting MUs and contacted Martha Strong regarding opportunities on the Quality Client Survey Team in the Business Practices group in Connecticut. Holt Aff. at ¶ 26.

Ms. Strong informed Ms. Holt that the Business Practices group was under a hiring freeze order and she could not hire or transfer any person into the group. Holt Aff. at ¶ 26.      **AGREE.**

50.      Ms. Holt also contacted Marty Cole, the Location Lead Partner for the Company, but he also could not find Mr. Bennett a position because many of the MUs were undergoing workforce reductions. Holt Aff. at ¶ 27.

**DISAGREE.  The defendant refused to provide the plaintiff with the number of employees who were eliminated from the Connecticut workforce as part of their RIF program during this period. (Ex. 6, Response to Interrogatory No. 6)**

51.      Due to the state of its business and the  Company's inability to locate a position for Mr. Bennett that would accommodate his work restrictions and skill

11

sets, Accenture terminated Mr. Bennett's employment. Holt Aff. at ¶ 28.

**DISAGREE. Ex. 7, Plaintiff's Affidavit, §§3-13.**

52.     On November 7, 2001, Ms. Holt called Mr. Bennett's home, but he was unavailable. Bennett Dep. at 136-138. Ms. Holt spoke with Mr. Bennett's wife, who stated that Mr. Bennett and she had come to the conclusion that Accenture did not have a position for him. Bennett Dep. at 136-138; Holt Aff. at ¶ 29.

Ms. Holt did not discuss Mr. Bennett's termination in detail with Mrs. Bennett at that time, but scheduled a telephone conference with Mr. and Mrs. Bennett for the following day. Holt Aff. at ¶ 29. **DISAGREE. Plaintiff did not say that Ms. Holt called him at home and also did not say that he was unavailable. He does state that his wife told him that she had spoken with Ms. Holt. Ex. 12, p. 138.**

56.     On November 8, 2001, Ms. Holt called Mr. and Mrs. Bennett and informed them that Accenture was unable to find a position for Mr. Bennett and, thus, had to terminate his employment. Holt Aff. at ¶ 30. **AGREE.**

**B.     Rule 56(a)(2) Statement of Material Facts in Dispute**

1.     The plaintiff was qualified to return to work part-time as of the spring of 2001; among other alternatives, he was available to assist other consultants and reduce overtime hours. **Ex. 7, Plaintiff's affidavit, §3-13, Defendant's Statement of undisputed facts, ¶¶s 9, 10.**

12

2.    The defendant made no real attempt to re-instate the plaintiff's employment; it's miscellaneous inquiries to various departments in the Hartford office did not constitute a real effort to return the plaintiff to work on a part-time basis. **Ex. 8.**

3.    The plaintiff's skills could easily have been put to use in a part-time position as of the spring of 2001, whether the defendant was in a cost-cutting mode or not. **Ex. 7, Plaintiff's Affidavit, §§3-13.**

4.    Since the employees were frequently asked to work over-time hours, the defendant could have saved expense by utilizing the plaintiff in a part-time capacity. **Ex. 7, §§3-4.**

5.    There is evidence that the defendant sought to terminate the plaintiff as early as August, 2001, and wondered aloud whether his receipt of LTD benefits posed a stumbling block to such a plan. **Ex. 8**

6.    Defendant's refusal to disclose the number of professional level employees who were actually terminated from the Hartford offices of Accenture during the relevant time period permits an adverse inference to be drawn against the defendant on the issue of attempts to accommodate the plaintiff; the defendant's rationalization concerning reduction in force during 2001 was pretext to avoid re-instating a person with a disability. **Ex. 6**

13

7.    The defendant claims that the plaintiff was terminated due to a

reduction in force; he was never offered any severance pay, although if

other employees were  terminated during the same time period, they were

presumably offered the plan. **Ex. 13, Defendant's Separation Plan as of**

**9/01, Ex. 7, §14.**

THE PLAINTIFF

BY: _____
KATRENA ENGSTROM
Federal Bar No. ct09444
51 Elm Street
New Haven, CT 06510
(203)562-9931
FAX: (203)776-9494
E-Mail: kengstrom@johnrwilliams.com
His Attorney

14

## CERTIFICATION

A copy of the foregoing was mailed, first class, on the date set forth above, to the following counsel of record:

Damian W. Wilmot, Esq.
Seyfarth Shaw
Two Seaport Lane, Suite 300
Boston, MA 02110

Douglas Varga, Esq.
Zeldes, Needle & Cooper
1000 Lafayette Blvd.
Bridgeport, CT 06604

KATRENA ENGSTROM