UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TODD BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:03CV0080 AVC |
| | ) | |
| v. | ) | |
| | ) | |
| ACCENTURE LLP, | ) | August 5, 2005 |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION IN LIMINE TO
ADMIT MEMORANDUM AT TRIAL**

Pursuant to Rules 803(6) and 807 of the Federal Rules of Evidence ("Rule 807"), the

Defendant, Accenture LLP ("Defendant," "Accenture" or the "Company"), hereby respectfully

moves this Court, in limine, to admit a Memorandum prepared by the late Michele Holt ("Ms.

Holt") and Employee Relations Manager Toni Corban (the "Memorandum") into evidence at

trial in the above-captioned action. The Memorandum is attached hereto as Exhibit A. The

Court should admit the Memorandum for the reasons set forth below.

First, the Memorandum possesses circumstantial guarantees of trustworthiness and

reliability and, therefore, is admissible under Rule 807. The Memorandum is particularly

probative evidence with respect to whether Accenture and Ms. Holt made good faith efforts to

accommodate Plaintiff Todd Bennett's ("Plaintiff" or "Mr. Bennett") purported disability, which

is the core factual issue in this case. As a result of the tragic and exceptional circumstances of

Ms. Holt's sudden passing, this Court should admit the Memorandum to best serve the interests

of justice. Moreover, Accenture has provided Plaintiff sufficient notice of its intent to offer the

Memorandum at trial in order to provide Plaintiff with a fair opportunity to prepare accordingly.

Finally, Accenture exercised due diligence to procure Ms. Holt's attendance and testimony at trial, even attempting to arrange for her deposition upon learning of her serious condition. Unfortunately, soon after the parties learned of Ms. Holt's grave condition, Ms. Holt passed away. Accordingly, the Court should admit the Memorandum in lieu of her live testimony because she was Accenture's most material witness. In further support, Defendant provides as follows:

## BACKGROUND AND PROCEDURAL POSTURE

Mr. Bennett, a former technology consultant for Accenture, claims that the Company failed to accommodate his alleged disability, copper toxicity poisoning, when he requested reinstatement in 2001 after a four-year disability leave. Specifically, Mr. Bennett contends that Accenture failed to accommodate him when the Company could not find him an available part-time position within his medical restrictions.

Ms. Holt served as Accenture's EEO Officer in the Company's Hartford office at the time Mr. Bennett requested reinstatement in 2001. In this capacity, Ms. Holt attempted to accommodate Mr. Bennett's purported disability by thoroughly searching Accenture's various business units for a vacant, part-time position within Mr. Bennett's medical restrictions and skill set. After Ms. Holt was unable to locate a position for Mr. Bennett, Ms. Holt informed Mr. Bennett in the Fall of 2001 that Accenture was terminating his employment.

On or about May 16, 2002, Mr. Bennett filed a charge with the Connecticut Commission on Human Rights and Opportunities (the "CHRO charge"), alleging that Accenture had failed to accommodate his disability because it did not reinstate him after he returned from a four-year leave of absence. See Affidavit of Toni Corban, attached hereto as Exhibit B ("Corban Aff."), at ¶ 5. Between May 16 and June 3, 2002, in an effort to relate the factual background to counsel in order to assist counsel in preparing the Company's CHRO Position Statement, Ms. Holt and

2

Employee Relations Manager Toni Corban jointly prepared the Memorandum at issue in this Motion.[1]  Corban Aff., at ¶ 6.  The Memorandum contains, inter alia, the background concerning Mr. Bennett's employment with Accenture, his leave of absence dates, and Ms. Holt's recollection concerning (i) her efforts to find Mr. Bennett an available position that would accommodate his medical restrictions and skill set, (ii) the results of her search, and (iii) the Company's decision to terminate Mr. Bennett's employment and her communications with Mr. Bennett about the termination.  Corban Aff., at ¶ 7; see Ex. A, Memorandum.  The Memorandum is particularly probative because it identifies each individual at Accenture with whom Ms. Holt spoke about finding Mr. Bennett a vacant position, and it summarizes the feedback she received. The Memorandum also related some of Ms. Holt's communications with Mr. Bennett during this process and the dates of those contacts.  As the Memorandum reflects, Ms. Holt was the key person who led Accenture's efforts to accommodate Mr. Bennett, and she was a decision-maker concerning Mr. Bennett's discharge.  Ms. Holt clearly was Accenture's primary witness.

Ms. Holt prepared the section of the Memorandum entitled, "Chronology of events pertaining to Todd Bennett's request to return to work."  Ms. Holt worked with Ms. Corban to draft the Memorandum until finalized.  Corban Aff., at ¶ 8.  It was the regular practice of Ms. Holt's and Ms. Corban's respective positions to prepare a memorandum and fact chronology, like the Memorandum, and to provide it to outside counsel to assist counsel in preparing a position statement and defense on behalf of Accenture.  Corban Aff., at ¶ 9.  Accenture maintained the Memorandum in the normal course of a regularly conducted business activity. Corban Aff., at ¶ 10.

---

[1] Accenture is waiving the attorney-client privilege and/or its rights under the work-product doctrine with respect to this document.

Because Plaintiff did not take <u>any</u> depositions during the two and one-half years this case has been pending, Ms. Holt has not testified under oath in this action. However, Ms. Holt and Ms. Corban drafted the Memorandum for counsel in between May 16 and June 3, 2002, anticipating that the facts set forth therein would be used by counsel in defense of this action. Accenture fully expected that Ms. Holt would testify at trial about the contents contained in the Memorandum. While Ms. Corban can testify about the fact that she worked with Ms. Holt to prepare the Memorandum, Ms. Holt possessed the personal knowledge of the events recorded in the Memorandum that are at the core of this lawsuit.

