TC f/u'd with PZ and asked him to re-send 401K Summary. Michele received note from Global Share Plans that Todd would be not eligible to get RSUs because he never returned to active status.

Todd left Michele a message stating he wants to revisit severance.

1/15/02 – Michele followed up with Heather Swanberg from Global Share Plans re Todd. Heather indicated LTD and RSUs were being reviewed at this time.

Michele received note from Patricia Boepple from Global Share Plans. She indicated that if Todd was on LTD, and is now being terminated then he would qualify under the grant agreements as being "Terminated due to Disability" and would be eligible to have his RSU release accelerated. We still needed to work on obtaining determination of how they would be paid and when.

January 02- March 02 – Michele followed up to get clarification regarding RSUs.

2/5/02 – Michele spoke with Todd, he wanted to revisit severance. Todd advised Michele that Aetna will re-evaluate him at 5 year mark (7/7/02), and he feels we should provide severance. Todd requested LTD information in writing and how termination would affect his benefits on LTD.

TC sent note to Peter Zackrison re statement in writing regarding his LTD benefits. Peter sent note to Aetna for clarification.

2/6/02 – Sent follow up letter to Todd outlining requested information status. Provided copy of Personnel File, as requested and how termination affects your benefits document. Indicated we were waiting for clarification of RSUs/E-units, when he could expect his unemployment notification (pink slip) who his contact at Aetna was to discuss LTD questions and that his Summary of 401K would be sent under separate cover.

2/25/02 – Michele received information from Global Share Plans that Todd would receive RSUs, but Global Share Plans could not give us information regarding the payout timing. Advised Michele it would take them 6–8 weeks.

3/8/02 – Michele spoke with Todd. Explained that he will receive RSUs, but we do not have date of when he will be paid out. Todd asked about severance and Michele advised him it was escalated and he will not receive severance.

Todd asked the following questions:
1. Can Michele speak to Aetna and let them know that we couldn't return him PT, because he didn't have a position?
2. Todd expressed that he was disappointed that he was notified of his termination in November and he does not have all the answers to his questions and is not terminated. He asked that given his 5 year review is currently going on with Aetna, can Accenture hold off on processing his termination until this review is complete?

Michele told Todd she would look into both questions and get back to him. Michele sent follow up to Global Share Plans re RSUs, TC sent note to Peter Zackrison re Aetna. Michele left voice mail message for Aetna Representative, Carrie Jo Peters.

3/12/02 – Michele spoke with Todd and let him know that his termination date will be after his RSU payout question has been answered.

3/19/02 – Michele spoke with Todd. He asked Michele to have Accenture write a letter to Aetna on his behalf to plead his case. TC spoke with PZ, responded that Accenture cannot comment on his condition, but can let Aetna know that we do not have a role to return him to. Michele spoke with Aetna representative (Carrie Jo Peters); Todd's case is in medical review. The representative told Michele that Todd volunteers 20 hours per week. Michele asked the Representative if any information or documentation was needed to support Todd's case, Representative indicated that Accenture does not need to provide anything.

March 2002 – Todd called Michele to discuss if a letter was sent to Aetna on his behalf. Michele indicated that she talked to Carrie Jo Peters and they required no information from Accenture. Todd wanted Accenture to send a letter on his behalf, as was done in the past. Todd asked Michele if Accenture could postpone his termination while his case was being reviewed by Aetna. Michele told Todd that she would do what she can regarding this request.

Currently – Todd's termination has not been processed.

Accenture 0491

EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TODD BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:03CV0080 AVC |
| | ) | |
| v. | ) | |
| | ) | |
| ACCENTURE LLP, | ) | August 5, 2005 |
| | ) | |
| Defendant. | ) | |

## SECOND AFFIDAVIT OF DANIEL B. KLEIN

I, Daniel B. Klein, being duly sworn, do hereby depose and state as follows:

1.    I am over 18 years of age and I understand the obligation of an oath.

2.    I am an attorney with the law firm of Seyfarth Shaw LLP, the firm representing the Defendant, Accenture LLP, in the above-captioned matter ("Defendant" or "Accenture").

