1    variety of other opportunities.

2         Q    So are you saying that you could have worked

3    in San Francisco, but from your Connecticut office,

4    worked for someone in San Francisco from your

5    Connecticut office?

6         A    Yes, I believe I could or I could have

7    assisted somebody working in San Francisco.

8         Q    Did Ms. Holt tell you that she had contacted

9    Amy Salvatore the People's Matters Representative For

10   the Communications And High Technologies Market Unit?

11        A    The name is vaguely familiar to me, but I do

12   not recall any other details.

13        Q    Do you recall Michelle telling you that Ms.

14   Salvatore didn't have any communications positions

15   available in the Connecticut office?

16        A    I'm sorry.  I don't recall that.

17        Q    Do you recall that Ms. Holt spoke with Olga

18   Conway within the Financial Services Market Unit?

19        A    I do not recall that and let me -- let me

20   back up a step, if I may; when Michelle would tell me

21   the efforts that she was making a lot of times she

22   would not refer -- sometimes she would refer to people

23   by name, but often times she would not.

24        Q    Okay.  Why don't you tell me what you

25   remember about what Michelle told you about the efforts

1    she was making to find a job for you within the

2    restrictions you had provided?

3         A    Okay.  I remember that she was talking with

4    Marty Strong on an internal project.  I know that she

5    talked with Mark Raymond, Marty Kohl and Rick Hedgewood

6    about a number of government opportunities.  I know

7    that there was also an agreement at one point that the

8    government market unit would take me back even if

9    unassigned.

10        Q    Tell me what she said to you about her

11   conversations with Marty Strong in her efforts to find

12   you a position?

13        A    May I refer to the notes, or are you asking

14   me to do this from memory?

15        Q    Absolutely, refer to anything that would

16   refresh your recollection--

17        A    Okay.

18        Q    --about what Michelle Holt told you about her

19   opportunities to find you replacement employment within

20   the restrictions you provided?

21                  (Witness looking at notes).

22        A    I'm not seeing it in these notes.  Either I

23   missed it or it's not included.

24        Q    Look at May 1, 2001, the bottom of the page

25   it says "two possibilities, government," and then

1    "internal."

2        A    Okay, thank you for finding that for me.

3        Q    Yes.

4        A    My recollection much as the note suggests is

5    that Marty needed some help as the notes mention "was

6    in crunch mode," and Michelle was looking to set up a

7    conversation for ways that I could assist her in that.

8        Q    And what happened with that?

9        A    I do not recall if that conversation ever

10    took place.  I don't have a recollection of it.

11        Q    What else do you remember that Michelle Holt

12    did to try to find you work in this timeframe?

13        A    She granted me permission to attend a

14    government community meeting where I had a chance to

15    meet some other members of the government community and

16    network.  Based on her conversations with me she talked

17    to people at both the local and market level and maybe

18    even the national level trying to find opportunities

19    for me and/or get agreement for me to come back

20    unstaffed to work on one, training and getting my

21    skills quickly back up to speed or to work on proposals

22    to sell new work.

23        Q    Did she tell you why she was having a hard

24    time finding a position for you?

25        A    At some point she told me that the company

1    was preparing for an initial public offering and I

2    think the phrase that she used was that the company was

3    being run very lean.

4         Q    So they weren't hiring a lot of new people;

5    is that what you took from that?

6         A    I took that to mean they didn't want people

7    who were unstaffed, not necessarily that they weren't

8    hiring them, but they wanted people to be staffed and

9    that's why their preference would be to get me directly

10    on a project, but they also did agree to take me back

11    if not.

12         Q    Okay.  You say here, "One possibility May 1,

13    2001 was in the government market unit with Mark

14    Raymond."  Do you see that in revenue services?

15         A    I do.

16         Q    Okay.  What happened with that opportunity

17    that she tracked down for you?