On April 19, 2005, the Court notified the parties that jury selection in this matter was scheduled for May 5, 2005. Upon immediately notifying its witnesses of the trial date, Accenture's counsel learned that Ms. Holt was gravely ill and would not be able to testify at trial.[2] <u>See</u> Second Affidavit of Daniel Klein, attached hereto as Exhibit C ("Klein Aff."), at ¶¶ 3-4. Defense counsel notified Plaintiff's counsel about Ms. Holt's serious condition, and as a result, the parties jointly moved for a 30-day continuance of the trial date to allow Defendant time to assess Ms. Holt's health and ability to testify. The Court granted this motion and re-scheduled jury selection for June 2, 2005.

Accenture tried to arrange for Ms. Holt to testify by some means other than at trial. Klein Aff., at ¶ 6. On May 5, 2005, Accenture's counsel advised Plaintiff's counsel that because Ms. Holt's condition had reached such a grave state, she would be unable to testify at trial or even at a deposition. <u>See</u> Letter dated May 5, 2005 from Daniel B. Klein to John R. Williams, attached to Klein Aff. as Exhibit 1; Klein Aff., at ¶ 7.

---

[2] For privacy purposes, Ms. Holt's specific condition is not included herein. However, Accenture can share this information with the Court separately, if necessary.

Notwithstanding, Accenture again attempted to determine whether Ms. Holt might be able to endure a brief deposition and cross-examination. Klein Aff., at ¶ 8. However, Accenture learned that Ms. Holt's condition had reached a near-fatal state.[3] Id., at ¶ 9. On June 9, 2005, Ms. Holt sadly passed away. Id., at ¶ 10.

Pursuant to Rule 807, Defendant notified Plaintiff on July 20, 2005 that Accenture intended to move for admission of the Memorandum at trial in lieu of Ms. Holt's live testimony. See Letter dated July 19, 2005 from Daniel B. Klein to John R. Williams, attached to Klein Aff. as Exhibit 2; Klein Aff., at ¶¶ 11-13.

## ARGUMENT

Although the Memorandum itself may constitute a hearsay statement, it is admissible pursuant to Rule 803(6), the business records exception to the hearsay rule.[4] The Memorandum satisfies Rule 803(6) because Ms. Corban regularly prepared these case summaries for Accenture's counsel in the course of her business activities as an Employee Relations Manager and Accenture maintained such records in the course of a regularly conducted business activity.

To the extent that any of Ms. Holt's statements contained in the Memorandum constitute hearsay, they are admissible under Rule 807, the residual hearsay exception. Rule 807 provides:

---

[3] On May 18, 2005, Plaintiff moved to continue the trial date. On May 24, 2005, the Court granted this motion and re-scheduled jury selection for September 1, 2005.

[4] Rule 803(6) of the Federal Rules of Evidence provides:

   **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 807.[5]  The courts also consider whether the proponent of the hearsay testimony has exercised due diligence and made a good faith effort to preserve the declarant's testimony.

The Court should admit the Memorandum and the statements contained therein because they meet each of Rule 807's five requirements, and Accenture exercised due diligence and made good faith efforts to preserve Ms. Holt's testimony.

## I.     THE MEMORANDUM SATISFIES THE REQUIREMENTS OF TRUSTWORTHINESS, MATERIALITY, PROBATIVE IMPORTANCE, THE INTERESTS OF JUSTICE AND NOTICE.

Hearsay statements normally are inadmissible because of four categories of risk to which hearsay statements are susceptible: (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration.  Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 233 (2d Cir. 1999); Steinberg, M.D. v. Obstetrics-Gynecological & Infertility Group, 260 F. Supp.2d 492, 496-497 (D. Conn. 2003).  However, hearsay statements "need not be free from all four categories of risk to be admitted under Rule 807" because Rule 807's five requirements minimize these dangers.  See Schering Corp., 189 F.3d at 233.  Therefore, in order for hearsay evidence to be admissible under Rule 807, it must satisfy the five requirements of "'trustworthiness, materiality, probative

---

[5] It is worth noting that in the state courts in this jurisdiction, C.G.S. § 52-172 permits the admission of statements of deceased persons into evidence, including memoranda, as an exception to the hearsay rule. C.G.S. § 52-172.

importance, the interests of justice and notice.'" <u>Schering Corp.</u>, 189 F.3d at 231 (quoting

<u>United States v. Harwood</u>, 998 F.2d 91, 98 (2d Cir. 1993) (internal citation omitted)); <u>see</u>

<u>Steinberg</u>, 260 F. Supp.2d at 496-497.

 Rule 807's requirements ensure that the Rule will be used only in exceptional

circumstances. <u>See</u> <u>Schering Corp.</u>, 189 F.3d at 232. An exceptional circumstance exists even if

the proffered evidence is not the only evidence, but is clearly the strongest and most probative on

the matter, so long as it possesses the requisite guarantees of trustworthiness. <u>See</u> <u>Steinberg</u>, 260

F. Supp.2d at 496-497 (letter from deceased declarant to litigation counsel describing facts of the

case admitted because it was the strongest and most probative on the matter even though not the

only evidence); <u>Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 112-114

(3d Cir. 2001) (affidavit of deceased declarant admitted into evidence because only evidence

available to rebut material fact).

 Like the cases cited above, in light of the exceptional circumstances of Ms. Holt's tragic

and untimely passing, the Memorandum provides strong and extremely probative evidence of the

core events at issue in this case, while possessing the requisite guarantees of trustworthiness, as

discussed in the section that follows. <u>See</u> <u>Steinberg</u>, 260 F. Supp.2d at 496-497; <u>Bohler-</u>

<u>Uddeholm</u>, 247 F.3d at 112-114. Indeed, because Ms. Holt and Ms. Corban prepared the

Memorandum to assist counsel in assessing the case and preparing a defense, it was imperative

that they do so sincerely and narrate the full sequence of events. Further, because they prepared

the Memorandum shortly after the events described therein, their perception and memory were

fully accurate. Accordingly, the four risks of insincerity, faulty perception, faulty memory and

faulty narration were not present under these circumstances. <u>See</u> <u>Schering</u>, 189 F.3d at 233.