3.    On April 19, 2005, the Court notified the parties that jury selection in this matter was scheduled for May 5, 2005.

4.    That day, upon notifying Accenture of the trial date, I learned that our most material witness, Michele Holt, Accenture's EEO Officer, was gravely ill and would be unable to testify at trial.[1]  Ms. Holt had been out of work on disability leave since the Fall of 2004. However, Accenture did not learn until about one week prior to my April 19, 2005 inquiry that Ms. Holt's condition had reached a grave state and that she would be unable to return to work.

5.    On or about April 22, 2005, I notified Plaintiff's counsel, John Williams, about Ms. Holt's serious condition, and as a result, the parties jointly moved for a 30-day continuance

---

[1] For privacy purposes, I have not specified Ms. Holt's specific condition herein.  However, Accenture can share this information with the Court separately, if necessary.

of the trial date to allow Defendant time to assess Ms. Holt's health and ability to testify in some

manner. On April 27, 2005, the Court granted this motion and re-scheduled jury selection for

June 2, 2005.

6.     In the interim, through our contacts at Accenture, we tried to assess whether Ms.

Holt might be able and willing to testify by some other means. However, we learned that Ms.

Holt was unable to testify.

7.     In a letter dated May 5, 2005, I advised Plaintiff's counsel that because Ms. Holt's

condition had reached such a grave state, she would be unable to testify at trial or even at a

deposition. See Letter dated May 5, 2005 from Daniel B. Klein to John R. Williams, attached

hereto as Exhibit 1 (a reference to Ms. Holt's condition therein has been redacted).

8.     Notwithstanding Defendant's intention to move to admit Ms. Holt's Affidavit in

lieu of her live testimony, we again attempted to determine whether Ms. Holt might be able and

willing to endure a brief deposition, including cross-examination by Plaintiff's counsel, at her

home concerning her Affidavit.

9.     However, on May 19, 2005, we learned that Ms. Holt's condition had reached a

near-fatal state, and that she would be unable to testify even at a brief deposition.

10.    On June 9, 2005, Ms. Holt passed away.

11.    In a letter dated July 19, 2005, we informed Plaintiff's counsel that Ms. Holt had

passed away. See Letter dated July 19, 2005 from Daniel B. Klein to John R. Williams, attached

hereto as Exhibit 2. We produced therewith a copy of a memorandum jointly prepared for

counsel by Ms. Holt and Toni Corban, an Employee Relations Manager for Accenture, in

between May 16, 2002 and June 3, 2002 (the "Memorandum"). See id. Ms. Holt and Ms.

Corban prepared the Memorandum for the purpose of relaying the factual background of this

matter to counsel in order to assist counsel in preparing Accenture's Position Statement to the Connecticut Commission on Human Rights and Opportunities ("CHRO") in response to the charge of disability discrimination filed by the Plaintiff, Todd Bennett, with the CHRO on or about May 16, 2002.

12.    In our July 19, 2005 letter, Accenture waived the attorney-client privilege and/or its rights under the work product doctrine with respect to the Memorandum. See id.

13.    In this letter, we also notified Plaintiff's counsel that, pursuant to Rule 807 of the Federal Rules of Evidence, Accenture intended to move for admission of the Memorandum at trial in lieu of Ms. Holt's live testimony. See id.



Daniel B. Klein

Subscribed and sworn to
before me this 5th day of August, 2005.

Notary Public

KIM HAARER
NOTARY PUBLIC
COM... ... OF MASSACHUSETTS
M... ...ES 5/18/2008

3

BO1 15728999 1

EXHIBIT 1

# SEYFARTH SHAW LLP
ATTORNEYS

World Trade Center East
Two Seaport Lane
Suite 300
Boston, MA  02210-2028
617-946-4800
fax 617-946-4801
www.seyfarth.com

Writer's direct phone
(617) 946-4840

Writer's e-mail
dklein@seyfarth.com

May 5, 2005

**By Federal Express**

John R. Williams, Esq.
John R. Williams & Associates LLC
51 Elm Street, Suite 409
New Haven, CT  06510

    *Re:*  *Bennett v. Accenture LLP;* C.A. No. 3:03CV0080 (AVC)