18         A    There were a number of government

19    opportunities and some of them were not won.  Others

20    kept getting delayed past the point where I was

21    ultimately terminated.

22         Q    Okay.  So in your notes you have a message to

23    Mark Raymond that we were just looking at where you

24    talk about "a ton of changes"?

25         A    Are you referring to the list on May 22nd?

1        Q     The one that Amy typed up for you?

2        A     That was notes.  If you want to look at the

3   actual call, it's on the next page.

4        Q     On May 22nd, okay.  You said, "I have been

5   working with Michelle Holt for several months to make

6   it happen."  When you say you have been working with

7   her, so Michelle Holt was trying to find you a position

8   for several months, right?

9        A     Based on me contacting her in January and

10  this being in May, yes.

11       Q     Okay.  And all those phone calls that you had

12  with her?

13       A     Correct.  Again, I can't -- I can only tell

14  you what she told me she was doing--

15       Q     Right.

16       A     --but that's my understanding of it.

17       Q     Okay.  And you say your "progress is slow.  I

18  am in an unusual situation.  I want to return

19  part-time."

20       A     Uh-hum.

21       Q     That was an unusual situation for Accenture?

22       A     Unusual in the sense that as you have

23  indicated most people are there on a fulltime basis.

24  What I was looking to do to come back in any capacity

25  including assisting somebody who is overworked.

1      Q    Now, if you look at the bottom of the page it

2   says that on May 30th you actually had a really good

3   conversation with Mark Raymond.

4      A    Uh-hum.

5      Q    Right?

6      A    That's what the note says, yes.

7      Q    And it says he was going to try to find a

8   role for you on a government ERP job using Oracle or

9   File Net, which were the two things that you said you

10  were conversant on, right?

11     A    Correct, I used those on a previous

12  engagement.

13     Q    And he invited you to a government community

14  meeting?

15     A    That's correct.

16     Q    What happened with his efforts to try to find

17  a role for you using Oracle and File Net?

18     A    As I mentioned before, there were a couple of

19  government opportunities and in my conversations with

20  Michelle I lost track of what happened to which one.  I

21  don't know if that was something that Accenture lost or

22  it was delayed past the point where I was terminated or

23  they just didn't find a match for me.  I can't tell you

24  that.

25     Q    So despite his efforts either they didn't

1    have the opportunity or it wasn't a good match for you?

2        A    Well, it didn't happen.  Let's put it that

3    way.

4        Q    Did you get the impression that Mark wasn't

5    telling you the truth when you spoke to him on May 30

6    and that he wasn't looking for an opportunity for you?

7        A    Not at all.

8        Q    Did you get the impression in any of these

9    conversations with Michelle Holt that she wasn't truly

10   trying to find an opportunity for you within your

11   restrictions?

12       A    I was certainly frustrated by the lack of

13   progress.

14       Q    But listen to my question, it's very

15   important; did you get the impression during any of

16   these many conversations you reported with Michelle

17   Holt that she wasn't telling you the truth that she was

18   truly trying to find you an opportunity with your

19   restrictions?

20       A    I believe she was trying.  I don't know how

21   hard or how big a priority it was for her or other

22   people based on how slow things moved.

23       Q    Okay, but you believe she was trying?

24       A    I believe she was trying and I have no reason

25   to believe she was lying to me.  She's a good person.

1    Q    And she did tell you she was unable to find a

2    match for your skill set with your restrictions?

3    A    I know that Accenture gave up the search and

4    terminated before -- before finding something.

5    Q    Do you remember her telling you that Mark

6    Raymond could not assign you to the government market

7    unit because you didn't have any knowledge of the

8    PeopleSoft Program, the software that the government

9    market unit used on its Connecticut projects in 2001?

10    A    Are you referring to a particular date?

11    Q    I'm referring to any date.  Do you remember

12    having any conversation with Michelle Holt where she

13    told you that it wasn't going to work out for you with

14    Mark Raymond in the government market unit because you

15    weren't conversant with the PeopleSoft Program which

16    was the software that the government market unit

17    currently used at that time on its Connecticut

18    projects?