Moreover, as discussed below, the Memorandum minimizes the four classic hearsay risks because the Memorandum satisfies Rule 807's five requirements of "trustworthiness, materiality, probative importance, the interest of justice and notice." See id.; Steinberg, 260 F. Supp.2d at 496-497; Copperweld, 578 F.2d at 956.

### A.    The Memorandum Contains Circumstantial Guarantees of Trustworthiness And Reliability Equivalent To Rules 803 and 804.

In evaluating a hearsay statement's trustworthiness, the Court looks at the circumstantial guarantees of trustworthiness that existed at the time the statement was made. See, e.g., Bohler-Uddeholm, 247 F.3d at 112-114 (affidavit made under oath and penalties of perjury, declarant aware of pending litigation at time of statement, statement based on personal observation, declarant not employed by proponent and had no financial interest in litigation's outcome, affidavit partially corroborated by other evidence, and declarant's position and background qualified him to make the assertions); State of Conn. v. Aaron L., 272 Conn. 798, 812-815, 865 A.2d 1135, 1145-1147 (2005) (citing Idaho v. Wright, 497 U.S. 805, 822, 110 S. Ct. 3139 (1990)) (statement to mother when 2 ½ years old was spontaneous and used terminology appropriate for a child of declarant's age); Steinberg, 260 F. Supp.2d at 496-497 (deceased former attorney had no motive to fabricate or exaggerate description of the case in letter intended to assist litigation counsel to adequately represent the plaintiff).

In Steinberg, M.D. v. Obstetrics-Gynecological & Infertility Group, a case with extremely similar circumstances to those in the instant matter, the plaintiff's former attorney, who was not litigation counsel and who passed away before trial, wrote a letter to litigation counsel describing the facts of the case, as well as her conclusions and impressions, so that litigation counsel could adequately represent the plaintiff. 189 F. Supp.2d at 496-497. Under these circumstances, the Court found that the letter satisfied the trustworthiness requirement. Id.

8

Similarly, in Copperweld Steel Company v. DeMag-Mannesmann-Bohler, the trial court entered

judgment in favor of the defendant-manufacturer in a breach of contract action brought by a

purchaser. 578 F.2d 953, 964 (3rd Cir. 1978). On appeal, the plaintiff challenged the trial court's

admission of a hearsay memorandum prepared by the plaintiff's attorney after his interview of a

deceased material witness, which the witness reviewed and adopted as his own. The Third

Circuit upheld the trial court's decision to admit the memorandum on the grounds that it was

direct evidence from a key witness, and the witness had adopted this statement as his own before

he died. Id. The Court found that the memorandum was trustworthy and there was no reason to

doubt its truth. Id.

Like the Steinberg and Copperweld cases, Ms. Holt, a deceased declarant, prepared the

Memorandum for litigation counsel and described the facts of the case therein. See Steinberg,

260 F. Supp.2d at 496-497; Copperweld, 578 F.2d at 956. Like the memorandum in

Copperweld, Ms. Holt adopted the Memorandum as her own statement because she prepared the

relevant fact chronology section, and she worked with Ms. Corban to draft the Memorandum

until they both agreed that it was finalized. See 578 F.2d at 956; Corban Aff., ¶ 8. Indeed, the

Memorandum is even more probative than the attorney's letter in Steinberg because Ms. Holt did

not provide any conclusions or impressions in the Memorandum. See 260 F. Supp.2d at 496-

497.

Like the deceased attorney in Steinberg, Ms. Holt had no motive to fabricate or

exaggerate the description of the case for litigation counsel. See 260 F. Supp.2d at 496-497.

Further, the Memorandum possesses the following indicia of trustworthiness: (1) Ms. Holt was

known and named; (2) she was aware of the pending charge and likelihood of litigation at the

time she made the statement and, thus, knew that counsel would use her assertions in

9

Accenture's defense of the matter and they were subject to cross-examination; (3) Ms. Holt based her statements on personal observation, and she had no motive to fabricate or convey any inaccurate information; (4) she had no financial interest in the litigation's outcome; (5) other evidence corroborated Ms. Holt's Memorandum; and (6) as the Company's EEO Officer responsible for attempting to accommodate Mr. Bennett, Ms. Holt was qualified to make the assertions contained in the Memorandum. See Bohler-Uddeholm, 247 F.3d at 112-114; Aaron, 865 A.2d at 1145-1147; Steinberg, 260 F. Supp.2d at 496-497.

Mr. Bennett testified at his deposition that he had known the declarant, Ms. Holt, since at least 2001, when he and Ms. Holt regularly conversed regarding Ms. Holt's efforts to find him a vacant, part-time position that would accommodate his medical restrictions and skill set.[6] Id. Deposition of Todd Bennett, attached hereto as Exhibit D ("Bennett Tr."), at 112, 116-138. Further, at the time Ms. Holt and Ms. Corban drafted the Memorandum to counsel, they were both aware of the pending charge and the likelihood of further litigation, and Ms. Holt knew that her assertions ultimately would be subject to cross-examination. See Bohler-Uddeholm, 247 F.3d at 112-114; Steinberg, 260 F. Supp.2d at 496-497.

Ms. Holt based the statements contained in the Memorandum on her personal observations and efforts to accommodate Mr. Bennett's purported disability. Id. While Accenture employed Ms. Holt at the time of her Memorandum, she had no financial interest in the litigation's outcome. Id. Moreover, Mr. Bennett's own deposition testimony, his handwritten notes and Plaintiff's Rule 56(a)(2) Statement of Material Facts In Dispute do not dispute, and indeed all of them corroborate, the material assertions contained in the

---

[6] Plaintiff also has known since 2001 that Ms. Holt was the key witness to the events in question – i.e., Accenture's efforts to accommodate Mr. Bennett. In addition, Accenture identified Ms. Holt as the key participant in the Company's accommodation efforts in its CHRO Position Statement, which Plaintiff received on or about June 28, 2002.