Dear Attorney Williams:

        As you may recall, during our conversations concerning our Joint Motion to Continue the Trial Date in the above-referenced matter, I alluded to the current health of Accenture's key witness, Michelle Holt. As you may recall, Ms. Holt was the EEO Officer who attempted to locate a position for Mr. Bennett in 2001 within his restrictions, and she communicated with him regarding her unsuccessful efforts. Without disclosing too many details of her medical condition and with the understanding that this will remain confidential under the circumstances, we wanted you to know that Ms. Holt has ██████ and it has reached a grave state. We only learned this after contacting our client immediately after the Court notified the parties of the initial trial date. Our client did not know that her condition had reached this grave state until approximately one week prior. Nevertheless, Ms. Holt will be unable to testify at trial or even at a deposition.

        In lieu of Ms. Holt's live testimony at trial, pursuant to Rule 807 of the Federal Rules of Evidence, we will be moving for the admission of Ms. Holt's Affidavit, which we initially provided to your offices on or about February 24, 2004 with the Defendant's Motion for Summary Judgment. As you can see from a review of your client's deposition transcript (pp. 116 – 138), Mr. Bennett acknowledged and maintained notes from multiple conversations with Ms. Holt concerning her efforts to find him an available position at Accenture in 2001. Mr. Bennett testified that he did not have reason to believe that she was lying to him. Moreover, in Plaintiff's Rule 56(a)(2) Statement of Material Facts in Dispute, Plaintiff agreed to the facts asserted by Defendant concerning Ms. Holt's efforts to locate a position for Mr. Bennett.



John R. Williams, Esq.
May 5, 2005
Page 2

Accordingly, please let us know whether, under the circumstances, Plaintiff will stipulate to our motion to admit Ms. Holt's Affidavit. If not, please let us know if Plaintiff can at least stipulate to certain paragraphs of Ms. Holt's Affidavit. To that end, enclosed please find a courtesy copy of Ms. Holt's Affidavit.

Thank you for your consideration and cooperation under the circumstances. We look forward to hearing from you.

Sincerely,

SEYFARTH SHAW LLP

Daniel B. Klein

Enclosure

cc:    Lynn A. Kappelman, Esq.

EXHIBIT 2

# SEYFARTH
**ATTORNEYS**
## SHAW LLP

World Trade Center East

Two Seaport Lane

Suite 300

Boston, MA  02210-2028

617-946-4800

fax 617-946-4801

www.seyfarth.com

Writer's direct phone
(617) 946-4840

Writer's e-mail
dklein@seyfarth.com

July 19, 2005

**By Federal Express**

John R. Williams, Esq.
John R. Williams & Associates LLC
51 Elm Street, Suite 409
New Haven, CT  06510

    *Re:*   *Bennett v. Accenture LLP;* C.A. No. 3:03CV0080 (AVC)

Dear Attorney Williams:

    Enclose please find Accenture's supplemental production of documents in the above-referenced action.  The documents are labeled "Accenture 0473" through "Accenture 0491".

    Please note that we have produced the governing job description for Mr. Bennett's position ("Accenture 0473") in place of the one previously produced.  Further, some of the enclosed documents contain strings of e-mail correspondence that include certain e-mails already produced.  Please substitute these documents for any such documents.

    In addition, we wanted to let you know that, sadly, Michelle Holt has passed away.  As we mentioned previously, we will be filing shortly a motion to admit her Affidavit into evidence at trial in lieu of her live testimony pursuant to Rule 807 of the Federal Rules of Evidence.  Also, pursuant to Rule 807, we will be moving for admission of the three-page document enclosed herewith labeled as "Accenture 0489" through "Accenture 0491".  Ms. Holt and Toni Corban jointly prepared this document between May 15 and June 3, 2002 for the purpose of relaying the factual background of this matter to counsel so that counsel could prepare Accenture's Position Statement to the CHRO in response to Mr. Bennett's CHRO Charge.  This document contains information concerning Accenture's efforts to accommodate Mr. Bennett, Ms. Holt's communications with Mr. Bennett and the termination of his employment.  Accenture is hereby waiving the attorney-client privilege and/or the work product privilege with respect to this document.