19    A    Your question is a global question.  I do

20    remember a conversation with Michelle Holt about

21    PeopleSoft.  I believe it was in the context of a

22    particular engagement, not their inability to take me

23    back at any time anywhere.

24    Q    Okay.  What exactly do you remember about

25    what Michelle told you about PeopleSoft?

1       A     My recollection is that there was an

2   opportunity with PeopleSoft for a project for somebody

3   who knew PeopleSoft and I got the impression that

4   uh--that Accenture was not willing to make the

5   reasonable accommodation for me to do a brief amount of

6   training and come back up to speed quickly on that.

7       Q     So the government market unit you don't

8   understand that the government market units uses

9   PeopleSoft on all of its Connecticut projects?

10      A     It's not a matter of whether I understand it

11  or not.  I don't know what they use on projects

12  throughout the world.

13      Q     And Michelle didn't tell you that; are you

14  saying that Michelle never told you that the government

15  market unit uses PeopleSoft on all of its projects?

16      A     That wouldn't make any sense.  That would be

17  like trying to solve every problem with a hammer if

18  you're trying to drive a screw.

19      Q     So it wouldn't make any sense for the

20  government market unit to use PeopleSoft on its

21  Connecticut projects?

22      A     I know for a fact that's not the only

23  solution they used because of the Oracle and File Net

24  proposal.

25      Q     What are the other solutions, what are all

1    the other solutions that the government market unit

2    uses?

3         A    You're asking me a question I do not know the

4    answer to.

5         Q    Right.  Do you know whether you are

6    conversant in the other solutions that the government

7    market unit uses?

8         A    I know that if there's something I'm not, I

9    would get back up to speed on it very quickly.

10        Q    But as you sit here today you don't know if

11   you were conversant in 2001 in all of the technologies

12   that the government market unit was using?

13        A    You're asking me a question that I can't

14   answer because there are thousands of projects and I

15   don't know what technologies are in use.

16        Q    Right.  At some point Michelle Holt told you

17   that she couldn't find a position for you; is that

18   correct?

19        A    At some point she told me -- actually she

20   initially told my wife that -- that Accenture was

21   terminating me.

22        Q    At some point did it become clear that she

23   wasn't able to find a job for you with your skills and

24   your doctor's restrictions?

25        A    There was a point where it certainly wasn't

1    looking good and it wasn't looking promising and I had

2    hoped that my doctor's approval to ease the

3    restrictions to the point to where I was working four

4    hours a day, five days a week would open up additional

5    opportunities, but that did not occur.

6        Q    On August 13, 2001 you have a note which says

7    "left message with Janice Beebe.  I called, please call

8    back.  She called back with no progress."  Do you see

9    where I am reading from?

10        A    I do and the she being Michelle Holt.

11        Q    "She had talked to the government HR rep, no

12    current positions, told her that I was getting

13    increased pressure from Aetna, told her 'I can't be the

14    only employee who is gone for a while who needs to come

15    back part-time.'  Her response was 'You left two

16    reorganizations ago.'"

17        Does that refresh your recollection that at

18    least in August of 2001 Michelle told you that there

19    had been two reorganizations at Accenture while you

20    were away on leave?

21        A    Yes.

22        Q    Does it refresh your recollection at least

23    that in August of 2001 she said "there were no current

24    positions available in the government department"?

25        A    I took that to mean that they were going to

1    back out on their agreement to take me back unstaffed

2    and that things certainly weren't looking good.

3         Q    If you turn the page it was at least clear by

4    August 20 of 2001 that the government wasn't able to

5    find a home for you with your skill set and your

6    restrictions, correct?

7         A    You're referring to August 20?

8         Q    Right.

9         A    Correct.  As I said before, I took that to

10   mean that obviously things were going poorly and that

11   the agreement to take me back unstaffed was not going

12   to happen.