Memorandum.  <u>See</u> Plaintiff's Rule 56(a)(2) Statement of Material Facts, attached hereto as Exhibit E ("Plaintiff's Facts"), at ¶¶ 28-34, 36, 38-46, 49, 56; Bennett Tr., 116-138.  Finally, Ms. Holt clearly was qualified to make the assertions contained in the Memorandum, as these statements concerned her efforts as EEO Manager to reasonably accommodate Mr. Bennett.

Accordingly, the Memorandum contains sufficient circumstantial guarantees of trustworthiness and reliability.

**B.      <u>The Memorandum Concerns Material Facts, Is Very Probative, And Its Admission Will Best Serve The Interests Of Justice.</u>**

Because Ms. Holt's contributions to the Memorandum recount her efforts to find Mr. Bennett a vacant position, her statements therein directly address the core of Plaintiff's claims that Accenture failed to reasonably accommodate his purported disability.  The Memorandum, therefore, clearly concerns material facts.  <u>See</u> <u>Schering Corp.</u>, 189 F.3d  at 232; <u>Steinberg</u>, 260 F. Supp.2d at 496-497; <u>Bohler-Uddeholm</u>, 247 F.3d at 112-114.

The Memorandum also is extremely probative on this issue.  <u>See</u> <u>id.</u>  Ms. Holt was the individual making all of the inquiries regarding potential vacant part-time positions for Mr. Bennett, and she was the only person communicating with Mr. Bennett about her efforts.  No other witness or document can relay Ms. Holt's account as powerfully as Ms. Holt's own Memorandum prepared for counsel soon after the events it discusses.

Further, the general purposes of the Rules of Evidence and the interests of justice, as well as pure fairness, will be served best by admitting the Memorandum.  <u>See</u> <u>id.</u>  Plaintiff did not depose any witnesses during discovery in this matter, including Ms. Holt, whom Plaintiff clearly knew was Accenture's most important witness.  The Court should not deprive the jury from hearing Ms. Holt's account firsthand simply because of her unfortunate passing.

Indeed, Mr. Bennett does not dispute the material assertions contained in the Memorandum. Rather, he admittedly held multiple conversations with Ms. Holt concerning her efforts to find him an available position with the Company in 2001, as he acknowledged during his deposition. Bennett Tr. 116-138. Mr. Bennett further testified that he did not have any reason to believe that Ms. Holt was lying to him. Bennett Tr., 133. Moreover, in Plaintiff's Rule 56(a)(2) Statement of Material Facts in Dispute, Plaintiff expressly agreed to the material facts asserted by Defendant and contained in the Memorandum concerning Ms. Holt's efforts to accommodate Mr. Bennett. See Ex. E, Plaintiff's Facts, at ¶¶ 28-34, 36, 38-46, 49, 56.

Finally, Plaintiff will have opportunities at trial to attempt to rebut the substance of the Memorandum. For example, Plaintiff can present witnesses and/or cross-examine those individuals who spoke with Ms. Holt about whether there were any vacant, part-time positions within their respective business units. Accordingly, the general purposes of the Rules of Evidence and the interests of justice dictate that the Court admit the Memorandum at trial.

**C.  Accenture Has Provided Plaintiff Sufficient Notice of Intent To Offer The Memorandum Into Evidence At Trial.**

A party satisfies Rule 807's notice requirement if it provides the adverse party notice of the statement sufficiently in advance of trial to provide the adverse party with a fair opportunity to prepare to meet it. Fed. R. Evid. 807; see United States v. Ruffin, 575 F.2d 346, 358-59 (2d Cir. 1978) (reversing conviction on count to which Rule 803(24) evidence pertained where proponent failed to provide pretrial notice); Bohler-Uddeholm, 247 F.3d at 113 (sufficient notice when moving party proffered the affidavit months prior to trial).

Accenture provided Plaintiff sufficient notice that it intended to seek admission of the Memorandum. See id. Accenture first provided Plaintiff notice on July 20, 2005 of its intention to seek admission of the Memorandum, more than six weeks prior to the currently scheduled

September 2005 trial. See Klein Aff., at ¶¶ 11-13. Moreover, Plaintiff has possessed all of the information contained within the Memorandum since June 28, 2002, when Plaintiff received Accenture's CHRO Position Statement.

To the extent Plaintiff contends that he will not have the opportunity to cross-examine Ms. Holt as to the substance of her Memorandum, such contention fails. Mr. Bennett has known the substance of the Memorandum (*i.e.*, Ms. Holt's account of her efforts to accommodate Mr. Bennett) since 2001, when Ms. Holt continually informed Mr. Bennett of her efforts. See Bennett Tr., 116-138. Plaintiff again reviewed Ms. Holt's account of her efforts through the Position Statement submitted by Accenture to the CHRO on June 28, 2002. Yet, despite knowing Ms. Holt's role and account, and that she was the key witness to the central events from which Mr. Bennett's claims arose, Plaintiff declined to take Ms. Holt's deposition during discovery in this action. Thereafter, Mr. Bennett knew full well that Ms. Holt was highly likely to testify at trial if summary judgment failed. Plaintiff cannot assert that he has not had the opportunity to cross-examine Ms. Holt. The Court should not prejudice Accenture because Plaintiff opted not to depose Ms. Holt when on notice of her account and key role.

## II.   ACCENTURE USED DUE DILIGENCE TO PROCURE MS. HOLT'S ATTENDANCE AND TESTIMONY AT TRIAL AND TO PREVENT THE LOSS OF FACTS CONTAINED IN THE MEMORANDUM.