    Finally, in follow up to my May 24th letter, as soon as practicable, kindly supplement any and all documents and interrogatory responses concerning Mr. Bennett's mitigation and efforts to mitigate his damages, including without limitation any actual employment, any efforts to gain

BRUSSELS

WASHINGTON, D.C.

SAN FRANCISCO

SACRAMENTO

NEW YORK

LOS ANGELES

HOUSTON

CHICAGO

BOSTON

ATLANTA

John R. Williams, Esq.
July 19, 2005
Page 2



employment, all tax returns from 2003 to 2005, and any pay stubs or records related to any employment or other income. In addition, please produce all documents and supplement the relevant interrogatory responses regarding any other damages Mr. Bennett has allegedly suffered since his August 29, 2003 deposition.

Thank you for your attention to this matter. We look forward to hearing from you with respect to our request in the preceding paragraph.

Very truly yours,

SEYFARTH SHAW LLP

Daniel B. Klein

Enclosures

cc:    Lynn A. Kappelman, Esq.

EXHIBIT D

1              U.S. DISTRICT COURT

2            DISTRICT OF CONNECTICUT

3   TODD BENNETT           CIVIL ACTION NO.
         Plaintiff         3:03CV0080AVC
4        VS.

5   ACCENTURE, LLP         AUGUST 29, 2003
         Defendants

6

7

           DEPOSITION OF TODD BENNETT
8
                                        COPY
9   APPEARANCES:

10      FOR THE PLAINTIFF:
           WILLIAMS And PATTIS, LLC
11            51 Elm Street, Suite 409
              New Haven, Connecticut 06510
12      BY:  TIMOTHY J. MAHONEY, ESQ. (203-562-9931)

13

        FOR THE DEFENDANT (LOCAL COUNSEL):
14         ZELDES, NEEDLE & COOPER
              1000 Lafayette Boulevard
15            Bridgeport, Connecticut 06604
           BY:  DOUGLAS VARGAS, ESQ. (203-333-1489)
16            (Not Present)

17      FOR THE DEFENDANTS, ACCENTURE, LLP:
           LAW OFFICES OF SEYFARTH SHAW, LLP
18            Two Seaport Lane, Suite 300
              Boston, Massachusetts 02210
19         BY:  LYNN A. KAPPELMAN, ESQ. (Ct.)13480
              (617-946-4800)

20      ALSO PRESENT:
           Geomatrix Productions, Matt DeGennaro.
21
              ALEEN M. STANTON, CLSR, #00196
22

23
    NIZIANKIEWICZ & MILLER REPORTING SERVICES
24            972 Tolland Street
        East Hartford, Connecticut 06108-1533
25            (860) 291-9191

1           . . . Deposition of **TODD BENNETT**,

2    Plaintiff, taken on behalf of the Defendants,

3    **Accenture, LLP,** in the hereinbefore entitled action

4    pursuant to Rules 26 and 30 of the Federal Rules of

5    Civil Procedure of the Connecticut Practice Book and

6    the videotape deposition videotaped pursuant to Rule

7    30(b)(2) of the Federal Rules of Civil Procedure of the

8    Connecticut Practice Book, before Aleen M. Stanton,

9    CLSR and Notary Public, at the Law Offices of Zeldes,

10   Needle & Cooper, 1000 Lafayette Boulevard, Bridgeport,

11   Connecticut 06604, commencing at approximately

12   9:30 p.m., on Friday, August 29, 2003.

13

14                      STIPULATIONS

15

16        It is hereby stipulated and agreed by and
     among counsel for the respective parties that all
     formalities in connection with the taking of this
17   deposition, including time, place, sufficiency of
     notice and the authority of the officer before
18   whom it is being taken may be and are hereby
     waived.

19
          It is further stipulated and agreed that
20   objections, other than as to form, are reserved to
     the time of trial and that the reading and signing
21   of the deposition **is not waived and that the
     deposition may be signed before any** Notary public.

22
          It is further stipulated and agreed that the
23   proof of the qualifications of the notary public
     before whom the deposition is being taken is
24   hereby waived.