13        Q    In the bottom of this same page it says that

14   "November 7,2001 Michelle told Amy you were being laid

15   off."

16        A    Correct.

17        Q    Okay.

18        A    And I think that she would not have -- I

19   think that Michelle was a little bit uncomfortable with

20   telling that to Amy and not to me, but they know each

21   other.  They met previously and I think she was

22   comfortable with that.  It was actually on the next day

23   that Michelle informed me; although, clearly I knew

24   what was happening from my conversation with my wife.

25        Q    And when did you start your training program

EXHIBIT E

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

TODD BENNETT                          :

VS.                                   :        NO. 3:03CV80(AVC)

ACCENTURE, LLP                        :        MARCH 29, 2004

## PLAINTIFF'S RULE 56(a)(2) STATEMENT OF MATERIAL FACTS IN DISPUTE

**A.    Plaintiff's Response to Defendant's Rule 56(a)(1) Statement**

1.     Accenture is a global management and technology consulting firm. *See* Affidavit of Toni L. Corban, hereinafter "Corban Aff.," filed simultaneously herewith at ¶ 5.   **AGREE.**

2.     The Company's primary mission is to help clients become more successful in their own businesses and operations. Corban Aff. at ¶ 6. **AGREE.**

3.     The Company serves the major global industries through its five Market Units (Resources, Communications and High Technologies, Financial Services, Products and Government) and a number of Global Service Lines. Corban Aff. at ¶ 7.  **AGREE.**

4.     Todd Bennett began his employment as an analyst in Accenture's Connecticut office, located in Hartford, on August 17, 1992. See Deposition of Todd Bennett dated August 29, 2003, hereinafter "Bennett Dep.," attached as

Exhibit A to Affidavit of Lynn  A. Kappelman filed simultaneously herewith, at

pages 48-49.[1]  **AGREE.**

5.      Mr. Bennett was 22 years old at the time. Bennett Dep. at 21.  **AGREE.**

6.      Prior to August 2002, Accenture's Hartford office was the Company's only

location in Connecticut.  **AGREE.**

7.      Soon thereafter he became a staff consultant. Bennett Dep. at 45-50.

**AGREE.**

8.      As a staff consultant, Mr. Bennett primarily was responsible for solving the

business problems of his Accenture clients by directing them to the most

effective technologies to meet their business needs. Bennett Dep. at 49-50;

Corban Aff. at ¶ 11. **AGREE.**

9.      Specifically,  Mr. Bennett worked with clients at their own facilities to

maintain and solve problems with their computer systems. Bennett Dep. at 45-

46; Corban Aff. at ¶ 12. **AGREE.**

10.      On average, he would work seventy to eighty hours a week in this

position. Bennett Dep. at 50-52. **AGREE IN PART.  Employees at Accenture**

**are compensated for their overtime.  For the first 80 hours each year,**

**employees received compensatory time.  After 80 hours, the plaintiff**

---

        [1]      Prior to August 2002, Accenture's Hartford office was the
Company's only location in Connecticut. Corban Aff. at ¶  9.

received extra compensation at an hourly rate based upon his annual salary.  Ex. 7, Plaintiff's Affidavit, §§ 3-4.

11.      It was fairly common to work long hours as an analyst or a consultant at Accenture. Bennett Dep. at 61-63; Corban Aff. at ¶ 13.  **AGREE IN PART. The plaintiff was paid extra compensation for overtime after the first 80 hours annually.  For the first 80 hours, employees received compensatory time. Ex. 7, Plaintiff's Affidavit, ¶3.**

12.      Mr. Bennett performed reasonably well, and the Company promoted him once and granted him annual salary increases. Bennett Dep. at 58-62; Corban Aff. at ¶ 14. **DISAGREE.  Plaintiff's work was described as "consistently outstanding" by his supervisor since his employment commenced at Accenture.  Plaintiff's Exhibit 1.**