The courts also consider whether the proponent of the hearsay testimony has exercised due diligence and made a good faith effort to preserve the declarant's testimony. See State v. Sullivan, No. CR01106675, 2005 Conn. Super. LEXIS 720, 49 (Conn. Super. Ct. Mar. 11, 2005) (citing State v. Summerville, 13 Conn.App. 175, 180, 535 A.2d 818 (1988)) (proponent of hearsay testimony must make good faith effort to procure declarant's attendance to satisfy due diligence requirement). Accenture exercised due diligence and made good faith efforts to preserve Ms. Holt's testimony once it learned that she might be unavailable to testify. See id.

13

Accenture attempted in good faith to depose Ms. Holt when the Company learned about her condition. See Klein Aff., at ¶¶ 5-6. Indeed, both parties jointly moved for a continuance to postpone the trial date to allow Accenture to assess Ms. Holt's status and ability to testify. Defendant never wavered in its efforts to have Ms. Holt testify at trial. Once Accenture learned of the gravity of Ms. Holt's medical condition, it even communicated with Ms. Holt's caregivers to determine her willingness and ability to testify at a brief deposition in her own home. Id., at ¶ 8. However, within days, the seriousness of Ms. Holt's condition made her unable to testify even at a deposition. Id., at ¶ 9. Shortly thereafter, Ms. Holt sadly passed away on June 9, 2005. Id., at ¶ 10. Accordingly, Accenture made good faith efforts to preserve Ms. Holt's testimony upon learning of her unavailability. See id.

## CONCLUSION

In sum, the Memorandum possesses sufficient circumstantial guarantees of trustworthiness and reliability. Moreover, the Memorandum concerns material facts and is substantially more probative than other evidence. Under the circumstances, by admitting it, this Court would serve the general purposes of the Rules of Evidence and the interests of justice. Accenture has provided Plaintiff sufficient notice of its intent to offer the Memorandum at trial, and Accenture used due diligence to procure Ms. Holt's attendance and testimony at trial. The Court, therefore, should admit the Memorandum at trial pursuant to Rules 803(6) and 807.

WHEREFORE, Defendant respectfully requests that this Court admit the Memorandum pursuant to Rules 803(6) and 807, the residual exception to the hearsay rule. Alternatively, Defendant requests that the Court allow Defendant to highlight the portions of the Memorandum

to which Plaintiff already has admitted and agreed in his Rule 56(a)(2) Statement of Material

Facts in Dispute, and that the Court admit such portions as stipulated facts.

Respectfully submitted,

**DEFENDANT**
**ACCENTURE LLP**

By its Attorneys,

By

Lynn A. Kappelman (ct 03480)
    lkappelman@seyfarth.com
Daniel B. Klein (ct 18934)
    dklein@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA 02210
(617) 946-4800
Fax: (617) 946-4801

Defendant's Local Counsel:
Douglas Varga, Esq.
Zeldes, Needle & Cooper
1000 Lafayette Blvd.
Bridgeport, CT 06604

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2005, a copy of the foregoing document was sent by overnight delivery to John R. Williams, Esq., John R. Williams & Associates LLC, 51 Elm Street, Suite 409, New Haven, CT 06510.

Daniel B. Klein

15

BOI 157264671

EXHIBIT A

# Todd Bennett Overview

## Background Information

Todd Bennett went out on Long-term disability LOA in July 1997. At that time, the Accenture's organization was location based. Todd was an experienced consultant in the Hartford office. During the time that Todd was out on leave, Accenture had several organizational changes and went to an industry-focused (Market Unit) organization in the spring of 2000. Since Todd did not belong to an industry before his leave of absence; when the organization transitioned, Todd was not placed in an organization. Todd continued to be aligned with the Hartford office.

In addition, Accenture's economic situation changed starting in the spring of 2001. As a result, Accenture went through a series of workforce reductions as well as a hiring freeze and offering Flex Leave.

## Pertinent Information Prior to going on LTD

**Personnel #:** 000054941
**Date of Hire:** 8/17/92
**Level:** Experienced Consultant
**Last Date of Promotion:** September 1, 1994
**Last Rating before leave of absence:** Outstanding
**Organization:** Technology Competency Group
**Office:** Hartford office
**Date of STD:** 4/7/97
**Date of LTD:** 7/7/97

## Chronology of events pertaining to Todd Bennett's request to return to work

**1/31/2001** - Todd called Michele Holt, EEO Officer in Hartford to let her know he was released to return to work on a modified schedule. Michele told Todd she would look into what next steps were and would get back to him.

**Jan/February 01** - Michele asked Todd to provide us with medical document regarding his return. Todd requested that Accenture send a written request directly to his doctor.

**2/28/01** – Paula Miller, Accenture Benefits, sent request to Todd's doctor asking for return to work date, restrictions surrounding return, if any, and timeframe of outlined restrictions.

**3/5/01** – Paula Miller received document from Todd's doctor, indicating he was released to return to work as of 3/12/01, restrictions were as follows:

*Work 3 hours per day, 3 days per week for first two weeks and increase to 4 hours per day, 3 days per week for next two weeks. Continue at that level until re-evaluated. Suggestion from doctor 9-12 pm, Monday, Wednesday, Friday. Assigned to home office and not be sent to other locations until reassessed. Set up in office with minimal distractions. Should have parking available at his office.*

Michele Holt started reviewing possible roles/organizations for Todd. Michele spoke with Market Units with projects in Hartford. Michele explained to Todd that we needed to find him a MU to transfer to and role, since when he went on leave he was not aligned to a Market Unit .

**March 2001 – August 2001** – Michele made the following inquiries:

- Spoke with Andrew Burns, PM Rep for Resources MU in Hartford, no Hartford Resources projects were available
- Spoke with Amy Salvatore, PM Rep for Communications MU in Hartford, no CHT projects in Hartford were available
- Spoke with Olga Conway, PM Rep for Financial Services MU in Hartford, no opportunities at FS projects in Hartford were available
- Spoke with Hilary McCracken, PM Rep for Health Services MU in Hartford, no opportunities at Health projects in Hartford were available
- Spoke with Tara Parisi, PM Rep for Government MU in Hartford. On June 1, 2001, Todd attended a Hartford Government Market Unit Meeting and spoke with Mark Raymond, Government AP regarding a potential opportunity. The Government project in Hartford area could only bring on Peoplesoft skilled individuals, Todd did not possess Peoplesoft skill set
- Spoke to Marty Strong regarding Quality Client Survey Team. Business Practices had a headcount freeze and could not hire or transfer into their group.