25

1    work?

2         A    To the best of my knowledge, it was the

3    January 31st date indicated.

4         Q    And do you know who you spoke to?

5         A    Michelle Holt.

6         Q    Do you know what her title was at Accenture

7    then?

8         A    I do not know.

9         Q    And how did you know who to contact when you

10   wanted to come back?

11        A    I think I contacted her first because she had

12   been involved in staffing previously and I didn't know

13   if she would be the right person, but it seemed like a

14   good place to start.

15        Q    And what did you say to her and what did she

16   say to you during that first conversation that you had

17   with her in January of '01?

18        A    As you see my notes are incomplete for that

19   conversation, but to the best of my recollection, I

20   informed her where I stood in terms of my recovery, the

21   fact that I had been cleared to work or at least maybe

22   not in written fashion to Accenture, but verbally

23   cleared to work by my doctors that I had every interest

24   and intention of resuming my career with Accenture.

25        Q    And in your notes it says, "HR team note from

1    you were willing to work?

2        A    That's what my doctors initially recommended

3    and that's what the original work release to Accenture

4    suggested.

5        Q    So do you recall it's got three dates here,

6    "Michelle Holt, January 31 '01, 2-14-01 and 2-22-01,"

7    are those the dates of your conversations with Michelle

8    about returning?

9        A    I believe they are.

10       Q    And during those conversations do you recall

11   telling her that your doctor said you could come back

12   to work as long as you could park near the building and

13   not have to travel beyond the Hartford/Springfield

14   area, work Monday, Wednesday and Friday from nine to

15   twelve in a quiet environment?

16       A    I do recall telling her that, yes.

17       Q    So that was what she was charged with,

18   finding you a job with those restrictions?

19       A    That was and please understand that that

20   changed over time as I recovered and I was later on

21   cleared to work five days a week, four hours a day.

22           MS. KAPPELMAN:  I'd like to ask the

23       court reporter to mark this as the next

24       exhibit, please?

25               (Whereupon, the referred to

1          document was Marked For Identification as

2          Defendant's Exhibit No. 20).

3     BY MS. KAPPELMAN:

4          Q    So she asked you to get a letter from your

5     doctor saying that stuff, right?

6          A    That was a condition of my return to work,

7     yes.

8          Q    Okay.  Directing your attention to what we've

9     marked as Exhibit 20 for your deposition, can you

10    identify that document for the record, please?

11         A    This appears to be my clearance to return to

12    work from Dr. Gerald Kaplan at Gaylord to Paula Miller

13    at the Benefit Center of Accenture.

14         Q    And this was a letter that your doctor sent

15    explaining the restrictions on your return to work

16    correct?

17         A    Yes, this is the letter that Accenture had

18    requested and if I recall there was some back and forth

19    in terms of both sides trying to get and state the

20    information that they required, but I believe this is

21    the result of that effort.

22         Q    Okay.  So what the doctor says here is that

23    you can work "three hours a day, three days a week, and

24    then increase to four hours a day, three days a week,"

25    and you are supposed to work "Monday, Wednesday and

1    Friday 9:00 a.m. to noon," right; is that what that

2    letter says?

3        A    I'm just reviewing it.  That's correct.

4        Q    It also says you are only supposed to be

5    assigned to your home office and not sent to other

6    locations until you are reassessed, right, and that you

7    be set up in an office that minimizes possible

8    distractions?

9        A    That's what it says.  The reference to home

10   office I think is a bit -- a bit misleading in that it

11   implies just the One Financial Plaza office as opposed

12   to the Hartford/Springfield area.

13       Q    And did you talk to Michelle Holt after she

14   received this letter?

15       A    I believe I did, yes.

16       Q    And what did she say to you and what did you

17   say to her about these restrictions?

18       A    I recall discussing them with her and her

19   understanding and agreement that this is what -- what

20   the doctors were recommending for me.

21       Q    Did she mention to you during this period of

22   time that the company was going through a reduction in

23   force?

24       A    I don't recall.

25       Q    Did she mention to you that the company,

1      parts of the company at least, were in a hiring freeze?