13.      In or about December 1996,  Mr. Bennett took several intermittent sick leaves claiming fatigue and weakness. Bennett Dep. at 64-68; Corban Aff. at ¶ 15. **DISAGREE.  Sick leave was not intermittent, but consistent as of the pay period ending 12/15/96, continuing  through the pay period ending April 15, 1997; averaging 30 hours per pay period. Ex. 2**

14.      Mr. Bennett applied for a short-term disability leave on February 14,  1997, and began that leave on April 7, 1997. *See* Application For Family and/or

3

Personal Medical Leave of Absence attached to the Corban Aff. as Exhibit A; Bennett Dep. at 74,79-81. **AGREE.**

15.    According to correspondence from Mr. Bennett's physician, Dr. Robban Sica, Mr. Bennett suffered from hypothyroidism and candida enteritis, which caused him fatigue, weakness, chronic sinusitis and multiple allergies. *See* letter from Dr . Robban Sica, dated May  23, 1997, attached to the Corban Aff. as Exhibit B; *see also* Bennett Dep. at 74-76.

16.    By letter, Dr. Sica stated that he expected Mr. Bennett to recover within two to three months. *See* Exhibit B attached to Corban Aff. **AGREE IN PART.** **Dr. Sica revised her diagnosis and her opinion subsequently. Ex. 4**

17.    Thereafter, Mr. Bennett submitted a long- term disability leave application to Accenture's insurance carrier on June  17,  1997. Corban Aff. at ¶ 19.

**AGREE.**

1.    Accenture's long-term disability insurance carrier approved Mr. Bennett's application and he began long-term disability leave on July 7, 1997. Bennett Dep. at 86; *see* letter from Daniel Dolyak, dated August  30, 1997  attached to the Corban Aff. as Exhibit C. **AGREE.**

19.    In  1997, Dr. Zampierson diagnosed Mr. Bennett with "copper toxicity." Bennett Dep. at 81-83. **AGREE.**

20.    Mr. Bennett surmises that he developed this condition from the well water

in East Granby, Connecticut where he grew up. Bennett Dep. at 84-85. **AGREE.**

21.    No other members of his family, and none of his  neighbors, have had any similar problems with copper toxicity. Bennett Dep. at 84-86. **AGREE.**

22.    Mr. Bennett received Long-Term Disability benefits from July 6, 1997 until April 7, 2002. Bennett Dep. at 89; Corban Aff. at ¶ 21.  **AGREE.**

23.    During this four and a half year  period, Mr. Bennett would spend his time during the day at two gyms in Unionville, Connecticut and Windsor, Connecticut, where he used the sauna, shower and whirlpool to "ramp up his excretions of copper." Bennett Dep. at 91-93.  **DISAGREE. Plaintiff was involved in many other activities, such as receiving chelation therapy at the University of Michigan Metal Toxicology Clinic, to leach the copper out of his body. Ex. 3, Ex. 4.**

24.    During Mr. Bennett's medical leave  from 1997 to 2001, Accenture made several organizational changes. Bennett Dep. at 95-98; Corban Aff. at ¶ 22. **AGREE.**

25.    The largest change occurred in the Spring of 2000 when Accenture deployed its practice personnel, including consultants, into various Market Units based on industry. Corban Aff. at ¶ 23. **AGREE.**

26.    Because Mr. Bennett did not focus on a particular industry at the time he began his disability leave, Accenture could not yet assign him to a Market Unit.