Accenture 0489

In addition, Michele met with Location Lead Partner, Marty Cole to discuss finding Todd a role. Unfortunately, no opportunities were available for Todd. At this time, many of the Market Units were going through reductions as well as offering Flex Leave to manage an oversupply of resources.

In August, due to the state of Accenture's business (refer to background information) and the inability to locate a role for Todd to return to, the decision was made to terminate Todd's employment. Before communicating this to Todd, questions surrounding how termination would impact his LTD benefits were researched.

**August 01** – Todd updated Michele that his restrictions had been changed. We did not receive updated physician's note.

**8/21/01** – Aetna responded that Todd would continue to receive full LTD benefits. Although his medical information indicated he may be capable of PT work, he has not resumed work on a part time basis and is therefore eligible to continue to receive his full benefit.

**11/7/01** – Michele called Todd Bennett, he was unavailable and Michele spoke with his wife, Amy. Todd's wife indicated that she and Todd have come to the conclusion we do not have a position for him. They had questions, would like to speak about them.

**11/8/01** – Michele spoke with Todd Bennett and his wife regarding his termination. She explained that we unfortunately could not locate a role for him and cannot return him from leave. They had the following questions:

1. Will Todd receive a pink slip? They stated at some point he will be released to return to work and would like to qualify for unemployment benefits.
2. Would like copy of his personnel file
3. Would like in writing that his LTD benefits will not be impacted.
4. What happens to his eUnits and RSUs?
5. What type of documentation will he receive? Would like a copy of the Summary of 401K plan and how termination will affect his benefits.
6. Will he receive severance? Michele indicated he would not and he questioned this. Given good employment record, he wondered why he wouldn't get this. Feels it will be very difficult to enter the workforce on PT basis and is upset that others that were laid off or asked to leave got severance. Michele explained that his termination was not part of a layoff. Todd still felt he should get severance. Michele explained that our practice is not to give individuals returning from LTD leave severance. Todd's wife asked if Todd was not being returned because of our reductions, why would he not receive severance. Michele explained that Todd was not being terminated due to reductions, but because we do not have a role for him.
7. Todd asked if Accenture has let go other individuals on LTD. Michele advised him that we have, but she did not have specific information, as each case was different. She let him know it is not our practice to give job search/severance to individuals returning from LTD.
8. Todd asked why we were letting him go since he isn't costing us anything. Michele stated he was released to return and we did not have a role now or in the foreseeable future for him to return to.

Michele advised Todd that she would look into his questions and get back to him. Todd asked that he not be terminated until he received all the answers to his questions, Michele said that she would do this.

As per Toni's request, Pete Zackrison provided clarification of getting something in writing related to LTD benefits and Plan Summary of 401K.

**11/20/01** – Michele started looking into RSU/EUnit questions with the Global Share Plan group.

**1/10/02** – Michele spoke with Todd. He let her know he hasn't received the Plan Summary of 401K. He also asked for all the answers to his questions in writing.

Todd and Michele discussed:

1. Letter of termination and impact on benefits.
2. Can Todd get clarification on EUnits and RSUs?
3. Plan Summary of 401K, did not receive yet.
4. Pink Slip, when will he receive?
5. Written notification that LTD benefits are not impacted by termination.
6. When does COBRA kick in? Michele advised Todd that COBRA would kick in upon his termination being processed through our payroll system.
7. Can he receive unemployment? Determination would be up to the State of Connecticut.

Accenture 0490

TC f/u'd with PZ and asked him to re-send 401K Summary. Michele received note from Global Share Plans that Todd would be not eligible to get RSUs because he never returned to active status.

Todd left Michele a message stating he wants to revisit severance.

1/15/02 – Michele followed up with Heather Swanberg from Global Share Plans re Todd. Heather indicated LTD and RSUs were being reviewed at this time.

Michele received note from Patricia Boepple from Global Share Plans. She indicated that if Todd was on LTD, and is now being terminated then he would qualify under the grant agreements as being "Terminated due to Disability" and would be eligible to have his RSU release accelerated. We still needed to work on obtaining determination of how they would be paid and when.

January 02- March 02 – Michele followed up to get clarification regarding RSUs.

2/5/02 – Michele spoke with Todd, he wanted to revisit severance. Todd advised Michele that Aetna will re-evaluate him at 5 year mark (7/7/02), and he feels we should provide severance. Todd requested LTD information in writing and how termination would affect his benefits on LTD.

TC sent note to Peter Zackrison re statement in writing regarding his LTD benefits. Peter sent note to Aetna for clarification.

2/6/02 – Sent follow up letter to Todd outlining requested information status. Provided copy of Personnel File, as requested and how termination affects your benefits document. Indicated we were waiting for clarification of RSUs/E-units, when he could expect his unemployment notification (pink slip) who his contact at Aetna was to discuss LTD questions and that his Summary of 401K would be sent under separate cover.

2/25/02 – Michele received information from Global Share Plans that Todd would receive RSUs, but Global Share Plans could not give us information regarding the payout timing. Advised Michele it would take them 6-8 weeks.

3/8/02 – Michele spoke with Todd. Explained that he will receive RSUs, but we do not have date of when he will be paid out. Todd asked about severance and Michele advised him it was escalated and he will not receive severance.

Todd asked the following questions:
1. Can Michele speak to Aetna and let them know that we couldn't return him PT, because he didn't have a position?
2. Todd expressed that he was disappointed that he was notified of his termination in November and he does not have all the answers to his questions and is not terminated. He asked that given his 5 year review is currently going on with Aetna, can Accenture hold off on processing his termination until this review is complete?