2          A    I don't recall that.

3          Q    Did you have a conversation about the fact

4      that the kind of job that you were hired to do didn't

5      fit necessarily within the nine to twelve, three day a

6      week timeframe?

7          A    I remember discussing with her that the job

8      may not, but my ability to assist somebody doing that

9      job who needed some help was much more feasible.

10         Q    Okay.  Did she mention to you that your

11     technical skills were not as up-to-date as someone's at

12     the company were?

13         A    I remember discussing with her what my skills

14     were and uh -- and what we could do upon my return to

15     quickly get me back up to speed.

16         Q    Okay.  And it says if you could direct your

17     attention--

18         A    May I refer back to the notes if that's what

19     you're reading from?

20         Q    Yes.  If I could direct your attention to

21     Exhibit 19 the third page.  It reflects a conversation

22     with Michelle Holt on March 26, 2001; do you see that

23     in the middle of the page?

24         A    I do.

25         Q    And it says, "Want to make sure not

1    jeopardizing long-term disability."  What did you mean

2    by that?

3         A    I think what I meant was that I was trying to

4    play by the rules and follow a proper procedure so that

5    both Accenture and Aetna and I would work towards the

6    partial disability arrangement.

7         Q    So you wanted to be able to keep getting

8    disability payments, but go back to work Monday,

9    Wednesday, Friday?

10        A    I wanted to as the contract with Aetna

11   provides I wanted to move from an area of total

12   disability to partial disability in an effort to get

13   back on with my life.

14        Q    So you wanted to continue to receive

15   disability payments but come back to work Monday,

16   Wednesday, Friday nine to twelve?

17        A    I wanted to play by the rules towards partial

18   disability.

19        Q    Is there any part of my statement that isn't

20   true; you wanted to continue to receive disability

21   payments, but come back to work Monday, Wednesday,

22   Friday nine to twelve?

23        A    If you change disability to partial

24   disability, I agree with you.

25        Q    Okay.  So when it says "long-term disability"

1      in this note on page 3 "want to make sure I'm not

2      jeopardizing long-term disability," what you meant by

3      that is that you want to make sure you can still

4      receive partial disability payments?

5          A    Correct.

6          Q    Okay.  At this point in March of 2001 what

7      were your symptoms?

8          A    My symptoms have never really changed.  It's

9      a matter of degree.

10         Q    Okay.  How were you limited in your day to

11     day ability to perform functions in March of 2001 by

12     you condition?

13         A    I could at that point perform functions

14     reasonably well, but the limitations was the amount of

15     mental and physical energy that it would take out of me

16     to perform those functions.  So it's not a matter of

17     what I could do.  It's a matter of how well and how

18     long I could do it.

19         Q    Okay.  And how long could you do the

20     functions of your job in March of 2001?

21         A    I hadn't had an opportunity to test this

22     recommendation, but the recommendation, and I bought

23     into it, was to try it Monday, Wednesday, Friday for

24     three hours a day and go from there as my ability

25     improved.

1    Q    Did the kind of projects that you were

2    usually put on as a consultant for Accenture lend

3    itself to doing them only Monday, Wednesday and Friday

4    from nine to twelve?

5    A    The kind of projects I was on were populated

6    by people who desperately could have used the

7    additional help that I could provide in that timeframe.

8    Q    Isn't if fair to say though that very few

9    projects only need you on them Monday, Wednesday and

10   Friday from nine to twelve, that usually when you go to

11   a client to do a project it's fulltime with the client

12   until it's done?

13   A    I think the assumption that you are making

14   with that question is that you are the primary person

15   doing that job and what I thought made the most sense

16   was for me to come back and assist somebody who

17   performed the job that I had done before who was badly

18   overworked, probably not performing at peak efficiency.

19   Q    So were you going to come back not as a

20   consultant; is that what you're saying?

21   A    I was going to come back in any capacity and

22   I think I made that clear to them that I wanted to

23   resume my career, but whatever I had to do to get my

24   foot in the door was fair.  However, my goal obviously

25   was to get back to consulting, yes.

1    Q    So you made it clear that you were willing to

2    come back as an analyst?