Corban Aff. at ¶ 24. **AGREE.**

27.    Mr. Bennett, however, remained assigned to the Hartford office. Corban Aff. at ¶ 25. **AGREE.**

28.    On January 31, 2001, Mr. Bennett, now 27 years old, called Michele Holt, an EEO Officer in the Hartford office, and informed her that his physician had released him to return to work on a modified schedule. Bennett Dep. at 89-90, 112-113; *see also* Affidavit of Michele Holt, hereinafter "Holt Aff.," filed simultaneously herewith at ¶ 7. **AGREE.**

29.    In response, Ms. Holt explained to Mr. Bennett that she would initiate the appropriate reinstatement procedures and call him back. Bennett Dep. at 113; Holt Aff. at ¶ 8. **AGREE.**

30.    Shortly thereafter, Ms. Holt called Mr. Bennett and asked him to provide documentation to Accenture from his physician concerning Mr. Bennett's ability to return to work. Bennett Dep. at 113; Holt Aff. at ¶ 9. **AGREE.**

31.    Mr. Bennett requested that Accenture ask his physician directly for the documentation. Holt Aff. at ¶ 10. **AGREE.**

32.    On February 28,2001, Paula Miller, Hartford Benefits Contact, sent a request to Mr. Bennett's physician, Dr. Jerrold Kaplan, asking for Mr. Bennett's return to work date, restrictions on his work, and the duration of his restrictions. Holt Aff. at ¶ 11; *see also* fax from Paula Miller, dated February 28, 2001,

attached to the Holt Aff. as Exhibit A.

**AGREE.**

33.    Dr. Kaplan sent a letter on March 5, 2001 to Ms. Miller, stating that Mr.

Bennett could begin working on March 12, 2001 on a limited basis. *See* letter from

Dr. Jerrod Kaplan, dated March 5,2001, attached to the Holt Aff. as Exhibit B.

**AGREE.**

34.    Specifically, Dr. Kaplan outlined Mr. Bennett's restrictions, stating in

relevant part:

> [Mr. Bennett] can work three hours per day, three days
> per week for the first two weeks and then increase to
> four hours per day, three days per week for the next
> two weeks. He should continue at that level until he is
> re-evaluated at Gaylord Hospital. In order to make his
> transition the most successful, I would suggest that his
> three hours per day be done for a 9 a.m. to 12 noon
> shift, Monday, Wednesday, and Friday. When the
> extra hour is added in two weeks, I would suggest that
> it be done also on a Monday, Wednesday , Friday
> schedule. . . . He should be assigned just to his home
> office and not be sent to other locations until he is
> reassessed at Gaylord Hospital. I would recommend
> that he be set up in an office that minimizes possible
> distractions. It would be helpful for Mr. Bennett to have
> parking available at his office location so that his
> fatigue can be minimized.

Exhibit B attached to Holt Aff.

**AGREE.**

35.    Ms. Holt immediately began looking for a position within the Company to accommodate Mr. Bennett's medical restrictions and his skill set. Bennett Dep. 115-121; Holt Aff. at ¶ 14. **DISAGREE. In their response to plaintiff's interrogatories to defendant, the defendant produced paltry evidence of any effort to locate a temporary part-time assignment for the plaintiff. Ex. 5**

36.    In 2001, the essential job functions of analyst or consultant included, but were not limited to, ability to lift light materials, proficiency in applicable technologies; understanding in systems integration and interactive design; ability to work overtime, as required; ability to travel to different client locations; ability to work during business hours; proficiency in written and verbal communication skills; ability to work creatively and analytically in a problem-solving environment; ability to work independently in work and/or client settings; and ability to speak and write English proficiently. Holt Aff. At ¶6. **AGREE.**

37.    By this time, Mr. Bennett had been out of work for approximately four years and had no experience or training on Accenture's current systems. Bennett Dep. 103-108; Holt Aff. at ¶ 15.    **DISAGREE. The defendant was using Oracle and File Net in 2001 and the plaintiff had experience with both systems. Ex. 12, Plaintiff's deposition, pps. 102-106.**

38.    Indeed, the technology Mr. Bennett used prior to his disability leave was significantly outdated. Bennett Dep. 103-108; Holt Aff. at ¶ 16.