Michele told Todd she would look into both questions and get back to him. Michele sent follow up to Global Share Plans re RSUs, TC sent note to Peter Zackrison re Aetna. Michele left voice mail message for Aetna Representative, Carrie Jo Peters.

3/12/02 – Michele spoke with Todd and let him know that his termination date will be after his RSU payout question has been answered.

3/19/02 – Michele spoke with Todd. He asked Michele to have Accenture write a letter to Aetna on his behalf to plead his case. TC spoke with PZ, responded that Accenture cannot comment on his condition, but can let Aetna know that we do not have a role to return him to. Michele spoke with Aetna representative (Carrie Jo Peters); Todd's case is in medical review. The representative told Michele that Todd volunteers 20 hours per week. Michele asked the Representative if any information or documentation was needed to support Todd's case, Representative indicated that Accenture does not need to provide anything.

March 2002 – Todd called Michele to discuss if a letter was sent to Aetna on his behalf. Michele indicated that she talked to Carrie Jo Peters and they required no information from Accenture. Todd asked Michele if Accenture could send a letter on his behalf, as was done in the past. Todd asked Michele if Accenture could postpone his termination while his case was being reviewed by Aetna. Michele told Todd that she would do what she can regarding this request.

Currently – Todd's termination has not been processed.

EXHIBIT B

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

TODD BENNETT                                    :        CIVIL ACTION NO.
                                                :        3:03CV0080 (AVC)
                              Plaintiff,         :
                                                :
v.                                              :
                                                :
ACCENTURE, LLP                                   :
                                                :
                                                :
                              Defendant.         :

## AFFIDAVIT OF TONI L. CORBAN

I, Toni L. Corban, being duly sworn, hereby depose and say:

1.  I am over eighteen years of age and understand the obligation of an oath.

2.  I am aware of the action filed by the above-referenced Plaintiff, entitled Todd
    Bennett v. Accenture, LLP.

3.  I make this affidavit based upon my own personal knowledge. I attest that the
    assertions herein are true and correct to the best of my knowledge, information
    and belief. I also attest that the documents attached hereto are true and accurate
    copies of documents that Accenture maintained in the normal course of business.

4.  I am an Employee Relations Manager for United States Personnel Matters for
    Accenture. I have held this position from September 1, 2001 to the present. Prior
    to my current position, I was an Employee Relations Specialist for Accenture
    from September 1, 1999 until September 1, 2001.

5.  On or about May 16, 2002, Mr. Bennett filed a charge with the Connecticut
    Commission on Human Rights and Opportunities (the "CHRO charge"), alleging
    that Accenture had failed to accommodate his disability because it did not
    reinstate him after he returned from a four-year leave of absence.

6.    Between May 16 and June 3, 2002, in an effort to assist Accenture's outside counsel in preparing the Company's Position Statement in response to Mr. Bennett's CHRO charge, Michele Holt, Accenture's EEO Officer, and I jointly prepared a memorandum, entitled "Todd Bennett Overview," in which we provided counsel a factual background concerning Mr. Bennett's employment and request for reinstatement (the "Memorandum"), attached hereto as Exhibit 1.

7.    Specifically, in the Memorandum, Ms. Holt and I provided counsel information concerning Todd Bennett's employment with Accenture, his leave of absence dates, and, based on Ms. Holt's recollection, a chronology of events from January 31, 2001 through May 2002 pertaining to Mr. Bennett's request for reinstatement, including (i) Ms. Holt's efforts to find Mr. Bennett an available position that would accommodate his medical restrictions and skill set, (ii) the results of her search, and (iii) the Company's decision to terminate Mr. Bennett's employment and Ms. Holt's communications with Mr. Bennett about the termination.

8.    I prepared the sections of the Memorandum entitled, "Background Information" and "Pertinent Information Prior to going on LTD," and Ms. Holt prepared the section entitled, "Chronology of events pertaining to Todd Bennett's request to return to work." We worked together to draft the Memorandum until finalized.

9.    It was my regular practice in my capacity as an Employee Relations Manager for Accenture to prepare a memorandum and fact chronology, like the Memorandum in the instant matter, and to provide it to outside counsel to assist counsel in preparing a position statement and defense on behalf of Accenture. Further, it was my normal practice to have the relevant EEO Officer or human resources

representative prepare the factual chronology sections of such memoranda when such person had more direct knowledge than I of the events at issue. Therefore, it also was in the ordinary course of Ms. Holt's position to assist in the preparation of such memoranda and prepare such factual chronologies.

10.  Accenture maintained the Memorandum and provided it to outside counsel in the normal course of a regularly conducted business activity.

11.  I sent the Memorandum to Accenture's outside counsel, Daniel Klein, on June 3, 2002.

Toni L. Corban
Accenture LLP
Employee Relations Manager

Subscribed and sworn to before me
this 4th day of August 2005.

JOSEPH J. DOWNEY
Notary Public of New Jersey
My Commission Expires: April 9, 2008
Commission ID: 2299180

Notary Public
My Commission Expires: April 9th 2008

EXHIBIT 1

# Todd Bennett Overview

## Background Information

Todd Bennett went out on Long-term disability LOA in July 1997. At that time, the Accenture's organization was location based. Todd was an experienced consultant in the Hartford office. During the time that Todd was out on leave, Accenture had several organizational changes and went to an industry-focused (Market Unit) organization in the spring of 2000. Since Todd did not belong to an industry before his leave of absence; when the organization transitioned, Todd was not placed in an organization. Todd continued to be aligned with the Hartford office.

In addition, Accenture's economic situation changed starting in the spring of 2001. As a result, Accenture went through a series of workforce reductions as well as a hiring freeze and offering Flex Leave.