3    A    I don't know if I used the term analyst, but

4    I think I made it clear both for my health recovery and

5    for my career the best thing for me was to come back to

6    work.

7    Q    Okay.  And what did Ms. Holt do between March

8    of 2001 and November of 2001 to try to find a job that

9    would accommodate the restrictions that your doctor set

10   forth on Exhibit 20?

11   A    I think that information would probably best

12   come from her, but--

13   Q    No, I'm asking you.

14   A    I understand that.

15   Q    What is your knowledge about what Michelle

16   Holt did?  Strike that.  Were you touch with Ms. Holt

17   between March of 2001 and November 2001?

18   A    Yes, I was.

19   Q    And your notes reflect that you were in touch

20   with her, let's just go through the dates, March 30,

21   April 9, April 18, April 20, April 25, April 26, April

22   30, May 1, May 7, May 15, May 16, May 21; do you know

23   the date of this voicemail message that Amy typed up?

24   A    She typed this up as she was helping me

25   prepare a message that I ultimately left for Mark

1    Raymond on May 22, 2001.

2        Q    So when you say in this message, "I know

3    there have been a ton of changes to the firm and would

4    love to get your perspective on those changes as well

5    as any insights you may have about my return to work

6    and potential assignments," what were the ton of

7    changes to the firm that you're referring to in May of

8    2001?

9        A    The single biggest change was the change to

10   the name and the impact that had on your clients and

11   work in our separation from Arthur Anderson.

12       Q    So that was really the biggest change you

13   were referring to in "a ton of changes," you were

14   referring to the change to the name?

15       A    As I said, that was -- that was the most --

16   the most obvious one.  Beyond that at some point

17   Michelle had told me that the company was preparing for

18   an initial public offering which surprised me because

19   it had been a partnership for its -- for its duration.

20   I don't recall if that was another one of the changes.

21   The market units change, I don't recall if I knew about

22   that at this time or not.

23       Q    So it's fair to say that at least from March

24   2001 until May 2001 you had a lot of contact with

25   either Michelle Holt or Janice?

1      A    I made getting my job back my job.  I took it

2    very seriously, yes.

3      Q    My question is it's fair to say between March

4    of 2001 and May of 2001 you had a lot of contact with

5    Michelle Holt and Janice?

6      A    I did.

7      Q    And who is Janice?

8      A    Janice Beebe is Michelle Holt's executive

9    assistant or was at that time.

10      Q    Okay.  And so were you familiar with the

11    efforts that Michelle Holt was making to try to find

12    you replacement employment during this period of time?

13      A    I knew that -- let's put it this way, I knew

14    what she told me.

15      Q    Okay.  And what did she tell you?

16      A    Well, as evidenced by Document 19 that they

17    were working on finding a spot for me.

18      Q    Okay.  Did she tell you she spoke with Andrew

19    Burns the People's Matters Representative for the

20    Resources MU Unit in Hartford?

21      A    Are you referring to a particular date?

22      Q    No.  Did she tell you that in trying to find

23    you a position which met your restrictions she spoke to

24    the People's Matters Representative for the Resources

25    Market Unit in Hartford?

1     A     I do not recall if she told me that or not.

2     Q     Did she tell you that Mr. Burns told her that

3   he had no resources positions available in the

4   Connecticut office?

5     A     I do not recall being told that.

6     Q     Is it fair to say that you wouldn't have

7   accepted a position outside of Connecticut at this

8   point in time?

9     A     It would depend on the distance.

10     Q     So if you were to be sent to Boston, would

11   you go in early 2001?

12     A     In early 2001 I don't think that would have

13   met my doctor's recommendations.

14     Q     Right.  It actually doesn't meet his

15   recommendations--

16     A     Correct?

17     Q     --in Exhibit 20, correct?

18     A     Right, as I said.

19     Q     So basically the only positions that you were

20   open to with your restrictions were the ones in

21   Connecticut?

22     A     If you're talking about a position where I

23   physically was attending, yes.  If you're talking about

24   something with conference calls, e-mails,

25   video-conferencing, et cetera, I think that opened up a