8

**AGREE.**

39.. During 2001, Accenture suffered an economic downturn, during which it implemented several workforce reductions in its Consulting and Business Practices. Bennett Dep. at 96-99; Holt Aff. at ¶ 17.    **AGREE.**

40. In response to its economic situation, Accenture also issued a hiring freeze in its Business Practices group and deferred the start dates for its new hires. Bennett Dep. at 97-99; Holt Aff. at ¶ 18.  **AGREE.**

41. Despite these economic restrictions, between March 2001 and November 2001, Ms. Holt contacted each of Accenture's five Consulting Market Units ("MUs") in the Hartford office in an effort to find Mr. Bennett a position in Connecticut. Holt Aff. at ¶ 19.    **AGREE.**

42. For example, she spoke with Andrew Burns, the People Matters ("PM") Representative for the Resources MU in Hartford. Holt Aff. at ¶ 20.  Mr. Burns had no Resources positions available in the Connecticut office. Holt Aff. at ¶ 20. **AGREE.**

43. Ms. Holt contacted Amy Salvatore, the PM Representative for the Communications and High Technologies MU . Holt Aff. at ¶ 21. Likewise, Ms. Salvatore did not have any Communications positions available in the Connecticut office. Holt Aff. at ¶ 21. **AGREE.**

9

44.    Within the Financial Services MU, Ms. Holt spoke with Olga Conway, the PM Representative for the Banking and Insurance Group in Hartford, and Hilary McCracken, the PM Representative for the Health Services Group in Hartford, and learned that there were no opportunities for employment available at all in either department. Holt Aff. at ¶ 22. **AGREE.**

45.    Similarly, there were no employment opportunities available in the Products MU in Connecticut. Holt Aff. at ¶ 23. **AGREE.**

46.    Ms. Holt also contacted Tara Parisi, the PM Representative for the Government MU in Hartford. Holt Aff. at ¶ 24. The Government MU in Hartford had a possible employment opportunity for Mr. Bennett and, therefore, Mark Raymond, an Associate Partner in the Government MU, contacted Mr. Bennett to come in for a meeting. Bennett Dep. 127-133; Holt Aff. at ¶ 24.    **AGREE.**

47.    Mr. Raymond met with Mr. Bennett on June 1, 2001. Bennett Dep. 127-133; Holt Aff. at ¶ 25. However, Mr. Raymond could not assign Mr. Bennett to his MU because Mr. Bennett did not have any knowledge of the Peoplesoft program, the software that the Government MU currently uses on its Connecticut projects. Holt Aff. ¶25. **DISAGREE. Peoplesoft was not the only program used by the Government Unit in Connecticut. It may have been used in one contract with the state. Ex. 12, Plaintiff's deposition, pps. 134-136. In any case, since the plaintiff was a computer expert and he would have had no**

difficulty in digesting the Peoplesoft program, in the same manner that other similarly trained Accenture employees learn to adapt to new software programs.  (See 1996 annual review, Ex. 1)

48.     In June 2001, knowledge of the  Peoplesoft program was an essential function of the position. Holt Aff. at ¶ 25. **DISAGREE. See Response to No. 47, above.**

49.     Ms. Holt even searched beyond the Consulting MUs and contacted Martha Strong regarding opportunities on the Quality Client Survey Team in the Business Practices group in Connecticut. Holt Aff. at ¶ 26.

Ms. Strong informed Ms. Holt that the Business Practices group was under a hiring freeze order and she could not hire or transfer any person into the group. Holt Aff. at ¶ 26.     **AGREE.**

50.     Ms. Holt also contacted Marty Cole, the Location Lead Partner for the Company, but he also could not find Mr. Bennett a position because many of the MUs were undergoing workforce reductions. Holt Aff. at ¶ 27.