## Pertinent Information Prior to going on LTD

**Personnel #:** 000054941
**Date of Hire:** 8/17/92
**Level:** Experienced Consultant
**Last Date of Promotion:** September 1, 1994
**Last Rating before leave of absence:** Outstanding
**Organization:** Technology Competency Group
**Office:** Hartford office
**Date of STD:** 4/7/97
**Date of LTD:** 7/7/97

## Chronology of events pertaining to Todd Bennett's request to return to work

**1/31/2001** - Todd called Michele Holt, EEO Officer in Hartford to let her know he was released to return to work on a modified schedule. Michele told Todd she would look into what next steps were and would get back to him.

**Jan/February 01** - Michele asked Todd to provide us with medical document regarding his return. Todd requested that Accenture send a written request directly to his doctor.

**2/28/01** – Paula Miller, Accenture Benefits, sent request to Todd's doctor asking for return to work date, restrictions surrounding return, if any, and timeframe of outlined restrictions.

**3/5/01** – Paula Miller received document from Todd's doctor, indicating he was released to return to work as of 3/12/01, restrictions were as follows:

*Work 3 hours per day, 3 days per week for first two weeks and increase to 4 hours per day, 3 days per week for next two weeks. Continue at that level until re-evaluated. Suggestion from doctor 9-12 pm, Monday, Wednesday, Friday. Assigned to home office and not be sent to other locations until reassessed. Set up in office with minimal distractions. Should have parking available at his office.*

Michele Holt started reviewing possible roles/organizations for Todd. Michele spoke with Market Units with projects in Hartford. Michele explained to Todd that we needed to find him a MU to transfer to and role, since when he went on leave he was not aligned to a Market Unit .

**March 2001 – August 2001 –** Michele made the following inquiries:

- Spoke with Andrew Burns, PM Rep for Resources MU in Hartford, no Hartford Resources projects were available
- Spoke with Amy Salvatore, PM Rep for Communications MU in Hartford, no CHT projects in Hartford were available
- Spoke with Olga Conway, PM Rep for Financial Services MU in Hartford, no opportunities at FS projects in Hartford were available
- Spoke with Hilary McCracken, PM Rep for Health Services MU in Hartford, no opportunities at Health projects in Hartford were available
- Spoke with Tara Parisi, PM Rep for Government MU in Hartford. On June 1, 2001, Todd attended a Hartford Government Market Unit Meeting and spoke with Mark Raymond, Government AP regarding a potential opportunity. The Government project in Hartford area could only bring on Peoplesoft skilled individuals, Todd did not possess Peoplesoft skill set
- Spoke to Marty Strong regarding Quality Client Survey Team. Business Practices had a headcount freeze and could not hire or transfer into their group.

Accenture 0489

In addition, Michele met with Location Lead Partner, Marty Cole to discuss finding Todd a role. Unfortunately, no opportunities were available for Todd. At this time, many of the Market Units were going through reductions as well as offering Flex Leave to manage an oversupply of resources.

In August, due to the state of Accenture's business (refer to background information) and the inability to locate a role for Todd to return to, the decision was made to terminate Todd's employment. Before communicating this to Todd, questions surrounding how termination would impact his LTD benefits were researched.

**August 01** – Todd updated Michele that his restrictions had been changed. We did not receive updated physician's note.

**8/21/01** – Aetna responded that Todd would continue to receive full LTD benefits. Although his medical information indicated he may be capable of PT work, he has not resumed work on a part time basis and is therefore eligible to continue to receive his full benefit.

**11/7/01** – Michele called Todd Bennett, he was unavailable and Michele spoke with his wife, Amy. Todd's wife indicated that she and Todd have come to the conclusion we do not have a position for him. They had questions, would like to speak about them.

**11/8/01** – Michele spoke with Todd Bennett and his wife regarding his termination. She explained that we unfortunately could not locate a role for him and cannot return him from leave. They had the following questions:
1. Will Todd receive a pink slip? They stated at some point he will be released to return to work and would like to qualify for unemployment benefits.
2. Would like copy of his personnel file
3. Would like in writing that his LTD benefits will not be impacted.
4. What happens to his eUnits and RSUs?
5. What type of documentation will he receive? Would like a copy of the Summary of 401K plan and how termination will affect his benefits.
6. Will he receive severance? Michele indicated he would not and he questioned this. Given good employment record, he wondered why he wouldn't get this. Feels it will be very difficult to enter the workforce on PT basis and is upset that others that were laid off or asked to leave got severance. Michele explained that his termination was not part of a layoff. Todd still felt he should get severance. Michele explained that our practice is not to give individuals returning from LTD leave severance. Todd's wife asked if Todd was not being returned because of our reductions, why would he not receive severance. Michele explained that Todd was not being terminated due to reductions, but because we do not have a role for him.
7. Todd asked if Accenture has let go other individuals on LTD. Michele advised him that we have, but she did not have specific information, as each case was different. She let him know it is not our practice to give job search/severance to individuals returning from LTD.
8. Todd asked why we were letting him go since he isn't costing us anything. Michele stated he was released to return and we did not have a role now or in the foreseeable future for him to return to.

Michele advised Todd that she would look into his questions and get back to him. Todd asked that he not be terminated until he received all the answers to his questions, Michele said that she would do this.

As per Toni's request, Pete Zackrison provided clarification of getting something in writing related to LTD benefits and Plan Summary of 401K.

**11/20/01** – Michele started looking into RSU/EUnit questions with the Global Share Plan group.

**1/10/02** – Michele spoke with Todd. He let her know he hasn't received the Plan Summary of 401K. He also asked for all the answers to his questions in writing.

Todd and Michele discussed:
1. Letter of termination and impact on benefits.
2. Can Todd get clarification on EUnits and RSUs?
3. Plan Summary of 401K, did not receive yet.
4. Pink Slip, when will he receive?
5. Written notification that LTD benefits are not impacted by termination.
6. When does COBRA kick in? Michele advised Todd that COBRA would kick in upon his termination being processed through our payroll system.
7. Can he receive unemployment? Determination would be up to the State of Connecticut.

Accenture 0490