**DISAGREE.  The defendant refused to provide the plaintiff with the number of employees who were eliminated from the Connecticut workforce as part of their RIF program during this period. (Ex. 6, Response to Interrogatory No. 6)**

51.     Due to the state of its business and the  Company's inability to locate a position for Mr. Bennett that would accommodate his work restrictions and skill

sets, Accenture terminated Mr. Bennett's employment. Holt Aff. at ¶ 28.

**DISAGREE. Ex. 7, Plaintiff's Affidavit, §§3-13.**

52.    On November 7, 2001, Ms. Holt called Mr. Bennett's home, but he was unavailable. Bennett Dep. at 136-138. Ms. Holt spoke with Mr. Bennett's wife, who stated that Mr. Bennett and she had come to the conclusion that Accenture did not have a position for him. Bennett Dep. at 136-138; Holt Aff. at ¶ 29. Ms. Holt did not discuss Mr. Bennett's termination in detail with Mrs. Bennett at that time, but scheduled a telephone conference with Mr. and Mrs. Bennett for the following day. Holt Aff. at ¶ 29. **DISAGREE. Plaintiff did not say that Ms. Holt called him at home and also did not say that he was unavailable. He does state that his wife told him that she had spoken with Ms. Holt.  Ex. 12, p. 138.**

56.    On November 8, 2001, Ms. Holt called Mr. and Mrs. Bennett and informed them that Accenture was unable to find a position for Mr. Bennett and, thus, had to terminate his employment. Holt Aff. at ¶ 30. **AGREE.**

**B.    Rule 56(a)(2) Statement of Material Facts in Dispute**

1.    The plaintiff was qualified to return to work part-time as of the spring of 2001; among other alternatives, he was available to assist other consultants and reduce overtime hours, . **Ex. 7, Plaintiff's affidavit, §3-13, Defendant's Statement of undisputed facts, ¶¶s 9, 10.**

2.    The defendant made no real attempt to re-instate the plaintiff's employment; it's miscellaneous inquiries to various departments in the Hartford office did not constitute a real effort to return the plaintiff to work on a part-time basis. **Ex. 8.**

3.    The plaintiff's skills could easily have been put to use in a part-time position as of the spring of 2001, whether the defendant was in a cost-cutting mode or not. **Ex. 7, Plaintiff's Affidavit, §§3-13.**

4.    Since the employees were frequently asked to work over-time hours, the defendant could have saved expense by utilizing the plaintiff in a part-time capacity.  **Ex. 7, §§3-4.**

5.    There is evidence that the defendant sought to terminate the plaintiff as early as August, 2001, and wondered aloud whether his receipt of LTD benefits posed a stumbling block to such a plan. **Ex. 8**

6.    Defendant's refusal to disclose the number of professional level employees who were actually terminated from the Hartford offices of Accenture during the relevant time period permits an adverse inference to be drawn against the defendant on the issue of attempts to accommodate the plaintiff; the defendant's rationalization concerning reduction in force during 2001 was pretext to avoid re-instating a person with a disability.  **Ex. 6**

7.    The defendant claims that the plaintiff was terminated due to a reduction in force; he was never offered any severance pay, although if other employees were  terminated during the same time period, they were presumably offered the plan. **Ex. 13, Defendant's Separation Plan as of 9/01, Ex. 7, §14.**

THE PLAINTIFF

BY: _Katrena Engstrom_ (signature)
KATRENA ENGSTROM
Federal Bar No. ct09444
51 Elm Street
New Haven, CT 06510
(203)562-9931
FAX: (203)776-9494
E-Mail: kengstrom@johnrwilliams.com
His Attorney

14

## CERTIFICATION

A copy of the foregoing was mailed, first class, on the date set forth above, to the following counsel of record:

Damian W. Wilmot, Esq.
Seyfarth Shaw
Two Seaport Lane, Suite 300
Boston, MA 02110

Douglas Varga, Esq.
Zeldes, Needle & Cooper
1000 Lafayette Blvd.
Bridgeport, CT 06604

KATRENA ENGSTROM

15